IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
SOUTHERN DIVISION
Case No 7:14-CV-00157-D

| | |
|---|---|
| CTB, INC., | ) |
| | ) **PLAINTIFF'S OBJECTION AND** |
| Plaintiff, | ) **APPEAL FROM THE MAGISTRATE** |
| | ) **JUDGE'S MARCH 23, 2016 ORDER ON** |
| v. | ) **DEFENDANT'S MOTION FOR** |
| | ) **SPOLIATION SANCTIONS AGAINST** |
| HOG SLAT, INC., | ) **CTB, INC.** |
| | ) |
| Defendant. | ) |

Plaintiff CTB, Inc. ("CTB"), by counsel, herein respectfully objects to and appeals the Magistrate's March 23, 2016 Order granting, in part, the Motion For Spoliation Sanctions filed by Defendant HOG SLAT, INC. as follows:

## INTRODUCTION

Magistrate Judge James E. Gates entered an Order on March 23, 2016 addressing a number of motions presented by the parties, and which included a finding that CTB improperly spoliated evidence thereby warranting sanctions in the form of attorneys' fees for Defendant and the recommendation of adverse inferences at trial. Respectfully, there was nothing in the record before the Magistrate, and there is nothing in the Magistrate's Order, that even hints at the ***willful*** destruction of ***relevant*** evidence by CTB. Further, the Magistrate was simply wrong to conclude that CTB "took a cavalier approach to its preservation obligation" given the evidence establishing CTB's robust document retention policy and a total absence of any evidence that any relevant document was destroyed.

The Magistrate wrongly concluded that CTB's failure to produce "competitive advertisements" qualified as the deliberate destruction of relevant documentation. The Magistrate recommended an inference that the allegedly missing competitor advertising materials were somehow adverse to CTB's product configuration trade dress application before the USPTO. Yet, there is no explanation anywhere in the Magistrate's Order, or in any of Defendant's papers, as to exactly what was in the competitor

1

advertisements that could have been adverse to CTB's application. Neither the Magistrate nor the Defendant ever articulated what was or could have been relevant in a competitor's advertisement that made it germane to any question asked by the Trademark Office examiner. In short, there is ***nothing*** about a competitor's advertisements that could jeopardize CTB's trade dress application in this case, such that, even with a broad definition of relevance under the Federal Rules of Civil Procedure, competitor advertisements were never relevant in this case and would not fall under the protections of any litigation hold letter or any litigation document retention protocol.

The Magistrate also found that sanctions and an adverse inference were appropriate for the purported destruction of certain information employed by CTB's survey expert, but maintained on a third-party server. As shown below, there is no evidence that CTB or its expert caused the destruction of any evidence. Instead, the most the evidence shows is that CTB's expert could not confirm that the information she provided to Defendant's expert was the total universe of information because the third-party provider, and not the expert, had apparently purged the information from the provider's server.

In sum, the Magistrate's ruling was clearly erroneous in finding that sanctions were warranted against CTB. The absence of evidence of any missing relevant documentation undercuts the severity of the Magistrate's ruling. This Court should reverse the entry of sanctions against CTB.

## BACKGROUND

On July 30, 2014, CTB filed its Complaint alleging, *inter alia*, trademark infringement in violation of the Lanham Act as against Defendant. (Dkt.#3.) CTB is the owner of United States Trademark Registration No. 4,116,988, issued on March 27, 2012 on the Principal Register, for the Product Configuration Trade Dress ("Configuration Trademark"); and CTB is the owner of U.S. Trademark Registration No. 4,290,371, issued on February 12, 2013 on the Supplemental Register for the red/gray color combination ("Color Trademark"). CTB has alleged that Defendant illegally copied (1) the Configuration Trade Dress and (2) Color Trade Dress which CTB uses on its MODEL C2® PLUS feeder ("C2 PLUS").

2

On September 23, 2014, Defendant filed its Answer, Affirmative Defenses and Counterclaims. (Dkt.#12.) As its Fifth and Sixth Affirmative Defenses, Defendant asserted "Inequitable Conduct and Fraud on the United States Patent and Trademark Office" against CTB for its prosecution of the trademark registrations at issue in the instant case. Any claim for fraud on the Trademark Office in the prosecution of trademarks requires a showing of specific intent to defraud: "a trademark is obtained fraudulently under the Lanham Act only if the applicant or registrant knowingly makes a false, material representation with the intent to deceive the [US]PTO." *In re Bose Corp.*, 580 F.3d 1240, 1245 (Fed. Cir. 2009). Defendant has the burden of proving that CTB either (a) intentionally provided false information to the Trademark Office or (b) intentionally omitted material information in its submissions to the Trademark Office.

Defendant's attack on both trade dress registrations is that the protected features are "functional," where functional aspects of a product are not eligible for trade dress protection under the Lanham Act. *In re Morton-Norwich Products, Inc.*, 671 F. 2d 1332, 1343 (C.C.P.A. 1982). More precisely, Defendant wants to argue CTB's trademark registrations under the Lanham Act are void because CTB intentionally failed to provide the Trademark Examiner with purported evidence that CTB's trade dress is functional. With the close of discovery, it is indisputable that Defendant has no evidence whatsoever that CTB's trade dress features are functional in any way. As such, Defendant has been left to make the case for its Affirmative Defenses by way of adverse inferences for purported discovery violations, as argued to, and found by the Magistrate in his March 23, 2016 Order. To understand the issues underlying the Magistrate's mistaken findings in the March 23, 2016 Order, it is essential to understand, and distinguish, the two different trade dress prosecution histories.[1]

---

[1] The Magistrate heard the Motion For Sanctions during a joint hearing with two other motions: Hog-Slat's Motion to Compel and CTB's Motion to Quash. All of the Motions included numerous exhibits and cross-referenced documents. CTB presented the prosecution histories as part of its Motion to Quash, but the documents were referenced by all parties during the lengthy oral argument before the Magistrate on February 3, 2016.

3

### A. CTB's Protectable Trade Dress.

CTB manufacturers and markets systems and solutions for producing grain, poultry, pigs and eggs, and for processing poultry. CTB, through its Chore-Time Group division ("Chore-Time") designs, manufactures, and markets equipment for poultry grow-out facilities for breeder and broiler chickens. Broiler chickens are bred and raised specifically for meat production, while breeder chickens are used to produce eggs that hatch into broiler chickens.

Chore-Time revolutionized the industry in the early 1960s by inventing an entirely new means of moving feed throughout the building using a flexible auger, and with it, a revolutionary type of mechanized feeder, known as a "pan feeder." A pan feeder usually consists of a (1) pan (the bottom portion in which feed collects), (2) grill (top portion of the feeder, which is usually made up of spokes of varying number, size, and shape), and (3) center cone (central feed distribution mechanism). Different manufacturers use different designs for the shape and color of the pan and grill, so that feeders are made in a variety of shapes, colors and color combinations.

Fundamentally, this case is about CTB's C2 PLUS feeder and its shape and color combination. The C2 PLUS has two (2) distinct claimed forms of trade dress: (1) a pan structure and a grill structure wherein, when viewed from any side, the profile of the feeder has a flattened octagonal silhouette (Configuration Trade Dress); and (2) a distinctive color scheme of having the pan in the color red and the grill in the color gray (Color Trade Dress). Defendant has been selling poultry feeders substantially identical to the C2 PLUS feeder, as shown below, in which the (a) Defendant's product is located on the left and (b) CTB's C2 PLUS is on the right:

4



Defendant's pan feeder utilizes the CTB Trade Dress in its entirety.

### 1. The Prosecution History of the Configuration Trademark.

The Configuration Trademark is valid and subsisting, and is in full force and effect. (A List of Attachments is attached hereto as **Exhibit 1**. A copy of the Configuration Trademark is attached hereto as **Exhibit 2**.) In Count I of the Complaint, CTB asserts a claim that Defendant's use of the Configuration Trademark constitutes infringement in violation of 15 U.S.C. §1114(1).

On November 18, 2010, CTB filed a trademark application, for the Principal Register, for the Configuration Trade Dress ("Configuration Application"). (*See* Trademark Application, Serial Number 85/180,347, a copy of which is attached hereto as **Exhibit 3**.) Soon thereafter, on February 3, 2011, CTB filed a Petition to Make Special, requesting that the Trademark Office expedite the review of the Configuration Application because CTB had learned that Defendant had begun selling a knock-off of CTB's C2 PLUS feeder. (*See* Petition to Make Special, at ¶10, a copy of which is attached hereto as **Exhibit 4**.) The Petition to Make Special was granted.

In response to the Configuration Application, the Trademark Office, on March 9, 2011, issued an Office Action refusing the Configuration Application. (A copy of the March 9, 2011 Office Action

5

Case 7:14-cv-00157-D   Document 88   Filed 04/06/16   Page 5 of 17

is attached hereto as **Exhibit 5**.) The Office Action refusal was predicated on the opinion of the Examiner that the Configuration Trade Dress was impermissibly "functional," citing 15 U.S.C. §1052(e)(5) ("Section 2(e)(5)"). As accurately cited by the Examiner, CTB's Configuration Trade Dress was described as follows:

> The mark consists of a three-dimensional configuration of unique mechanized poultry feeder which includes a pan structure and a grill structure. When viewed from any side, the perimeter of the feeder has a generally octagonal shape as it has two generally vertical sides, defined by portions of both the pan structure and the grill structure, two generally horizontal sides, one defined at the bottom of the pan structure and the other defined at the top of the grill structure, and four generally diagonal sides which interconnect the vertical sides to the horizontal sides. Internal angles between the diagonal sides and the vertical sides are generally smaller than the internal angles between the diagonal sides and the horizontal sides.

The Examiner then correctly noted that functionality normally involves an evaluation of four (4) considerations referred to as the *Morton-Norwich* factors, following the decision by the United States Court of Customs and Patent Appeals in *In re Morton-Norwich Products, Inc.*, 671 F.2d 1332 (C.C.P.A.1982) (emphasis added):

> (1) the existence of a utility patent that discloses the utilitarian advantages of the design sought to be registered; (2) Advertising *by the applicant* that touts the utilitarian advantages of the design; (3) Facts pertaining to the availability of alternative designs; (4) Facts pertaining to whether the design results from a comparatively simple or inexpensive method of manufacture.

The Examiner applied each of the four factors to the Configuration Trade Dress to opine that it was impermissibly functional under Section 2(e)(5).

On September 8, 2011, CTB submitted its Response to Office Action for the Configuration Application. (A copy of the September 8, 2011 Response to Office Action is attached hereto as **Exhibit 6**.) In short, CTB provided *all* of the information requested by the Examiner within its, or its counsel's, possession. Consistent with the law and the Examiner's request for additional information, as part of the Response to Office Action, CTB provided advertising *by CTB*. The *Morton-Norwich* factors, as correctly cited by the Examiner, do *not* require the applicant to provide the Trademark Office with advertising from competitors. Further, CTB provided a written explanation regarding the availability of

6

alternative designs and the cost and process of the method of manufacture, and images depicting a representative sample of other poultry feeders in the marketplace

### 2. The Prosecution History of the Color Trademark.

The Color Trademark is valid and subsisting, and is in full force and effect. (A copy of the Color Trademark is attached hereto as **Exhibit 7**.) Count II of the Complaint, CTB asserts that Defendant's use of the Color Trademark constitutes trademark infringement under 15 U.S.C. §1114(1).

On November 18, 2010, CTB filed a trademark application, for the Principal Register, for the totality of its trade dress, including both the product configuration and red/gray color combination ("Color Application"). (*See* Trademark Application, Serial Number 85/180,324, a copy of which is attached hereto as **Exhibit 8**.) When it filed the Color Application, CTB was seeking trademark protection for the overall commercial impression created by the product configuration together with the color combination of the C2 PLUS feeder. As with the Configuration Application, on February 3, 2011, CTB filed a Petition to Make Special. (A copy of the Petition to Make Special is attached hereto as **Exhibit 9**.) Again, the Petition to Make Special was granted.

In response to the Color Application, the Trademark Office, on March 9, 2011, issued an Office Action. (A copy of the March 9, 2011 Office Action is attached hereto as **Exhibit 10**.) In the Office Action, the Examiner refused the application on the grounds of functionality as to configuration, but ***not*** as to the color combination. In short, the Office Action for the Color Application was substantively identical to the Office Action for the Configuration Application. On September 8, 2011, CTB filed its Response to Office Action. (A copy of the September 8, 2011 Response to Office Action is attached hereto as **Exhibit 11**.) In the Response to Office Action, CTB recounted a conversation between its counsel, Linda Palomar, and the Examiner, whereby CTB ***withdrew*** that part of the Color Application related to the product configuration, and amended the pending application to claim the red/gray color combination ***only***. From that point on, the Color Application no longer included the product

configuration. As a result, CTB submitted to the Examiner that the request for further information regarding functionality (relating to configuration only) was moot.

On November 7, 2011, the Trademark Office issued a second Office Action refusing the Color Application. (A copy of the November 7, 2011 Office Action is attached hereto as **Exhibit 12**.) Importantly, the Examiner noted her agreement with CTB that the request for further information regarding *functionality was moot*: "Thus, the Section 2(e)(5) refusal is WITHDRAWN." Instead, the Examiner refused registration to the Color Application based on her opinion that the color combination did not have the acquired distinctiveness required by 15 U.S.C. §1052(f) ("Section 2(f)"). As a result, the Examiner offered CTB the choice of (a) providing additional information regarding sales and advertising related to its use of the Color Trade Dress, or (b) amending the Color Application to the Supplemental Register.

On May 7, 2012, CTB provided its second Response to Office Action, this time providing additional information to support a claim of acquired distinctiveness under Section 2(f). (A copy of the May 7, 2012 Response Office Action is attached hereto as **Exhibit 13**.) On June 3, 2012, the Trademark Office issued its third Office Action, again refusing CTB's Color Application because CTB had not adequately demonstrated acquired distinctiveness. (A copy of the June 3, 2012 Office Action is attached hereto as **Exhibit 14**.) Finally, on December 3, 2012, CTB submitted its third Response to Office Action, opting to amend its application to the Supplemental Register. (A copy of the December 3, 2012 Response to Office Action is attached hereto as **Exhibit 15**.) As a result, on February 12, 2013 the Trademark Office issued a trademark registration on the Supplemental Register for the Color Trade Dress.

## ARGUMENT

I. **Applicable Legal Standards.**

A district court judge must "modify or set aside any part of the order that is clearly erroneous or contrary to law." *Johnson v. City of Fayetteville*, 2013 U.S. Dist. LEXIS 111289, *8 (E.D.N.C. Aug. 6, 2013) (quoting Fed. R. Civ. P. 72(a)). "A factual finding is clearly erroneous when [a court is] 'left with

8

the definite and firm conviction that a mistake has been committed.'" *TFWS, Inc. v. Franchot*, 572 F.3d 186, 196 (4th Cir. 2009) (quoting *Anderson v. Bessemer City*, 470 U.S. 564, 105 S. Ct. 1504, 84 L. Ed. 2d 518 (1985)).

As for the spoliation claims, and as cited by the Magistrate, the Fourth Circuit has defined spoliation as "the destruction or material alteration of evidence or . . . the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation." (3/23/2016 Order, at 15 citing *Silvestri v. GMC*, 271 F.3d 583, 590 (4th Cir. 2001).) It has been recognized that the duty to preserve arises not only after litigation has been commenced, but "'also extends to that period before the litigation when a party reasonably should know that the evidence may be relevant to anticipated litigation."' *Goodman v. Praxair Servs., Inc.,* 632 F. Supp. 2d 494, 509 (D. Md. 2009) (*quoting Silvestri*, 271 F.3d at 591). Further, "[o]nce a party reasonably anticipates litigation, it is obligated to suspend its routine document retention/destruction policy and implement a 'litigation hold' to ensure the preservation of relevant documents." *Id* at 511. As recited by the Magistrate, a party is obligated to preserve:

> any documents or tangible things (as defined by [Fed. R. Civ. P. 34(a))] made by individuals "likely to have discoverable information that the disclosing party may use to support its claims or defenses." The duty also includes documents prepared for those individuals, to the extent those documents can be readily identified (e.g., from the "to" field in e-mails). The duty also extends to information that is relevant to the claims or defenses of any party, or which is "relevant to the subject matter involved in the action." Thus, the duty to preserve extends to those employees likely to have relevant information-the "key players" in the case.

*Cognate BioServices, Inc. v. Smith*, No. CIV. WDQ-13-1797, 2015 WL 5158732, at *2 (D. Md. August 31, 2015) (*quoting Goodman*, 632 F. Supp. 2d at 511-12).

The court may impose sanctions for spoliation when it finds some degree of fault 'both for the purpose of leveling the evidentiary playing field and for the purpose of sanctioning the improper conduct." (*quoting Vodusek v. Bayliner Marine Corp.,* 71 F.3d 148, 156 (4th Cir. 1995)). The Magistrate correctly noted that permissible sanctions for spoliation include an instruction to the jury allowing it to infer that the destroyed evidence would have been unfavorable to the party that destroyed it. *See Buckley*

*v. Mukasey,* 538 F.3d 306, 322-23 (4th Cir. 2008). The Fourth Circuit has ruled that for such an adverse inference instruction to be given there **must** be a showing "'that the party **knew the evidence was relevant** to some issue at trial and that his **willful** conduct resulted in its loss or destruction,'" *Buckley*, 538 F.3d at 323 (quoting *Vodusek*, 71 F.3d at 156) (emphasis added), though evidence of bad faith is not required. *Turner v. United States,* 736 F.3d 274, 282 (4th Cir. 2013). "Willful conduct is equivalent to conduct that is intentional, purposeful, or deliberate," whereas bad faith requires "destruction for the purpose of depriving the adversary of the evidence." *First Mariner Bank v. Resolution Law Group,* No. MJG-12-1133, 2014 WL 1652550, at *9 (D. Md. Apr. 22, 2014).

Where "a spoliator's conduct is **merely negligent**, the adverse inference instruction is not an appropriate sanction." *Evans v. Quintiles Transnational Corp.,* No. 4:13-CV-00987-RBH, 2015 WL 9455580, at *4 (D.S.C. 23 Dec. 2015) (citing *Hodge v. Wal-Mart Stores, Inc.*, 360 F.3d 446, 450-51 (4th Cir. 2004)) (emphasis added). Even if the two-prong showing for an adverse inference instruction is made, the trial court retains the discretion whether or not to give an adverse inference instruction. *See Buckley*, 538 F.3d at 323; *Vodusek,* 71 F.3d at 156.

As correctly noted by the Magistrate, Rule 26 does not define what is deemed relevant for purposes of the rule; however, relevance has been "'broadly construed to encompass any possibility that the information sought may be relevant to the claim or defense of any party."' (3/23/2016 Order, at 6 citing *EEOC v. Sheffield Fin. LLC*, No. 1:06CV889, 2007 WL 1726560, at *3 (M.D.N.C. June 13, 2007) (quoting *Merrill v. Wajjle House, Inc.*, 227 F.R.D. 467, 473 (N.D. Tex. 2005)).) Admittedly, the court has broad discretion in determining relevance for discovery purposes, *Watson v. Lowcountry Red Cross*, 974 F.2d 482, 489 (4th Cir. 1992), while the party resisting discovery bears the burden of establishing the legitimacy of its objections. *Brey Corp. v. LQ Mgmt., L.L.C.,* No. AW-11-cv-00718-AW, 2012 WL 3127023, at *4 (D. Md. July 26, 2012).

## II. The Magistrate's Rulings On Defendants' Claims of Spoliation of Evidence.

### A. "CTB Color Functionality Tests."

Defendant claimed that CTB intentionally failed to produce "CTB Color Functionality Tests." As it pertains to the trade dress in this case, color tests could matter because Defendant claims that the red and gray used as a part of CTB's chicken feeders are used because they **better** attract chickens to the feed than other colors, *i.e.,* the colors are "functional." As presented to the Magistrate, there were no written color feeder test results in CTB's possession or control because there never were any such written test results. Consistent with the facts, the Magistrate held that there could be no claim for spoliation of evidence as to the color functionality tests because there never was any document to be inadvertently or willfully destroyed: "Obviously, if no written documentation ever existed, there can be no claim for spoliation." (3/23/2016 Order, at 19.)

### B. "Competitive Advertising Materials."

Here, Defendant used the fact that CTB employee Susan Hight collected competitive advertisements during the trade dress application process to argue that the failure to produce such advertisements in discovery was sanctionable and warranted an adverse inference instruction. The Magistrate, incorrectly, agreed. The Magistrate's ruling was clearly erroneous insofar as (1) he held that competitive advertisements were relevant to the trade dress application process, and thus relevant in discovery; and (2) the evidence of alternative designs embodied in competitor advertisements is relevant apart from the trade dress application process. (3/23/2016 Order, at 19-20.)

The Magistrate incorrectly held that the competitor advertising was clearly relevant. (3/23/2016 Order, at 22.) The Magistrate's ruling is clearly erroneous because the Examiner never requested *competitor* advertising, so that there is no basis to claim competitor advertisements were ever relevant to the trade dress application process. As such, CTB never had a duty to preserve *publicly-available* competitor advertisements. Thus, there can be no claim for spoliation when the documents, as shown below, are not relevant, even given the broad construction of relevance afforded by courts generally.

11

Advertisements were not relevant to the Color Trade Dress Application. In reviewing the Color Trade Dress Application, the Examiner did not request any advertisements. CTB provided the Examiner with evidence of advertisement *expenditures* because such expenditures can serve as a proxy for the acquired distinctiveness at issue with the Color Trade Dress Application. There is no meaningful argument that competitor advertisements could ever be relevant to CTB's claim in the Color Trade Dress Application that CTB's red and gray color scheme had achieved acquired distinctiveness in the marketplace.

In reviewing the Configuration Trade Dress Application, the Examiner requested ***CTB's own advertising***, but not any competitor advertising. Here, the Magistrate clearly and erroneously failed to address the specific items actually requested by the Examiner, who, in her review of the application, correctly noted that functionality normally involves an evaluation of four (4) considerations referred to as the *Morton-Norwich* factors, only one of which is relevant for the current Motion for Sanctions. (*Id.* citing *In re Morton-Norwich Products, Inc.*, 671 F.2d 1332 (C.C.P.A.1982).) More specifically, when analyzing whether a trade dress feature is impermissibly functional, examiners and courts are instructed to look for "***advertising by the applicant*** that touts the utilitarian advantages of the [applicant's] design." (*Id.* citing *Morton-Norwich* (emphasis added).) Why? Simply put, because trade dress cannot be functional under the Lanham Act, and therefore it is a strike against the trade dress application ***if the applicant*** claims some functional advantage for the very feature for which it is seeking trade dress protection. Thus, it is not surprising that the *Morton-Norwich* factor does not reference competitor advertising because it does not matter if a competitor claims that *its* product has some functional advantage when the competitor is not using the applicant's trade dress.

The Magistrate also clearly and erroneously found that the competitor advertising is relevant because alternative designs could be relevant to undermining CTB's trade dress in this litigation. However, here, the Magistrate assumes a fact nowhere in the record: that there ever existed a competitor advertisement that somehow "touts the utilitarian advantages of [CTB's] design". Defendant offered no

12

instance of any such advertisement and the record is barren of any third-party advertisement "touting the utilitarian advantages of CTB's design." Thus, and consistent with the Magistrate's ruling on the color functionality test, "if no written documentation ever existed, there can be no claim for spoliation."

Regardless of any dispute as to the relevancy of competitor advertising, there is nothing in the record to support the Magistrate's finding that the inferred destruction of the materials was willful. (3/23/2016 Order, at 22.) In fact, the Magistrate acknowledges that there is no evidence as to how, when, or why the competitor advertisements were destroyed or made unavailable. (*Id*. at 22 n.7.) The Magistrate further states that "CTB's violations of its obligation to preserve were willful" (*id*. at 24); yet, here, again, the Magistrate cites to nothing in the record to support that conclusion. Instead, the Magistrate relies on the timing of CTB's litigation hold letter – a fact that cannot establish the ***willful*** disregard of any duty to preserve.

As an initial matter, the Magistrate ruled as a matter of law that the duty to preserve was triggered when CTB filed its Petition to Make Special on February 3, 2011. Yet, there was nothing about Defendant's infringement at the time that would alert CTB to preserve documents that CTB believed in good faith were not relevant to the trade dress application process. There was no specific request from the Examiner for competitor advertisements and there is no evidence in the record that it is part of the ordinary course of the trade dress application process to use or reference competitor advertisements. Simply put, there is no evidence in the record that competitor advertisements are or were ever relevant to a trade dress application; as such, even with the issuance of a litigation hold letter on February 3, 2011, CTB had no duty to preserve competitor advertisements. Moreover, there is nothing about CTB's relevance determination that hints at the necessary finding that CTB "knew the evidence was relevant to some issue at trial," as required by *Buckley* before there can be an adverse inference instruction. The evidence is to the contrary; CTB has maintained that competitor advertisements are not relevant and, as shown above, that view is fully warranted on the facts of this case.

13

## C. "2013 Survey Data Regarding Acquired Distinctiveness."

The Magistrate also found that CTB's survey expert, Rhonda Harper, impermissibly spoliated certain information related to her 2013 acquired distinctiveness (or secondary meaning) survey. (3/23/2016 Order, at 22-23.) Yet, there is nothing in the record as to what may have been destroyed and whether the information was material in any way. The facts in the record are to the contrary.

Ms. Harper provided two consumer surveys germane to the issues in this case. First, in 2013, Ms. Harper did a survey to assess the acquired distinctiveness, or secondary meaning, of CTB's trade dress. Second, in 2015, Ms. Harper did a different survey to assess the likelihood of confusion between CTB's trade dress and the alleged infringer. For both surveys, Ms. Harper used SurveyMonkey as the cloud data collection platform. When participants took the survey, they made selections on a computer screen and the SurveyMonkey server collected and stored the data in an account held by the survey taker, in this case Ms. Harper. Ms. Harper testified that she still had access to the 2015 data on SurveyMonkey, but that she no longer had access to the 2013 data.

Ms. Harper further testified that she provided the underlying data, but the form she provided included additional columns of information generated by her so-called "manipulation" of the underlying data. (Harper Dep., at 152:12-153:6) In other words, Ms. Harper used the raw data to create a "working document" that provided additional information other than the raw percentages emblematic of the underlying data. Ms. Harper never testified that she modified or changed any consumer response to either survey she performed. Here is the relevant testimony from Ms. Harper as to what data she still possessed (Harper Dep., at 59:11-16, excerpts attached as **Exhibit 16**):

> I have the data for 2015. I believe I gave you what I have for 2013 I'm not sure if it was my error or SurveyMonkey, but everything before 2014 has been eliminated from my account, and I don't know if that's their cleansing process or my membership package or what that is, but they have no records of anything before 14.

The above testimony does not establish that there was any *willful* destruction of evidence. Ms. Harper retained everything in her possession, including the information she downloaded from SurveyMonkey.

14

However, she was unable to determine if there was any further information at the service provider beyond the information she downloaded, because the provider appeared to purge the 2013 data used by Ms. Harper.

Critically, the place one would look to determine whether Ms. Harper failed to provide the underlying data would be Defendant's rebuttal expert report. Defendant's rebuttal expert, Thomas Maronick, provided a detailed critique of both surveys performed by Ms. Harper, yet, nowhere in his written report does Mr. Maronick complain that he lacked access to the underlying data. In fact, Mr. Maronick was asked at his deposition about this very issue. More specifically, Mr. Maronick was shown an exhibit (Harper Deposition Exhibit 4) that he identified as the "underlying data" for Ms. Harper's 2013 survey. (Maronick Dep. at 140:3-25, included as part of the relevant excerpts of Mr. Maronick's deposition attached hereto as **Exhibit 17** a copy of Harper Deposition Exhibit 4 is attached hereto as **Exhibit 18**.) Not only did Mr. Maronick testify that he saw the underlying data, he testified that the underlying data supported his conclusion, but not Ms. Harper's conclusion (Maronick Dep. at 139:17-140:1):

> there's no consumer confusion, there's no – in the 2013 survey, the data show – a careful, correct analysis of the data show that there is no second – there is no secondary meaning – presence – there is no presence of secondary meaning.

Given the testimony of Defendant's expert, not only was the underlying data provided to Defendant, at the deposition of Defendant's expert, he used that same data to opine that CTB's trade dress had not acquired secondary meaning, or acquired distinctiveness. In other words, Mr. Maronick reviewed the survey and the underlying data related to the survey, and did not conclude that the data was incomplete. As such, there was no spoliation and certainly no prejudice. Further, there is no evidence that Ms. Harper willfully destroyed anything, such that there should be no adverse inference instruction.

**WHEREFORE**, CTB respectfully requests that this Court enter an Order reversing the Magistrate's March 23, 2016 Order and granting any further relief this Court deems just and proper.

Dated this 6th day of April, 2016.

                                    Respectfully submitted,

                                    CLARK HILL PLC

                                    /s/ Christopher B. Clare
                                  David J. Marr (Ill. Bar No. 6194750)
                                  Eric Dorkin (Ill. Bar. No. 6256390)
                                  Jennifer Woods (Ill. Bar No. 6304326)
                                  150 North Michigan Avenue
                                  Suite 2700
                                  Chicago, Illinois 60601
                                  tel (312) 985-5900
                                  fax (312) 985-5999
                                  dmarr@clarkhill.com
                                  edorkin@clarkhill.com
                                  jwoods@clarkhill.com
                                  Attorneys for Plaintiff, CTB, Inc.

                                  Christopher B. Clare (N.C. Bar No. 39582)
                                  601 Pennsylvania Avenue NW
                                  North Building, Suite 1000
                                  Washington, D.C. 20004
                                  tel (202) 572-8671
                                  fax (202) 772-0919
                                  cclare@clarkhill.com
                                  Attorney for Plaintiff, CTB, Inc.
                                  Local Civil Rule 83.1 Counsel

# CERTIFICATE OF SERVICE

I certify that, on April 6, 2016, I electronically filed the foregoing PLAINTIFF'S OBJECTION AND APPEAL FROM THE MAGISTRATE JUDGE'S MARCH 23, 2016 ORDER ON DEFENDANT'S MOTION FOR SPOLIATION SANCTIONS AGAINST CTB, INC. with the Clerk of the Court using the CM/ECF system.

The aforementioned documents will be served on the following counsel of record for Hog Slat, Incorporated in accordance with the Federal Rules of Civil Procedure and the Local Rules of this Court:

>   Robert C. Van Arnam
>   Gilbert C. Laite, III
>   Martin Hayes
>   WILLIAMS MULLEN
>   301 Fayetteville Street, Suite 1700
>   P.O. Box 1000 (27602)
>   Raleigh, NC 27601
>   rvanarnam@williamsmullen.com
>   glaite@williamsmullen.com
>   mhayes@williamsmullen.com

Dated: April 6, 2016.

**/s/Jennifer Woods**_____