# EXHIBIT 6

# Response to Office Action

**The table below presents the data as entered.**

| Input Field | Entered |
|---|---|
| **SERIAL NUMBER** | 85180347 |
| **LAW OFFICE ASSIGNED** | LAW OFFICE 112 |
| **MARK SECTION (no change)** | |
| **EVIDENCE SECTION** | |
|    EVIDENCE FILE NAME(S) | |
| **ORIGINAL PDF FILE** | evi_20925420026-170050601_._Response_to_OA_Product_Configuration.pdf |
| **CONVERTED PDF FILE(S)** **(43 pages)** | \\TICRS\EXPORT11\IMAGEOUT11\851\803\85180347\xml6\ROA0002.JPG |
| | \\TICRS\EXPORT11\IMAGEOUT11\851\803\85180347\xml6\ROA0003.JPG |
| | \\TICRS\EXPORT11\IMAGEOUT11\851\803\85180347\xml6\ROA0004.JPG |
| | \\TICRS\EXPORT11\IMAGEOUT11\851\803\85180347\xml6\ROA0005.JPG |
| | \\TICRS\EXPORT11\IMAGEOUT11\851\803\85180347\xml6\ROA0006.JPG |
| | \\TICRS\EXPORT11\IMAGEOUT11\851\803\85180347\xml6\ROA0007.JPG |
| | \\TICRS\EXPORT11\IMAGEOUT11\851\803\85180347\xml6\ROA0008.JPG |
| | \\TICRS\EXPORT11\IMAGEOUT11\851\803\85180347\xml6\ROA0009.JPG |
| | \\TICRS\EXPORT11\IMAGEOUT11\851\803\85180347\xml6\ROA0010.JPG |
| | \\TICRS\EXPORT11\IMAGEOUT11\851\803\85180347\xml6\ROA0011.JPG |
| | \\TICRS\EXPORT11\IMAGEOUT11\851\803\85180347\xml6\ROA0012.JPG |
| | \\TICRS\EXPORT11\IMAGEOUT11\851\803\85180347\xml6\ROA0013.JPG |
| | \\TICRS\EXPORT11\IMAGEOUT11\851\803\85180347\xml6\ROA0014.JPG |
| | \\TICRS\EXPORT11\IMAGEOUT11\851\803\85180347\xml6\ROA0015.JPG |
| | \\TICRS\EXPORT11\IMAGEOUT11\851\803\85180347\xml6\ROA0016.JPG |

| | |
|---|---|
| | [\\TICRS\EXPORT11\IMAGEOUT11\851\803\85180347\xml6\ROA0017.JPG](\\TICRS\EXPORT11\IMAGEOUT11\851\803\85180347\xml6\ROA0017.JPG) |
| | [\\TICRS\EXPORT11\IMAGEOUT11\851\803\85180347\xml6\ROA0018.JPG](\\TICRS\EXPORT11\IMAGEOUT11\851\803\85180347\xml6\ROA0018.JPG) |
| | [\\TICRS\EXPORT11\IMAGEOUT11\851\803\85180347\xml6\ROA0019.JPG](\\TICRS\EXPORT11\IMAGEOUT11\851\803\85180347\xml6\ROA0019.JPG) |
| | [\\TICRS\EXPORT11\IMAGEOUT11\851\803\85180347\xml6\ROA0020.JPG](\\TICRS\EXPORT11\IMAGEOUT11\851\803\85180347\xml6\ROA0020.JPG) |
| | [\\TICRS\EXPORT11\IMAGEOUT11\851\803\85180347\xml6\ROA0021.JPG](\\TICRS\EXPORT11\IMAGEOUT11\851\803\85180347\xml6\ROA0021.JPG) |
| | [\\TICRS\EXPORT11\IMAGEOUT11\851\803\85180347\xml6\ROA0022.JPG](\\TICRS\EXPORT11\IMAGEOUT11\851\803\85180347\xml6\ROA0022.JPG) |
| | [\\TICRS\EXPORT11\IMAGEOUT11\851\803\85180347\xml6\ROA0023.JPG](\\TICRS\EXPORT11\IMAGEOUT11\851\803\85180347\xml6\ROA0023.JPG) |
| | [\\TICRS\EXPORT11\IMAGEOUT11\851\803\85180347\xml6\ROA0024.JPG](\\TICRS\EXPORT11\IMAGEOUT11\851\803\85180347\xml6\ROA0024.JPG) |
| | [\\TICRS\EXPORT11\IMAGEOUT11\851\803\85180347\xml6\ROA0025.JPG](\\TICRS\EXPORT11\IMAGEOUT11\851\803\85180347\xml6\ROA0025.JPG) |
| | [\\TICRS\EXPORT11\IMAGEOUT11\851\803\85180347\xml6\ROA0026.JPG](\\TICRS\EXPORT11\IMAGEOUT11\851\803\85180347\xml6\ROA0026.JPG) |
| | [\\TICRS\EXPORT11\IMAGEOUT11\851\803\85180347\xml6\ROA0027.JPG](\\TICRS\EXPORT11\IMAGEOUT11\851\803\85180347\xml6\ROA0027.JPG) |
| | [\\TICRS\EXPORT11\IMAGEOUT11\851\803\85180347\xml6\ROA0028.JPG](\\TICRS\EXPORT11\IMAGEOUT11\851\803\85180347\xml6\ROA0028.JPG) |
| | [\\TICRS\EXPORT11\IMAGEOUT11\851\803\85180347\xml6\ROA0029.JPG](\\TICRS\EXPORT11\IMAGEOUT11\851\803\85180347\xml6\ROA0029.JPG) |
| | [\\TICRS\EXPORT11\IMAGEOUT11\851\803\85180347\xml6\ROA0030.JPG](\\TICRS\EXPORT11\IMAGEOUT11\851\803\85180347\xml6\ROA0030.JPG) |
| | [\\TICRS\EXPORT11\IMAGEOUT11\851\803\85180347\xml6\ROA0031.JPG](\\TICRS\EXPORT11\IMAGEOUT11\851\803\85180347\xml6\ROA0031.JPG) |
| | [\\TICRS\EXPORT11\IMAGEOUT11\851\803\85180347\xml6\ROA0032.JPG](\\TICRS\EXPORT11\IMAGEOUT11\851\803\85180347\xml6\ROA0032.JPG) |
| | [\\TICRS\EXPORT11\IMAGEOUT11\851\803\85180347\xml6\ROA0033.JPG](\\TICRS\EXPORT11\IMAGEOUT11\851\803\85180347\xml6\ROA0033.JPG) |
| | [\\TICRS\EXPORT11\IMAGEOUT11\851\803\85180347\xml6\ROA0034.JPG](\\TICRS\EXPORT11\IMAGEOUT11\851\803\85180347\xml6\ROA0034.JPG) |
| | [\\TICRS\EXPORT11\IMAGEOUT11\851\803\85180347\xml6\ROA0035.JPG](\\TICRS\EXPORT11\IMAGEOUT11\851\803\85180347\xml6\ROA0035.JPG) |
| | [\\TICRS\EXPORT11\IMAGEOUT11\851\803\85180347\xml6\ROA0036.JPG](\\TICRS\EXPORT11\IMAGEOUT11\851\803\85180347\xml6\ROA0036.JPG) |
| | [\\TICRS\EXPORT11\IMAGEOUT11\851\803\85180347\xml6\ROA0037.JPG](\\TICRS\EXPORT11\IMAGEOUT11\851\803\85180347\xml6\ROA0037.JPG) |
| | [\\TICRS\EXPORT11\IMAGEOUT11\851\803\85180347\xml6\ROA0038.JPG](\\TICRS\EXPORT11\IMAGEOUT11\851\803\85180347\xml6\ROA0038.JPG) |
| | [\\TICRS\EXPORT11\IMAGEOUT11\851\803\85180347\xml6\ROA0039.JPG](\\TICRS\EXPORT11\IMAGEOUT11\851\803\85180347\xml6\ROA0039.JPG) |
| | [\\TICRS\EXPORT11\IMAGEOUT11\851\803\85180347\xml6\ROA0040.JPG](\\TICRS\EXPORT11\IMAGEOUT11\851\803\85180347\xml6\ROA0040.JPG) |
| | [\\TICRS\EXPORT11\IMAGEOUT11\851\803\85180347\xml6\ROA0041.JPG](\\TICRS\EXPORT11\IMAGEOUT11\851\803\85180347\xml6\ROA0041.JPG) |
| | [\\TICRS\EXPORT11\IMAGEOUT11\851\803\85180347\xml6\ROA0042.JPG](\\TICRS\EXPORT11\IMAGEOUT11\851\803\85180347\xml6\ROA0042.JPG) |
| | [\\TICRS\EXPORT11\IMAGEOUT11\851\803\85180347\xml6\ROA0043.JPG](\\TICRS\EXPORT11\IMAGEOUT11\851\803\85180347\xml6\ROA0043.JPG) |
| | [\\TICRS\EXPORT11\IMAGEOUT11\851\803\85180347\xml6\ROA0044.JPG](\\TICRS\EXPORT11\IMAGEOUT11\851\803\85180347\xml6\ROA0044.JPG) |
| **DESCRIPTION OF EVIDENCE FILE** | Written response to Office Action dated March 9, 2011, including exhibits. |

## SIGNATURE SECTION

| | |
|---|---|
| **RESPONSE SIGNATURE** | /David J. Marr/ |
| **SIGNATORY'S NAME** | David J. Marr |
| **SIGNATORY'S POSITION** | Attorney of Record, Illinois bar member |
| **DATE SIGNED** | 09/08/2011 |
| **AUTHORIZED SIGNATORY** | YES |

## FILING INFORMATION SECTION

| | |
|---|---|
| **SUBMIT DATE** | Thu Sep 08 18:00:31 EDT 2011 |
| **TEAS STAMP** | USPTO/ROA-209.254.200.26-20110908180031338741-8518 0347-4803c9b76214c28b456d 8133babd833c5-N/A-N/A-201 10908170050601513 |

PTO Form 1957 (Rev 9/2005)
OMB No. 0651-0050 (Exp. 04/30/2011)

## Response to Office Action

## To the Commissioner for Trademarks:

Application serial no. **85180347** has been amended as follows:

**EVIDENCE**
Evidence in the nature of Written response to Office Action dated March 9, 2011, including exhibits. has been attached.
**Original PDF file:**
evi_20925420026-170050601_._Response_to_OA_Product_Configuration.pdf
**Converted PDF file(s)** (43 pages)
Evidence-1
Evidence-2
Evidence-3
Evidence-4
Evidence-5
Evidence-6
Evidence-7
Evidence-8
Evidence-9
Evidence-10
Evidence-11

Evidence-12
Evidence-13
Evidence-14
Evidence-15
Evidence-16
Evidence-17
Evidence-18
Evidence-19
Evidence-20
Evidence-21
Evidence-22
Evidence-23
Evidence-24
Evidence-25
Evidence-26
Evidence-27
Evidence-28
Evidence-29
Evidence-30
Evidence-31
Evidence-32
Evidence-33
Evidence-34
Evidence-35
Evidence-36
Evidence-37
Evidence-38
Evidence-39
Evidence-40
Evidence-41
Evidence-42
Evidence-43

**SIGNATURE(S)**
**Response Signature**
Signature: /David J. Marr/    Date: 09/08/2011
Signatory's Name: David J. Marr
Signatory's Position: Attorney of Record, Illinois bar member

The signatory has confirmed that he/she is an attorney who is a member in good standing of the bar of the highest court of a U.S. state, which includes the District of Columbia, Puerto Rico, and other federal territories and possessions; and he/she is currently the applicant's attorney or an associate thereof; and to the best of his/her knowledge, if prior to his/her appointment another U.S. attorney or a Canadian attorney/agent not currently associated with his/her company/firm previously represented the applicant in this matter: (1) the applicant has filed or is concurrently filing a signed revocation of or substitute power of attorney with the USPTO; (2) the USPTO has granted the request of the prior representative to withdraw; (3) the applicant has filed a power of attorney appointing him/her in this matter; or (4) the applicant's appointed U.S. attorney or Canadian attorney/agent has filed a power of attorney appointing

him/her as an associate attorney in this matter.


Serial Number: 85180347
Internet Transmission Date: Thu Sep 08 18:00:31 EDT 2011
TEAS Stamp: USPTO/ROA-209.254.200.26-201109081800313
38741-85180347-4803c9b76214c28b456d8133b
abd833c5-N/A-N/A-20110908170050601513

## IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

| | | |
|---|---|---|
| In re Application of: | ) | |
| | ) | For: **PRODUCT DESIGN** |
| CTB, INC. | ) | |
| | ) | Examining Attorney: |
| Serial No.: 85/180,347 | ) |     Jaclyn Kidwell Walker |
| | ) |     Law Office 112 |
| Filed: November 18, 2010 | ) | |

### RESPONSE TO OFFICE ACTION MAILED MARCH 9, 2011

Asst. Commissioner for Trademarks
2900 Crystal Drive
Arlington, VA 22202-3513

Sir:

In response to the outstanding Office Action issued by the Examining Attorney dated March 9, 2011, Applicant respectfully requests reconsideration of the Examining Attorney's refusal to register for the reasons stated below.

### REMARKS

Initially, the Applicant notes that the Examining Attorney has searched the Office records and has found no similar registered or pending mark which would bar registration under the Trademark Act § 2(d), 15 U.S.C. §1052 (d), TMEP §1105.01. The Examining Attorney has also indicated that, despite the Examining Attorney's refusal to register, the Applicant is permitted to submit arguments in support of registration.

The Examining Attorney has refused registration on the asserted basis that the mark is a functional configuration within the meaning of Section 2(e)(5) of the Trademark Act. Applicant respectfully disagrees, and believes the mark to be a non-functional design eligible for registration.

7228153.1 35002/138054

Additionally, the Examining Attorney has requested additional information related to the following:

(1) A written statement as to whether the applied-for mark, or any feature(s) thereof, is or has been the subject of a design or utility patent or patent application, including expired patents and abandoned patent applications. Applicant must also provide copies of the patent;

(2) Advertising, promotional and/or explanatory materials concerning the applied-for configuration mark, particularly materials specifically related to the design feature(s) embodied in the applied-for mark;

(3) A written explanation and any evidence as to whether there are alternative designs available for the feature(s) embodied in the applied-for mark, and whether such alternative designs are equally efficient and/or competitive. Applicant must also provide a written explanation and any documentation concerning similar designs used by competitors;

(4) A written statement as to whether the product design or packaging design at issue results from a comparatively simple or inexpensive method of manufacture in relation to alternative designs for the product/container. Applicant must also provide information regarding the method and/or cost of manufacture relating to Applicant's goods; and

(5) Any other evidence that Applicant considers relevant to the registrability of the applied-for configuration mark.

Applicant has attached a copy of the relevant expired utility patent, United States Patent No. 5,092,274 ("the '274 patent) as Exhibit A. Applicant respectfully responds to the Examining Attorney's remaining requests for additional information in the remarks below.

2

## I.    Functionality

### A.    Functionality Should Be Determined Based On The Design As A Whole.

When considering whether a product design is functional for the purpose of trademark registration, the entire design should be considered, rather than individual components. Section 2(e)(5) of the Trademark Act states in pertinent part that "no trademark by which the goods of the applicant may be distinguished from the goods of others shall be refused registration on the principal register on account of its nature unless it...consists of a mark which...comprises any matter that, *as a whole*, is functional." 15 U.S.C. § 1052 (emphasis added).

Although individual features of a design may have utilitarian benefits, the combination of such features may nevertheless yield a protectable, non-functional design. *See Pebble Beach Co. v. Tour 18 I, Ltd.*, 155 F.3d 526,538 (5th Cir. 1998). Because "virtually every product is a combination of functional and non-functional features", having a rule "denying protection to any combination of features including a functional one would emasculate the law of trade dress infringement." *American Greetings Corp. v. Dan-Dee Imports, Inc.*, 807 F2d 1136, 1143 (3rd Cir. 1986). Therefore, the "critical functionality inquiry is not whether each individual component of the trade dress is functional, but rather whether the trade dress as a whole is functional." *Tools USA Equip. Co. v. Champ Frame Straightening Equip.*, 87 F.3d 654, 658 (4th Cir. 1996).

Moreover, it is the design itself that is significant to the analysis, not the object underlying the design. The Court of Customs and Patent Appeals stated, "a discussion of 'functionality' is *always* a reference to the *design* of the thing under consideration (in the sense of its *appearance*) and *not* the thing itself." *In re Morton-Norwich Prods., Inc.*, 671 F.2d 1332, 1338 (CCPA 1982) (emphasis in original). Because most designs result in utilitarian products,

3

focus should be directed "not to the mere *existence* of utility, but to the *degree* of design utility." *Id.* (emphasis in original).

**B.** **Designs That Are *De Facto* Functional, Or Functional In A Lay Sense, Are Capable Of Indicating Source And May Serve As Trademarks.**

To aid in determining whether a design is protectable, some courts distinguish between *de facto* functional features, which may be eligible for trademark protection, and *de jure* functional features, which are excluded from protection under Section 2(e)(5). As the Federal Circuit has explained, "[i]n essence, *de facto* functional means that the design of a product has a function, i.e., a bottle of any design holds fluid." *In re R.M. Smith, Inc.*, 734 F.2d 1482, 1484 (Fed. Cir. 1984). *De jure* functionality describes a product that has a particular shape because that shape works better. *Valu Eng'g., Inc. v. Rexnord Corp.*, 278 F3d 1268, 1274 (2002). *De facto* functionality does not operate as a bar to registrability, but *de jure* functionality does. *Brunswick Corp. v. British Seagull Ltd.*, 35 F.3d 1527, 1531 (Fed. Cir. 1994).

*De jure* functionality "rests on 'utility,' which is determined in light of 'superiority of design,' and rests upon the foundation [of]...'effective competition.'" *Brunswick Corp. v. British Seagull Ltd.*, 35 F.3d 1527, 1531 (Fed. Cir. 1994) *quoting In re Morton-Norwich Prods., Inc.*, 671 F.2d 1332, 1340 (CCPA 1982).

**II.** **The *Morton-Norwich* Factors**

As the Examining Attorney indicates, determining functionality typically requires consideration of the *Morton-Norwich* factors: 1) the existence of a utility patent that discloses the utilitarian advantages of the design sought to be registered; 2) advertising by the applicant that touts the utilitarian advantages of the design; 3) facts pertaining to the availability of alternative designs; and 4) facts pertaining to whether the design results from a comparatively simple or inexpensive method of manufacture. *Morton-Norwich*, 671 F.2d at 1340-41. A

4

7228153.1 35002/138054

determination of functionality is made based on the totality of the evidence. *Brunswick*, 35 F.3d at 1530.

In *Morton-Norwich*, the Court of Customs and Patent Appeals considered whether a design for a spray bottle was functional, and therefore ineligible for trademark protection. Morton-Norwich sought to register a design for a spray bottle as a trademark for a variety of cleaning products and insecticides. *Morton-Norwich*, 671 F.2d at 1334. The Examining Attorney refused registration on the grounds that the design was "no more than a non-distinctive purely functional container for the goods plus a purely functional spray trigger controlled closure *** essentially utilitarian and non-arbitrary ***." *Id.* at 1335. On appeal, the Trademark Trial and Appeal Board reviewed advertising of the product and noted that "the advertising pertaining to applicant's goods promotes...the desirable functional features of the containers. *Id.*

Although the Examining Attorney and Board found the design to be functional, and therefore ineligible for registration, the Court of Customs and Patent Appeals disagreed. The Court found that merely having a non-trademark function did not end the inquiry because "possession of a function and of a capability of indicating origin are not in every case mutually exclusive." *Id.* Instead, the Court focused on whether the spray-bottle at issue was *de jure* functional by virtue of being the best design or one of a few superior designs and found it was not. *Id.* at 1341-42. The Court reasoned that the availability of alternative designs showed that "the same functions can be performed by a variety of other shapes with no sacrifice of any functional advantage." *Id.* at 1342. In other words, "there [wa]s no necessity to copy appellant's trade dress to enjoy any of the functions of a spray-top container". *Id.*

Much like the spray bottle at issue in *Morton-Norwich*, poultry feeders do not have to have any particular shape to function as poultry feeders. Designs that effectively perform the

5

task of feeding birds and preventing them from entering/helping them to exit the feeder pan vary widely in shape and overall appearance. The *de jure* aspects of the poultry feeder, namely the components that control how feed is brought into the feeder, such as the feeder cone, flood gate(s), adjusting mechanisms, and connectors (if any), are not a part of the design sought to be registered. These are the parts of the poultry feeder that control how well the feeder works compared to other feeders, and Applicant does not seek to acquire trademark protection in any of these functional elements. Instead, Applicant merely seeks to protect the basic overall shape of the feeder, which Applicant respectfully submits is proper in light of the *Morton-Norwich* factors.

**Factor 1: The Existence Of A Utility Patent Or Application Claiming A Feature Of A Design Is Strong Evidence Of Functionality Only For That Feature.**

The existence of a utility patent "is strong evidence that the *features therein claimed* are functional." *TrafFix Devices, Inc. v. Marketing Displays, Inc.*, 532 U.S. 23, 29 (2001) (emphasis added).

At most, Applicant's product configuration mark incorporates only one of the features claimed in the '274 patent. *See* Exhibit A (copy of the '274 patent). Applicant merely seeks to register the basic overall shape of a feeder, which has a unique "squished" appearance. None of the features cited by the Examining Attorney that are claimed in the '274 patent necessitate the use of any particular basic overall shape; those features could be, and in some cases are, included in feeders with a wide variety of shapes without inhibiting the effectiveness of the product.

In particular, Applicant does not dispute that the invention claimed in the '274 patent had a number of utilitarian objectives and benefits. However, the utilitarian benefits of the invention cited by the Examining Attorney, specifically that it can be used to "fee[d] large numbers of birds and animals in an effective and efficient manner" and "preven[t] birds and animals from

6

7228153.1 35002/138054

bodily climbing into the feeder yet simultaneously allowing those who do force their way inside to easily exit without sustaining injury or damaging the feeder apparatus" are utilitarian benefits shared by a wide variety of poultry feeders that possess drastically different shapes. Office Action, dated 3/9/2011 at 3. All that is needed to feed large numbers of birds is a large enough feeder with a mechanism to distribute feed; the external design of the feeder can, and does, vary widely in the industry. Similarly, all that is needed to prevent birds from climbing into a feeder is a barrier, or grill; the design of that grill can, and does, vary widely in the industry. Much like the spray bottle at issue in the *Morton-Norwic*h case, both of these attributes are functional in the sense that every poultry feeder must possess them to operate as a poultry feeder. At the same time, each poultry feeder meets these requirements through the use of different designs. The functionality inherent in all poultry feeders possessing these features is *de facto* functionality: the features make the poultry feeders work—they do not make them work better.

### Factor 2: Applicant's Advertising Almost Exclusively Touts Utilitarian Features Of The Product That Are Not A Part Of The Claimed Mark.

Applicant's product literature describes many important, utilitarian, *de jure* functional features of the poultry feeder whose basic shape comprises Applicant's mark. However, all but one of the features are related to internal components of the feeder and not in any way related to the overall shape of the feeder.

The product literature for the C2® Plus feeder, which basic shape is the mark Applicant seeks to register, notes 13 features that contribute to the effective functioning of the product. *See* Exhibit B (copy of product literature for the C2® Plus feeder). These features include optional elements that allow for customization, all-plastic construction with reinforced areas for durability, and an adjustable flooding mechanism that makes the product suitable for birds of all

7

ages. These features are not a part of the claimed mark and exist independent of the basic design and shape of the feeder.

The sole point in the advertisement that makes mention of a part of the mark is the "chick-friendly 14 spoke grill design". Exhibit B. Applicant's advertisement does not mention the shape or width of the spokes, and does not claim that the 14 spoke design is a unique or special design that is more effective than grills with a different number of spokes, or any number of other potential spoke or grill designs. The advertisement does not tout any benefit inherent in the angle of the spokes, their thickness, or any other aspect of their appearance. Applicant's advertisement merely seeks to promote the idea that chicks will be able to use the feeder, which is essential to the product performing its *de facto* functional purpose of feeding poultry.

### Factor 3: A Wide Variety Of Competitive Alternative Designs Are Currently In Use By Competitors.

As the *Morton-Norwich* court indicated, the existence of competing alternative designs is significant for a determination of functionality. Competing designs show that the features of the design sought to be registered are not *de jure* functional, and that extending trademark protection to the design will not impede competition. *See* 1 J. Thomas McCarthy, MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 7:75, at 7-182.

Having reviewed only the prior art included in the '274 patent, the Examining Attorney recognizes that alternative designs for poultry feeders exist, but concludes that Applicant's design "is merely another revision of an already functional design for poultry feeders." Office Action, dated 3/9/2011 at 4. Applicant respectfully contends that the Examining Attorney's comments fail to consider the wide variety of poultry feeders on the market which the Examiner did not consider during the prosecution of the '274 patent because they were not relevant to the

8

specific invention disclosed. Because the '274 patent largely claimed features contained within the center apparatus of the feeder, the Examiner did not have reason to consider prior art with alternative outer shapes and silhouettes.

The design possibilities, and realities, of poultry feeders are nearly limitless. Beyond the basic *de facto* functional requirements of a bottom and sides, which are necessary to the basic purpose of a feeder, namely, to hold feed, the external shape is entirely arbitrary. Feeders may have silhouettes that are tall, short, straight, curved, rectangular, or triangular. Pan bottoms may be flat or curved, sides may be sloping or straight and the edges may be smooth, scalloped, or rounded. The grill may be a mostly solid piece with access holes or may contain spokes. Feeders may have many spokes, few spokes, or none at all, and the spokes may be straight or bent at any one of a number of different angles and locations. Exhibit C (representative sampling of available poultry feeder designs). Basic shapes vary dramatically, yet all possess the same *de facto* functionality of feeding poultry.

Applicant also submits that the United States Patent and Trademark Office has permitted product design registrations in the past for products that have similar functionality to Applicant's design, including feeders for poultry and other birds, as well as products that have the same functionality, but differ in shape. For example, Reg. Nos. 3,486,761 and 3,574,360 show feeders for poultry and other animals that contain all of the same elements in substantially the same configuration, including four legs, a four-sided food compartment, and a mechanism for feed distribution. Exhibit D (copies of Reg. Nos. 3,486,761 and 3,574,360). Although both designs have precisely the same functionality, namely, to feed poultry and other animals, both designs were deemed non-functional and were granted trademark protection on the Principal Register. Similarly, registrations have been granted to a number of different automobile designs, including

9

the Hummer H3, Reg. No. 2,969,972; Porsche 911, Reg. No. 2,655,378; Plymouth Prowler, Reg. No. 2,606,408; Ford Taurus and Ford Taurus NASCAR, Reg. Nos. 2,751,571 and 2,751,564; Dodge Viper, Reg. No. 2,418,499; and Volkswagen Beetle, Reg. No. 2,409,675. Each of these designs has the same functionality, to carry people and objects from one place to another, and possess a number of *de jure* functional features, such as windows and side-view mirrors to improve visibility, and roofs that are designed to withstand impact (to which Volkswagen devoted an entire advertising campaign entitled "Round for a Reason"). However, despite sharing the same elements of *de jure* functionality, all of these designs were deemed non-functional and eligible for trademark protection when the designs were considered as a whole.

**Factor 4: Applicant's Design Is No Cheaper Or Easier To Make Than Competitive Alternative Designs.**

Applicant respectfully disagrees with the Examining Attorney's supposition that a competitor's production of an identical feeder within four months of the expiration of the '274 patent shows that the design sought to be registered is cheaper or easier to manufacture than alternative designs. Applicant's design, which requires additional materials to produce the "squished" profile, fashion the numerous spokes and connect them to the bottom of the grill apparatus makes it more expensive to manufacture than competing feeders with different shapes and fewer or no spokes.

Applicant also contends that the existence of a feeder with an identical basic overall shape so soon after the expiration of a patent claiming important innovations in the interior of the feeder merely shows the competitor's intense desire to capitalize on a well-recognized and established design. Competitors in the highly competitive poultry feeder industry were well aware of the expiration date of the '274 patent, which is a matter of public record. Competitors

10

seeking to capitalize on Applicant's well-known design had the opportunity to prepare and purchase new equipment and materials in advance of the patent's expiration so that they could quickly produce an identical feeder once the patent expired.

Competitors could incorporate all of the significant innovations of the '274 patent, including adjustable, automatic brood gates, into their existing basic feeder shape. Moreover, using their own existing feeder shapes would in many cases save competitors considerable sums of money by relieving competitors of the need to purchase new equipment or retool existing equipment to produce Applicant's unique design.

### III.   <u>Alternative Test for Aesthetic Functionality</u>

In addition to the test for functionality discussed above, the Supreme Court adopted an alternative test for cases involving aesthetic functionality. *TrafFix*, 523 U.S. at 32. This test is based on a "competition theory" that evaluates whether extending trademark protection to a design results in a "significant non-reputation-related disadvantage" to competitors. *Id*. Within this "competition theory" approach, the most common tests of aesthetic functionality are the "effective competition" test and the "comparable alternatives" test. *Abercrombie & Fitch Stores, Inc. v. American Eagle Outfitters, Inc.*, 280 F.3d 619, 642 (6th Cir. 2002).

Both the "effective competition" test and the "comparable alternatives" test focus on the impact to competitors if they are foreclosed from using the design sought to be registered. The "effective competition" test asks whether a competing manufacturer can compete effectively in the given product market if the applicant's design is protected. *Id.* at 642. If granting protection to the design is likely to hinder effective competition, the design is functional and cannot be protected. *Abercrombie,* 280 F.3d at 642. Similarly, the "comparable alternatives" test asks

11

7228153.1 35002/138054

whether granting protection to a design would leave a sufficient number of comparable alternative designs for competitors to use to compete in the given product market. *Id.* If alternatives exist, the design is non-functional and may be protected. *Id.*

A review of alternative designs currently in use in the poultry feeder market show that a wide variety of alternative designs exist. *See* Exhibit C. Preventing competitors from using the "squished" shape of Applicant's poultry feeder would in no way limit their ability to compete in the highly competitive feeder market. Applicant does not seek to protect the features most important to competition—the features that control how feed is brought to and distributed in the feeder—without which competitors may be unable to compete effectively. Instead, Applicant only seeks to protect the unique "squished" shape of the feeder, which provides no meaningful competitive benefit outside of its well-recognized affiliation with Applicant's company.

Therefore, because Applicant's design is non-functional under all applicable tests, Applicant respectfully submits that it is entitled to protection under the Trademark Law.

Applicant believes that it has responded to all issues raised by the Examining Attorney. If any unresolved issues remain, or if the Examining Attorney requires anything further, she is invited to contact the undersigned attorney at (312) 985-5558.

Date: 9/8/2011

Respectfully submitted,

By:
David J. Marr, Reg. No. 32,915
Attorney for Applicant
CLARK HILL PLC
150 N. Michigan Ave. Suite 2700
Chicago, Illinois 60601
(312) 985-5558

12

# Exhibit A


US005092274A

# United States Patent [19]

Cole et al.

[11] Patent Number: 5,092,274

[45] Date of Patent: Mar. 3, 1992

[54] **POULTRY FEEDER**

[75] Inventors: Theodore J. Cole, Syracuse, Ind.; Ray Swartzendruber, Okemos, Mich.

[73] Assignee: CTB, Inc., Milford, Ind.

[21] Appl. No.: 605,756

[22] Filed: Oct. 30, 1990

[51] Int. Cl.⁵ ............................................... A01K 5/00
[52] U.S. Cl. ...................................... 119/57.4; 119/53
[58] Field of Search ...................... 119/51.01, 52.4, 53, 119/61, 57.4, 52.1, 72.5

[56] **References Cited**

**U.S. PATENT DOCUMENTS**

| | | | |
|---|---|---|---|
| 1,154,073 | 9/1915 | Stocking | 119/52.4 |
| 4,348,988 | 9/1982 | Lawson | 119/53 |
| 4,476,811 | 10/1984 | Swartzendruber | 119/57.4 |
| 4,527,513 | 7/1985 | Hart et al. | 119/57.4 |
| 4,552,095 | 11/1985 | Segalla | 119/57.4 |
| 4,800,844 | 1/1989 | Van Gilst | 119/52.4 |
| 5,007,380 | 4/1991 | Badia et al. | 119/57.4 |

*Primary Examiner*—John G. Weiss
*Attorney, Agent, or Firm*—Trexler, Bushnell, Giangiorgi & Blackstone, Ltd.

[57] **ABSTRACT**

A unique feeder for birds and animals of the type forming part of a modern automated feeding system used to minimize the operating costs associated with commercial breeding. The feeder assembly comprises feeder tube means, a pan member and may include cone means loosely surrounding the feeder tube for controlling the pattern and amount of feed presented in the pan. Indexing means and visual indication means may also be provided for enabling the preselection of the size of a lower feed gate which automatically results when the feeder is suspended above a feeding surface, and providing constant indication of the size selected, respectively. A brood gate may also be provided which is designed to automatically close upon elevation of the feeder above a feeding surface, but which can also be locked open when so desired. The unique feeder may also include rotatable coupling means to engage and disengage the pan member and a barrier means by simply rotating one with respect to the other. The barrier means is designed to facilitate the egress of birds or animals which might otherwise be trapped inside the feeder and make ingress more difficult than egress. Moreover, the feeder is preferably provided with a hanger means to enable simultaneous suspension of the pan from the barrier means upon disengagement therefrom.

**27 Claims, 7 Drawing Sheets**





FIG.1



FIG.2

FEED IN

FIG. 2A



FIG. 2B





FIG.3

FIG.4

FIG.5

FIG.6



FIG.7

FIG.8

FIG.9



FIG.10

FEED FLOW

FIG.11

FIG.12



FIG.14

FIG.15

FIG.13



FIG.16

FIG.17

FIG.18

FIG.19

FIG.20

FIG.21

1

## POULTRY FEEDER

### BACKGROUND OF THE INVENTION

This invention relates generally to feeding systems for poultry and the like, and more particularly to the feeder assemblies used in conjunction therewith.

In today's competitive marketplace, most animal husbandmen attempt to reduce the operating costs associated with the commercial breeding of domestic birds and animals by utilizing automated feeding systems designed to minimize the amount of labor needed to carry out daily feeding procedures. A modern automated feeding system of the type referred to usually comprises a bulk feed storage facility connected to a system of transport conduits which are equipped with means for conveying feed through the conduits and into the individual feeder assemblies. In poultry feeder applications, a single feeder should ideally be able to accommodate various types and sizes of birds thus eliminating the need and expense required to change feeders. The feeder assemblies should also be designed to minimize feed waste and discourage birds from bodily entering the feeder assemblies and contaminating the feed contained therein.

Examples of prior art feeder assemblies of the general type to which this invention is directed are disclosed in U.S. Pat. Nos. 3,230,933; 3,388,690; 3,511,215; 3,811,412; 3,911,868; 4,070,990; 4,476,811; 4,834,026 and U.S. patent application Ser. No. 302,015.

The feeders shown in U.S. Pat. Nos. 3,230,933; 3,388,690 and 4,476,811 disclose, among other things, the aspect of providing a wire barrier to prevent consuming poultry from physically climbing into the feeder apparatus. Because of the shape and configuration of the barriers shown, however, birds which force their way into the feeder apparatus can become trapped inside. Another aspect shown in U.S. Pat. No. 4,476,811 is that of a brood gate opening defined in the drop tube member to permit feed to flow from a transport conduit, through the opening, and into an outer portions of the pan for consumption by poultry which are newly-hatched and/or not yet large enough to feed from the interiors of the pan. When the '811 feeder is raised above a feeding surface as shown in FIGS. 4 and 5 of the '811 patent, the brood gate automatically closes. The brood gate shown in U.S. patent application Ser. No. 302,015, however, can be opened and closed whether or not the feeder assembly shown therein is raised above a feeding surface or resting thereon, but will not automatically close and open.

Except with respect to those aspects specifically discussed above, it is believed that a concise explanation as to the potential relevance of each of the prior art patents cited is provided by the title and abstract of each.

### OBJECTS AND SUMMARY OF THE INVENTION

It is a general objective of the present invention to provide apparatus for feeding large numbers of birds and animals in an effective and efficient manner.

It is an associated objective to provide a poultry feeder having a barrier for preventing birds and animals from bodily climbing into the feeder yet simultaneously allowing those that do force their way inside to easily exit without sustaining injury or damaging the feeder apparatus.

2

It is a related object to provide a poultry feeder including a brood gate which will automatically close when the feeder assembly is elevated above a feeding surface, and automatically open when the feeder assembly is lowered onto a feeding surface, but which can also be locked to remain open when the feeder assembly is elevated.

It is yet another object of the present invention to provide a feeder which includes means for preselecting the size of a lower feed gate which automatically results when the feeder assembly is raised above a feeding surface.

It is a collateral object of the present invention to provide means for visually indicating the size of the lower feed gate opening which has been preselected.

Still another object of the present invention is to provide a feeder with a rotatable coupling means for selectively connecting a pan member component and a barrier means component which allows the pan to be simultaneously disconnected and suspended from the barrier means when so desired.

Still another important object of the present invention is to provide a poultry feeder with means for eliminating or limiting rotation of the feeder assembly with respect to a feed supply conduit, thereby preventing consuming poultry from spilling feed onto the feeding surface.

Other objects and advantages of the invention will become apparent upon reading the following detailed description and upon reference to the drawings. Throughout the description, like reference numerals refer to like parts.

Summarily stated, the invention comprises a feeder assembly for birds or animals having feeder tube means for directing feed into the assembly, said feeder tube means being operatively associated with a feed conveyor and means for raising and lowering the assembly with respect to a feeding surface; a pan member for containing and presenting feed; wherein a cone means can be provided loosely surrounding the feeder tube for controlling the pattern and amount of feed presented by the assembly; and wherein indexing means can be provided for enabling the preselection of a vertical distance automatically resulting between the cone means and the pan member when the feeder assembly is suspended above the feeding surface. The assembly may further comprise indication means to visually mark said preselected vertical distance. A brood gate may also be provided which is designed to automatically close upon elevation of the feeder assembly, yet can be locked open when so desired. Rotatable coupling means may also be provided for engaging and disengaging the pan member and the barrier means by simply rotating one with respect to the other, and for allowing simultaneous suspension of the pan member from the barrier means when desired. In addition, the barrier means has a profile and spoke design which facilitates the exit of birds or animals which force their way inside the assembly and makes it easier for the birds or animals to get out than it was for them to get in.

### BRIEF DESCRIPTION OF THE DRAWINGS

The features of the present invention which are believed to be novel are set forth with particularity in the appended claims. The organization and manner of operation of the invention, together with further objects and advantages thereof, may best be understood by refer-

5,092,274

ence to the following descriptions taken in connection with the accompanying drawings, in which:

FIG. 1 is a perspective view of an automated feeding system incorporating the present invention;

FIG. 2 is an elevational side view of the present invention shown in operative association with a system branch line;

FIG. 2A is a partial elevational view illustrating a two-piece top member with multiple-slot locking insert aspect of the invention in operative association with a system branch line;

FIG. 2B is an elevational view of a one-piece top member;

FIG. 3 is a plan view of the grill means component of the invention;

FIG. 4 is a sectional view taken along line 4—4 of FIG. 3;

FIG. 5 is a sectional view taken along line 5—5 of FIG. 3;

FIG. 6 is a sectional view taken along line 6—6 of FIG. 5;

FIG. 7 is an elevational side view of the present invention, partially in section, shown in operative association with a system branch line;

FIG. 8 is an elevational view of the cone means component of the invention;

FIG. 9 is a plan view of the cone means component of the invention, partially broken away;

FIG. 10 is an elevational side view of the present invention, partially in section, and partially broken away, shown in operative association with a system branch line and elevated above a feeding surface;

FIG. 11 is a partial elevational view of the feeder tube component of the invention, partially broken away;

FIG. 12 is a sectional view taken along line 12—12 of FIG. 11;

FIG. 13 is a plan view of the pan member component of the invention;

FIG. 14 is a sectional view taken along line 14—14 of FIG. 3;

FIG. 15 is a sectional view taken along line 15—15 of FIG. 14;

FIG. 16 is a sectional view taken along line 16—16 of FIG. 13;

FIG. 17 is a sectional view taken along line 17—17 of FIG. 13;

FIG. 18 is a sectional view taken along line 18—18 of FIG. 17;

FIGS. 19-20 illustrate the rotational coupling means feature of the invention; and

FIG. 21 illustrates the "swing-down" pan member suspension feature of the invention.

## DETAILED DESCRIPTION OF THE ILLUSTRATED INVENTION

While the invention will be described in connection with a preferred embodiment, it will be understood that it is not intended to limit the invention of that embodiment. On the contrary, it is intended to cover all alternatives, modifications and equivalents as may be included within the spirit and scope of the invention.

Turning first to FIG. 1, several feeders of the present invention 10 are shown in conjunction with a modern automated feeding system 12 and an associated feeding house 14. Apart from the individual feeders 10, the automated feeding system 12, (shown only in part in FIG. 1) comprises a bulk feed storage bin 16, a main transport conduit 18, a drop tube 20, a hopper 22 and a branch line 24. These components, of course, enable feed supplied to the bulk feed storage bin 16, by truck for example, to be delivered to the individual feeders 10. The automated feeding system 12 also includes helical conveying elements (not shown) located inside the main conduit 18 and branch line 24 for urging the feed through the system and insuring proper delivery of predetermined amounts of feed to each feeder 10. Support joist 26 and pulley cables 28 are also provided within the feeding house 14 to enable the vertical adjustment of the hopper 22, branch line 24 and feeders 10 with respect to a feeding surface 30. It should be noted that drop tube 20 is preferably constructed of a flexible material so as to allow vertical expansion and contraction in accordance with the vertical adjustment of the feeders 10 above the feeding surface 30 as discussed above.

FIG. 2 illustrates an individual feeder unit 10 operatively associated with a portion of a branch line 24. Each individual feeder 10 comprises a feeder tube 32, a cone member 34, a grill means 36 and a pan member 38. Preferably, the feeder tube 32 has a two-piece top member 40 which loosely surrounds the branch line 24 and provides access to the feed delivered thereby. As further described below, the two-piece top member 40 comprises a cap 41 and a base 43 slidably connected, as illustrated best in FIG. 2A, on track member 37 and rail 39 so as to enable manual separation therebetween and greatly facilitate installation and removal of the individual feeders 10 from the branch lines 24.

Referring back to FIG. 2, it can be seen that each branch line 24 further includes a structural rib 45 which is interrupted only where the branch line 24 interconnects with the individual feeders 10. At these locations, dispensing apertures (not shown) are formed in a lower portion of the branch line 24 in order to allow feed delivered by the branch line 24 to descend into a lower cylindrical portion 42 of the feeder tube 32, and hence into the pan member 38, in a manner discussed more thoroughly below.

From the foregoing description, it should be apparent that without additional restraint, the individual feeders 10 are free to rotate about the branch line 24 when suspended above the feeding surface 30 by joints 26 and cables 28. In certain applications, however, this freedom of rotation may be undesirable. Therefore, in order to prohibit such rotation, and thereby prevent consuming poultry from spilling feed onto the feeding surface 30, the feeders 10 can also be provided with a locking insert means 47, best illustrated in FIG. 2A. Once the feeders 10 have been properly positioned on the branch line 24, the branch line rib 45 can be engaged in one of the several slots 49 formed in the locking insert 47. Attempts to rotate the feeder 10 about the branch line 24 will now cause the rib 45 to bear against the locking insert 47 which is securely held in place by compression from the branch line 24, and such rotation will thereby be prevented.

In other feeding applications where allowing such rotation may be desirable, however, the locking insert 47 can simply be eliminated. Moreover, when instant installation and removal of the feeders 10 from the branch lines 24 is not essential, a one-piece top member 51 can be incorporated into the feeder assembly 10 as shown in FIG. 2B. In either case, the feeders 10 can be installed and removed from an end of a branch line 24 by sliding the rib 45 along a groove 53 formed in at the top of the branch line access opening of the top mem-

bers 40 and 41 until the feeder 10 is located over a dispensing opening in the branch line 24, at which time the feeder can be rotated down into proper position.

In accordance with one important feature of the present invention, the grill means 36 comprises a central hub portion 44, radially projecting spokes 46 and a perimeter ring 48. With reference to FIGS. 2 and 3, it can be seen that the central hub 44 loosely surrounds the cone member 34 and that the individual spokes 46 radially project outward therefrom at spaced intervals in a substantially horizontal direction, until turning downward to extend in a substantially vertical direction before joining with the perimeter rim 48. Accordingly, as can be envisioned by reference to FIG. 5, the profile of each spoke members 46, in combination with the central hub 44, define an annular area 50 within the feeder 10 of significantly greater dimension in both height and depth than existed in comparable prior art feeders such as those discussed above. In addition, as shown in FIGS. 4 and 6, spoke members 46 have a T-shaped cross sectional area throughout their length which adds strength and rigidity to the grill means 36. While it is undesirable for feeding birds or animals to force their way past the grill means 36 and gain access into the annular feeding area 50, such activity inevitably occurs. With the benefits of the combined effects of the above-described features, however, birds and animals that do find their way inside have sufficient room to maneuver past and get out of the grill means 36 easier than it was for them to get in, without suffering injury and/or damaging the feeder.

It should also be noted at this juncture that the central hub portion 44 of the grill means 36 is also provided with a rim 52 (FIG. 3) having pegs 54 projecting radially inward therefrom and toward the cone member 34. Furthermore, adjacent each series of pegs 54, a visual indication means 55 is located on the hub portion 44 which, as illustrated, comprises a series of numerical indicia 57.

In accordance with yet another important feature of the invention, best seen in FIGS. 7, 8 and 9, the cone member 34 loosely surrounds the feeder tube 32 and includes a cylindrical top section 56 which is formed integral with a truncated cone-like bottom section 58. In general, the cone member 34 allows for feeding versatility from a single feeder unit 10 by providing both an upper feed gate 60 and a lower feed gate 62 (FIG. 10) for filling the pan member 38 with feed. More specifically, the cone member 34 includes a window 64 (FIG. 8) which can be brought into and out of alignment with a corresponding aperture 66 (FIG. 11) formed in the lower cylindrical portion 42 of the feeder tube 32 to divert feed into the pan member 38 in the manner depicted by the arrows shown in FIG. 7. This upper feed gate 60 is mostly useful in feeding brood-sized birds and animals which, because of their relatively small size, require the feed to be presented in a pile near the perimeter of the pan 38 in order to gain access thereto.

Ordinarily, when the feeder unit 10 is resting on the feeding surface 30 as shown in FIG. 7, the feeder tube aperture 66 and the cone window 64 are in alignment and the upper feed gate 60 is in an open position. Conversely, when support joist 26 and pulleys 28 are employed to raise the feeder unit 10 into a suspended position above the feeding surface 30, as shown in FIG. 10, feeder tube aperture 66 and cone window 64 will normally slide vertically out of alignment with one another and the upper feed gate 60 will automatically close. In

some situations, however, it may be desirable to keep the upper feed gate 60 open, even when the feeder 10 is suspended above the feeding surface 30. To accomplish this result, feeder tube 32 and cone member 34 are provided with cooperating pairs of hooks 68 (FIGS. 11–12) and latches 70 (FIG. 9), respectively. The hooks 68 and latches 70 can be engaged by manually rotating the feeder tube 32 with respect to the cone member 34, and function to lock the vertical relationship therebetween such that the feeder tube 32 and cone member 34 will rise in unison holding the upper feed gate 60 in an open position and preventing automatic closure thereof upon elevation of the feeder 10 above the feeding surface 30.

As discussed above, when hooks 68 and latches 70 are not positioned for engagement, the upper feed gate 60 will automatically close upon operation of the pulley 28 which causes the feeder tube 32 to slide upward relative to the remaining components of the feeder 10. In order to prevent further relative upward movement of the feeder tube 32 once the upper feed gate 60 is closed, the feeder tube is provided with a lip means 72 (FIGS. 11–12) which is designed to contact an upper edge 74 (FIG. 8) of the cone member window 64 thereby joining the feeder tube 32 and cone member 34. Further, vertical movement will cause the feeder tube 32 and cone member 34 to move in unison, similar to when hooks 68 and latches 70 are engaged, but now the upper feed gate 60 will be closed.

Indicator tabs 61 and 63 are provided (as best shown in FIG. 2) on the feeder tube 32 and cone rim 81, respectively, to give visual indication of whether these components are positioned to "lock" the upper feed gate 60 open, or allow it to slide shut. For exemplary purposes only, as illustrated in FIG. 2, an "automatic-close" position is indicated when the indicators 61 and 63 are stacked. When the indicators 61 and 63 are offset, however, the upper feed gate 60 will lock-open upon elevation of the feeder assembly 10 above the feeding surface 30.

Alignment bars 65 (FIGS. 11 and 12) are also provided on the feeder tub 32 to facilitate alignment of the feeder tube 32 and cone member 34 and also serve to minimize the entry of dust when the components are adjusted with respect to one another.

Once the upper feed gate 60 has either locked open or slid shut, still further evaluation of the feeder assembly 10 causes the lower feed gate 62, which is generally associated with feeding larger birds and animals, to open as the feeder tube 32 and the cone member 34 move above the pan member 38 as shown in FIG. 10.

The extent to which the lower gate 62 opens, however, is dependent upon the relative rotational relationship between the cone member 34 and the grill means 36 due to the provision of an indexing means 75. More specifically, the indexing means 75 comprises a pair of graduated guide set 76 (only one shown) disposed on cone top section 56 which operate in conjunction with pegs 54 located on grill means rim 52 and projecting radially inward therefrom (FIG. 3). The operation of the graduated guide sets 76 and pegs 54 is easily understood upon reference to FIGS. 7-10, upon close inspection of which it will be observed that the vertical extent of each groove 80 of the graduated guide sets 76 is different. Accordingly, rotating the cone member 34 with respect to the grill means 36 determines which set of grooves 80 will match up with pegs 54 thereby presetting the extent to which the lower feed gate 62 will open. After the pegs 54 are positioned in grooves 80,

7

5,092,274

8

further vertical movement of the pulleys 28 will cause the entire feeder unit 10 to be elevated, and will no longer affect the size of the lower feed gate 62. From this point on, only the vertical distance between the pan 38 and feeding surface 30 will increase.

As noted earlier, visual indication means 55 comprising a series of numerical indicia 57, illustrated in FIG. 3 as Nos. 1–6, is provided on hub portion 44 of grill means rim 52. In addition, the cone member 34 is provided with indicator arrows 78 disposed along a top rim 81 thereof as best shown in FIG. 9. So arranged, it should be apparent that the extent to which the lower feed gate 62 has been preset to open to can be indirectly obtained by viewing the numerical indicia 57 and indicator arrows 78 when direct observation of the lower feed gate opening 62 is covered by feed in the pan 38. Moreover, the exact height of the lower feed gate opening 62 can be observed by noting the distance between the grill means rim 52 and the cone member rim 81 as indicated by the letter "Y" in FIG. 10.

It should also be noted that the cone means 34 further includes dividers 82 to minimize feed waste and raking by limiting the portion of feed to which each bird or animal has access.

Still another important aspect of the present invention is a rotatable coupling means 84 (FIGS. 19–20) for engaging and disengaging the grill means 36 and the pan member 38. As shown in FIG. 13, the pan member 38 comprises a conical central bottom portion 86, contoured intermediate area 88 and cylindrical side wall 90. The sectional side view of the pan member 38 illustrated in FIG. 16, further illustrates that the side wall 90 terminates at a top rim 92 which includes intermittent barbs 94. The operation of the rotatable coupling means 84 will be apparent on reference to FIGS. 19 and 20 where 35 it is shown that the grill means perimeter ring 48 includes intermittent rails 96 which cooperate with the intermittent barbs 94 of the pan member 38 once the pan rim 92 has been positioned beneath the grill means perimeter ring 48 and rotated into place.

To facilitate manual rotation of the pan member 38 with respect to the grill means 36, finger tabs 98, best seen in FIG. 16, are also provided on the pan member 38 extending downward from an exterior surface 100 thereof. Finger tabs 98 also aid in stacking and shipping of the feeder units 10.

Pan stops 101 are also provided adjacent selected intermittent barbs 94 as shown in FIG. 13 to limit rotation of the pan rim 92, once engaged.

The present invention further includes a pan member 50 "swing-down" feature which allows the pan member 38 to be simultaneously disengaged from the grill means 36 and suspended therefrom in a single motion. The "swing-down" feature facilitates cleaning of the pan 38 and is most easily understood by reference first to FIGS. 3, 14–15 which show a fragmented portion of the grill means perimeter ring 48, having a rack means 102 provided thereon. The rack means 102 extends radially outward of the perimeter ring 48 for a limited arc covering a single intermittent rail 96 as illustrated. Rack stops 103 are also provided as illustrated to limit rotation.

A notch 104 is formed in the rack means 102 at a point thereon away from the intermittent rail 96. Provision of the notch 104 allows for engagement of a hook member 106 provided on the pan sidewall 90 as shown in FIGS. 17–18. To engage the hook 106 on the rack means 102 the pan member 38 is turned upside down and the hook 106 is slid upward between the rack means and the

perimeter ring 48. Returning the pan member to a right side up position completes the engagement.

The rack means 102 and hook member 106 engagement will not interfere with the operation of the rotatable coupling means 84 discussed above. Now when the rotatable coupling means 84 is disengaged, however, the hook member 106 can be positioned over the notch 104 of the rack 102 and the pan member 38 will automatically fall into a suspended position as shown in FIG. 21. The "swing-down" suspension feature therefore provides a quick and easy one-step method to position the feeders for cleaning and/or periods of non-use.

The invention is claimed as follows:

1. A feeder assembly for birds or animals operatively associated with a feed conveyor and means for raising and lowering said feeder assembly and said feed conveyor with respect to a feeding surface, said feeder assembly comprising:

  a. feeder tube means for directing feed downwardly from the feed conveyor;
  b. cone means loosely surrounding said feeder tube means for controlling a pattern and amount of feed within the assembly;
  c. a pan member for containing and presenting feed;
  d. grill means for preventing consuming birds and animals from bodily climbing into said assembly;
  e. upper and lower fed gate means for diverting feed from said feeder tube means into said pan member, said lower feed gate automatically opening when said feeder assembly is raised above said feed surface, and said upper feed gate automatically closing when said feeder assembly is raised above said feeding surface; and
  f. means for locking said upper feed gate in an open position to prevent automatic closure thereof when said feeder assembly is raised above said feeding surface.

2. The feeder assembly recited in claim 1, wherein indexing means are provided for preselecting the size of the lower feed gate opening when said feeder assembly is raised above said feeding surface and visual indication means are provided for indicating the size of the lower feed gate selected at all times.

3. The feeder assembly recited in claim 1, wherein said grill means comprises a plurality of spaced, spoke members having an inverted L-shaped profile and T-shaped cross-section thereby defining a rectangular area within the assembly and making it easier for birds and animals to climb out of the feeder than to climb in.

4. The feeder assembly recited in claim 1, wherein a lower portion of said cone means is provided with circumferentially projecting dividers for segmenting feed contained by said pan member and thereby minimizing feed waste.

5. The feeder assembly recited in claim 1, further comprising a rotatable coupling means for engaging and disengaging said pan member and said grill means by way of changing a relative rotational relationship therebetween.

6. The feeder assembly recited in claim 5, wherein said pan member further comprises tab means projecting from an exterior surface of the pan member to facilitate manual rotation of said pan member for engagement and disengagement with said grill means.

7. The feeder assembly recited in claim 5 further comprising means for simultaneously disengaging said rotatable coupling means and suspending said pan mem-

ber from said grill means to facilitate cleaning the pan member.

8. The feeder assembly recited in claim 1, further comprising locking insert means operatively associated with said feed conveyor for prohibiting rotation of said feeder assembly about said feed conveyor when said assembly is suspended above a feeding surface.

9. The feeder assembly recited in claim 1, wherein said feeder tube means further comprises a two-piece top for connecting said assembly to said feed conveyor, said two-piece top having track and rail members for slideably engaging the two pieces together.

10. A poultry feeder comprising a pan member operatively associated with feeder tube means and a feed conveyor system; barrier means for discouraging feeding poultry from climbing into the pan member; and rotatable coupling means for engaging and disengaging said pan member and said barrier means by changing a relative rotational relationship existing therebetween.

11. The poultry feeder recited in claim 10, wherein said pan member further comprises exterior tab means to facilitate manipulation of the relative rotational relationship between the pan member and the barrier means.

12. The poultry feeder recited in claim 10, wherein said feeder further comprises a swing-down hanger means for simultaneously vertically suspending said pan member from said barrier means at the same time said rotatable coupling means is disengaged to facilitate cleaning of the pan member.

13. The poultry feeder recited in claim 10, further comprising cone means loosely surrounding said feeder tube means and indexing means for selectively incrementally adjusting a lower feed gate formed between said pan member and said cone means.

14. The poultry feeder recited in claim 13, wherein said barrier means comprises a series of spaced spoke members extending from a lower perimeter of said barrier means to a central hub member thereof loosely surrounding said cone means, and wherein said spoke members have an angle of profile of approximately 90° and T-shaped cross-sections thereby permitting consuming poultry to exit the pan member more easily than gaining access thereto.

15. The poultry feeder recited in claim 10, wherein said upper and lower feed gates are provided for the passage of feed between said feeder tube means and said pan member and wherein said upper feed gate can be locked in an open position to prevent automatic closure thereof when said poultry feeder is suspended above a feeding surface.

16. The poultry feeder recited in claim 10, further comprising locking insert means operatively associated with said feed conveyor system for fixing the rotational relationship between said poultry feeder and said feed conveyor system and thereby preventing consuming birds and animals from spilling feed from the feeder when suspended above a feeding surface.

17. The poultry feeder recited in claim 10, wherein said feeder tube means further comprises a two-piece top having cap and base members selectively engaged

and disengaged by way of a sliding mechanism for surrounding said feed conveyor system.

18. Feeder apparatus comprising: a feeder tube operatively associated with a feed conveyor; a feed pan for providing access to the feed having a substantially circular perimeter of predetermined diameter; and a cage-like barrier having a central hub portion and a series of spoke members having an inverted L-shaped profile and T-shaped cross-section extending between said central hub and a substantially circular lower perimeter portion having a diameter similar to the diameter of said circular perimeter of said feed pan to define a rectangular area within the assembly which makes it easier for birds or animals to climb out of the feeder apparatus than to climb in.

19. Feeder apparatus as recited in claim 18, further comprising a rotatable coupling means for engaging and disengaging said feed pan and said cage-like barrier by way of rotating said feed pan with respect to said cage-like barrier and then reversing said rotation, respectively.

20. Feeder apparatus as recited in claim 19 wherein said feed pan has tabs projecting from a bottom surface thereof to facilitate manual rotation and operation of said rotatable coupling means.

21. Feeder apparatus as recited in claim 18, further comprising hanger means for simultaneously suspending said feed pan from said lower perimeter of said cage-like barrier upon disengaging said rotatable coupling means.

22. Feeder apparatus as recited in claim 18, wherein said feeder apparatus and said feed conveyor are adapted for elevation above a feeding surface and wherein said feeder apparatus further comprises cone means loosely surrounding said feeder tube and indexing means enabling preselection of the height of a lower feed gate which automatically results between said cone means and said feed pan when said feeder apparatus is elevated above said feeding surface.

23. Feeder apparatus as recited in claim 22, further comprising an upper feed gate for the passage of feed between said feeder tube and said feed pan, wherein said upper feed gate can be locked in an open position to prevent automatic closure thereof when said feeder apparatus is elevated above said feeding surface.

24. Feeder apparatus as recited in claim 22, wherein a lower portion of said cone means is provided with circumferentially projecting separating members for dividing feed contained by said feed pan into sections thereby minimizing feed waste.

25. Feeder apparatus as recited in claim 22, further comprising visual indication means for marking the preselected height of the lower feeder gate at all times.

26. Feeder apparatus as recited in claim 18, further comprising locking insert means operatively associated with said feed conveyor for prohibiting rotation of said feeder apparatus about said feed conveyor.

27. Feeder apparatus as recited in claim 18, wherein said feeder tube further comprises a slideably connectable two-piece top for interconnecting said feeder tube and said feed conveyor.

* * * * *

# Exhibit B

# MODEL C2® PLUS Broiler Feeders
## Featuring the Extended Fin Model of the Well-Known Chore-Time® Original Feeder


**CHORE-TIME®**
Let's grow together.

## Extended Fin Model Helps Maintain Feed Flow

- Longer anti-rake fins keep the cone off the bottom of the pan – permits more feed in the pan when the windows are closed with the pan on the floor.

- Fixed height at the bottom helps maintain feed flow at all times, regardless of pan height or litter level.

- Unique pan profile uses a shallow cone molded into the center of the pan. This short raised area within the upper feed cone aids with feed distribution, both through the flood windows and into the pan.

- All Chore-Time Model C2® Plus feeder pans feature Chore-Time's extended five-year prorated warranty. (See Chore-Time's full written warranty for complete warranty details.)



*More interior space improves flow for harder flowing feed*

*Shallow cone aids with feed distribution*

*Extended fin keeps cone off the bottom of the pan regardless of pan height or litter level*

*Chore-Time's MODEL C2® PLUS Extended Fin Feeder*

## Gets Birds Off to a Good Start from Day One

- **Chick-friendly** 14-spoke grill design lets birds exit pans easily.

- **Shallow pan option** reduces the need for feed trays and extra labor when starting birds.

- **Optional feed windows** fill pans high with feed to attract chicks.

- **All-plastic construction** with ultra-violet protection and reinforced eating and cone wear areas.

## Keeps Birds Growing with Top Feed Conversion

- **Feed-saving features** include Chore-Time's "V"-shaped pan bottom design, double pan lip and anti-rake fins.

- **A reinforced eating area** provides greater strength in the pan bottom.

- **Easy-to-read feed level settings** make it simple to adjust the feed level as birds grow.

- **Designed for management simplicity** – all models are based on original Chore-Time designs.



*Easy-To-Read Feed Level Settings*



Find your certified **TRUE RED®** distributor in our on-line distributor finder to get more information.

# MODEL C2® PLUS Feeder Specifications

|  | **Extended Fin** | **Shallow Pan** | **Original Pan** |
|---|---|---|---|
| **Pan Shape** |  |  |  |
| **Pan Depth** | 3 inches (76 mm) | 2-1/2 inches (64 mm) | 3 inches (76 mm) |
| **Window Options** | Window Only | Window or Non-Window | |
| **Extended Fins** | 1/2-inch (13-mm) longer | Not Available | |
| **Advantages of Each Model of Chore-Time's MODEL C2® PLUS Feeder** | Fixed feed height at bottom helps maintain feed flow at all times regardless of pan height or litter level; more interior space improves flow for harder flowing feed. | Shorter pan height results in easier access for chicks and small birds. | Still available for those accustomed to using this model. |

## Other Feeder Features

- 1/3 or 1/2 HP 348 RPM power unit.
- 230 volt 50/60 Hz 1 or 3 phase power.
- Pans hang for cleaning.
- Removable top option and slide shut-off available for all models.



*Chore-Time's MODEL C2® PLUS Feeder is shown with removable top option.*

 **Let's grow together.**

**Feeding** | Drinking | Controls | Ventilation | Heating | Nests | Feed Storage

Find your certified TRUE RED® distributor in our on-line distributor finder.

**www.choretimepoultry.com**

Chore-Time Poultry Production Systems
Chore-Time Brock International
Divisions of CTB, Inc.
Phone: 574.658.4101 or +1.574.658.9323 (International)
E-mail: poultry@choretime.com or world@ctbworld.com

CT-2430/0411

# Exhibit C











cnlionpower.en.alibaba.com











# Exhibit D

Int. Cl.: 7

Prior U.S. Cls.: 13, 19, 21, 23, 31, 34 and 35

Reg. No. 3,486,761

United States Patent and Trademark Office

Registered Aug. 19, 2008

Corrected

OG Date Nov. 10, 2009

## TRADEMARK
## PRINCIPAL REGISTER



ALL SEASON FEEDERS, LTD. (TEXAS LIMITED PARTNERSHIP)
8410 HIGHWAY 87 EAST
SAN ANTONIO, TX 78263
OWNER OF U.S. REG. NO. 3,010,110.
THE MARK CONSISTS OF A FOOD STORAGE COMPARTMENT, WHICH IS SHAPED LIKE A SQUARE AT THE TOP AND MIDDLE AND TAPERS AT THE BOTTOM WITH SLANTED SIDES. THE NARROW BOTTOM OF THE LARGE CONTAINER DIRECTS FEED TO A SMALLER SQUARE FEED HEAD OPENING DESIGNED FOR DEER TO FEED WITHOUT DAMAGE TO THEIR ANTLERS. THE FOOD STORAGE CONTAINER IS MADE OF HEAVY GAUGE GALVANIZED METAL. THE DESIGN COMES WITH 5'6" LEGS AND DRIVE PINS TO ANCHOR THE FEEDER INTO THE GROUND. THIS 300 LB. FEEDER IS DESIGNED TO FEED DEER AND REDUCE THE WASTE OF FEED TO VARMINTS AND WEATHER. THE FEED HEAD IS DRAWN WITH DOTTED LINES TO INDICATE THAT THEY ARE NOT PART OF THE MARK.

SEC. 2(F).

FOR: MECHANIZED DEER, TURKEY, QUAIL, WILD GEESE AND EXOTIC ANIMAL FEEDER, IN CLASS 7 (U.S. CLS. 13, 19, 21, 23, 31, 34 AND 35).

FIRST USE 6-1-1998; IN COMMERCE 6-1-1998.

SER. NO. 76-662,895, FILED 7-12-2006.

*In testimony whereof I have hereunto set my hand and caused the seal of The Patent and Trademark Office to be affixed on Nov. 10, 2009.*

Int. Cl.: 7

Prior U.S. Cls.: 13, 19, 21, 23, 31, 34 and 35

## United States Patent and Trademark Office

Reg. No. 3,574,360
Registered Feb. 17, 2009

## TRADEMARK
### PRINCIPAL REGISTER



ALL SEASONS FEEDERS, LTD (TEXAS LIMITED PARTNERSHIP)
8424 US HIGHWAY 87
SAN ANTONIO, TX 78263

FOR: MECHANIZED DEER, TURKEY, QUAIL, WILD GEESE AND EXOTIC ANIMAL FEEDER, IN CLASS 7 (U.S. CLS. 13, 19, 21, 23, 31, 34 AND 35).

FIRST USE 6-30-2006; IN COMMERCE 6-30-2006.

OWNER OF U.S. REG. NO. 3,486,761.

THE MARK CONSISTS OF A FOOD STORAGE COMPARTMENT. THE FOOD STORAGE COMPARTMENT HAS AN UPPER SECTION, WHICH IS MULTIPLE FLAT SIDED WALLS WITH THE WALLS SLANTING INWARD. THE UPPER SECTION WALLS TERMINATE AT A FLAT LID. THE LOWER SECTION DESCENDS DOWNWARD FROM THE BOTTOM OF THE UPPER SECTION AND IS COMPRISED OF FLAT SIDED WALLS TAPERING INWARD. THESE WALLS TERMINATE AT A HEAD. MULTIPLE LEGS DESCEND FROM THE FOOD COMPARTMENT AND MAINTAIN THE FOOD COMPARTMENT AND HEAD ABOVE THE GROUND OR THE SUPPORT SURFACE. THE BROADCAST FEEDER ELEMENT IS DRAWN WITH DOTTED LINES TO INDICATE THAT IT IS NOT PART OF THE MARK.

SEC. 2(F).

SER. NO. 76-662,925, FILED 7-12-2006.

NICHOLAS ALTREE, EXAMINING ATTORNEY