**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
SOUTHERN DIVISION**

| | | |
|---|---|---|
| **CTB, INC.,** | **)** | |
| | **)** | |
| **Plaintiff,** | **)** | |
| | **)** | |
| **v.** | **)** | **Case No. 7:14-CV-157-D** |
| | **)** | |
| **HOG SLAT, INCORPORATED** | **)** | |
| | **)** | |
| **Defendant.** | **)** | |

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT HOG SLAT, INC.'S
MOTION FOR SUMMARY JUDGEMENT**

Pursuant to Fed. R. Civ. P. 56 and L.R. 56.1, Defendant Hog Slat, Inc. ("Hog Slat"), through counsel, respectfully files this Memorandum of Law in Support for its Motion for Summary Judgement.

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................. 1

LEGAL STANDARD FOR SUMMARY JUDGEMENT ........................................ 1

ARGUMENT ...................................................................................................... 3

    I.  **CTB's Asserted Trade Dress – both Configuration and Color—Is Functional and Therefore Ineligible for Trade Dress Protection.** .................................... 3

        A.  CTB Is Not Entitled To A Presumption of Non-Functionality. ............................ 5

        B.  CTB's Product Configuration Trade Dress is Functional ...................................... 7

        C.  CTB's Color Trade Dress Is Functional. ............................................................. 10

    II.  **CTB's Asserted Trade Dress Lacks Secondary Meaning and Is Invalid** ................. 12

        A.  CTB Has No Direct Evidence of Secondary Meaning. ....................................... 14

        B.  CTB's Use of the Asserted Trade Dress Has Not Been Exclusive ..................... 15

        C.  CTB Has Not Meaningfully Advertised the Feeders in More than Ten Years. ................................................................................................................ 16

    III.  **CTB Has Failed to Show Any Likelihood of Confusion** ................................... 18

        A.  There Is  No Actual Confusion Despite More Than Six Years' Concurrent Use. ..................................................................................................................... 19

        B.  CTB's Asserted Trade Dress Is Weak and Entitled to Little, If Any, Protection. ............................................................................................................. 19

        C.  Defendant's Intent ................................................................................................ 20

        D.  The Relevant Consumers Are Sophisticated, Careful Purchasers Who Are Not Confused. .................................................................................................... 22

        E.  Products Are Sold Through Different Facilities ................................................... 24

        F.  The Marks Are Not Similar ................................................................................. 24

    IV.  **CTB Has Failed to Show That Hog Slat's Use of the Alleged Trade Dress is the Proximate Cause of Any Harm to CTB** ................................................. 25

CONCLUSION ................................................................................................. 27

CERTIFICATE OF SERVICE ............................................................................ 28

## INTRODUCTION

Faced with legitimate competition for poultry feeders after the expiration of its patent and monopoly rights, CTB defrauded the trademark office to secure the invalid trade dress it now seeks to enforce. The undisputed record, including CTB's own patents, documents and admissions, shows that the trade dress is functional, has not acquired the requisite secondary meaning to become a source identifier, and presents no likelihood of confusion in the small, knowledgeable consumer base that purchases poultry feeders. In fact, the true "end users" of the product in this case do not use the color or shape of poultry feeders to identify the source or quality of the products at all—they are chickens! The small number of sophisticated companies that purchase such feeders value the color or shape of poultry feeders only for their functional ability to attract chickens to the feed source and to most efficiently and safely feed them. In light of the functionality of the alleged trade dress, and the absence of evidence of secondary meaning, confusion, causation and other elements of unfair competition, none of CTB's claims can be sustained. Further, CTB has failed to show Hog Slat's use of the alleged trade dress proximately caused CTB harm. Even in the light most favorable to CTB, Hog Slat is entitled to summary judgment as a matter of law on all of CTB's claims.

## STATEMENT OF UNDISPUTED MATERIAL FACTS

Pursuant to Local Rule 56.1, a separate Statement of Undisputed Material Facts ("SUF") is being filed contemporaneously herewith. Citations in this Memorandum to the SUF refer to numbered paragraphs therein (*e.g.*, "(SUF at ¶1.)").

## LEGAL STANDARD FOR SUMMARY JUDGEMENT

Summary judgment must be granted if the movant shows that there is no genuine dispute as to any material fact and that it is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Turner v. U.S.*, 736 F.3d 274, 281 (4th Cir. 2013) (affirming grant of summary judgment).

Material facts are those necessary to establish the elements of a party's cause of action. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The party seeking summary judgment has the initial burden to show the absence of a material fact. *Id.* at 256. In opposing a motion for summary judgment, however, the nonmoving party must show more than the mere existence of some alleged factual dispute between the parties, and must rely on more than conclusory allegations, mere speculation, or the "mere existence of a scintilla of evidence." *Id.* at 252. Summary judgment is therefore appropriate if the record as a whole could not lead a rational trier of fact to find in favor of the nonmovant. *Williams v. Griffin*, 952 F.2d 820, 823 (4th Cir. 1991).

Both this Court and the Fourth Circuit have held that summary judgment may appropriately be used to determine the issues of trade dress invalidity, both for functionality and lack of secondary meaning, and the absence of a likelihood of confusion. *Baughman Tile Co., Inc. v. Plastic Tubing, Inc.*, 211 F. Supp. 2d 720, 725 (E.D.N.C. 2002) (granting summary judgement for defendant and invalidating plaintiff's registered trademark where yellow coloring of corrugated plastic tubing was functional); *U.S. Search, LLC v. U.S. Search.com Inc.*, 300 F.3d 517, 525-26 (4th Cir. 2002) (affirming summary judgment of no secondary meaning); *Louis Vuitton Malletier S.A. v. Haute Diggity Dog, LLC*, 507 F.3d 252, 263 (4th Cir. 2007) (affirming summary judgment of no likelihood of confusion). Similarly, summary judgment is appropriate to dismiss insufficient claims of unfair competition under North Carolina's Unfair and Deceptive Trade Practices Act. *Champion Pro Consulting Grp., Inc. v. Impact Sports Football, LLC*, No. 15-1899, 2016 WL 7413527, at *6 (4th Cir. Dec. 22, 2016) (affirming district court's grant of defendant's motion for for summary judgment on UDTPA claims).

<u>**ARGUMENT**</u>

CTB claims federal and common law infringement of its purported Product Configuration Trade Dress and Color Trade Dress (together "Asserted Trade Dress"), and related claims for federal, state, and common law unfair competition. (D.E. 3 at ¶¶ 43-78.) To prevail on these claims, CTB bears the burden to establish that: (1) the Alleged Trade Dress is non-functional; (2) the Alleged Trade Dress has acquired secondary meaning; and (3) Hog Slat's purported infringement creates a likelihood of consumer confusion. *Ashley Furniture Indus., Inc. v. SanGiacomo N.A. Ltd.*, 187 F.3d 363, 368 (4th Cir. 1999); *see also Polo Fashions, Inc. v. Craftex, Inc.*, 816 F.2d 145, 148 (4th Cir. 1987) (applying substantially similar elements to North Carolina UDTPA and common law unfair competition claims, on top of UDTPA's additional proximate cause of injury element (*see infra* at Sec. IV).). Failure to sufficiently prove any one of these elements is fatal to CTB's claims. CTB cannot meet its burden to establish any of them.

The law and undisputed facts establish that: (i) both the Product Configuration Trade Dress and Color Trade Dress are impermissibly functional and ineligible for protection; and (ii) neither Asserted Trade Dress has acquired the requisite secondary meaning. Moreover, even if the Asserted Trade Dress were valid, Hog Slat's sale of its Products into a small, niche market of sophisticated purchasers who know the industry creates no likelihood of consumer confusion. For each of these reasons, CTB's claims fail as a matter of law.

I.    **CTB's Asserted Trade Dress – both Configuration and Color—Is Functional and Therefore Ineligible for Trade Dress Protection.**

Any alleged trade dress that serves a functional purpose is not protectable. *TrafFix Devices, Inc. v. Mktg. Displays, Inc.*, 532 U.S. 23, 29 (2001). In fact, the Supreme Court has repeatedly cautioned against misuse or overextension of trade dress protection, noting that "product design almost invariably serves purposes other than source identification." *Id.* (quoting

*Wal-Mart Stores, Inc. v. Samara Brothers, Inc.*, 529 U.S. 205, 213 (2000)). The "functionality doctrine prevents trademark law, which seeks to promote competition by protecting a firm's reputation, from instead inhibiting legitimate competition by allowing a producer to control a useful product feature." *Qualitex Co. v. Jacobson Prods. Co.*, 514 U.S. 159, 164-65 (1995) (internal quotations omitted). Indeed, "patent law, not trade dress law, is the principal means for providing exclusive rights in useful product features." *Valu Eng'g, Inc. v. Rexnord Corp.*, 278 F.3d 1268, 1273 (Fed Cir. 2002) (citation omitted); *Baughman*, 211 F. Supp. 2d at 722 (same); *Berlin Packaging, LLC v. Stull Techs., Inc.*, 381 F. Supp. 2d 792, 796 (N.D. Ill 2005) (discussing the "undeniable tension between trademark protection of product configurations and patent law, and noting that an award of perpetual monopoly "is incompatible with the purpose of patent law; . . . dedicating innovations to the public" (quoting *Thomas & Betts v. Panduit Corp.*, 138 F.3d 277, 285 (7th Cir. 1998))).

In this case, patent law, through CTB's '274 Patent, has already afforded CTB the ***exclusive*** right to practice the Poultry Feeder invention taught therein. (SUF at ¶1.) It is undisputed that those rights expired in October 2010. (*Id.*) Therefore, CTB's attempt to extend those monopoly rights here through trade dress law seeks to improperly extend long expired patent rights and prevent competitors from appropriately utilizing what should be freely available innovations. *See, e.g.*, *Valu Eng'g*, 278 F.3d at 1273; *TrafFix*, 532 U.S. at 29 ("Trade dress protection must subsist with the recognition that in many instances there is no prohibition against copying . . . . [C]opying is not always discouraged or disfavored . . . [and] "often leads to significant advances in technology."); *Berlin*, 381 F. Supp. 2d at 797 ("Copying is not only good, it is a federal right—a necessary component to the patent system's grant of limited monopolies."). CTB's wholly functional trade dress, regardless of its registration with the PTO,

consists of nothing more than utilitarian features for which it already received nearly two decades of exclusive rights to exclude others from practicing. (SUF at ¶1.) CTB's Asserted Trade Dress is therefore unprotectable as a matter of law. *TrafFix*, 532 U.S. at 29.

### A. CTB Is Not Entitled To A Presumption of Non-Functionality.

Generally, registration on the Principal Register is prima facie evidence that the trade dress depicted therein is non-functional. 15 U.S.C. § 1115(a). This presumption is "neutralized" and effectively "drop[ed] from the case," with evidence that the claimed configuration is functional. *McAirlaids, Inc. v. Kimberly-Clark Corp.*, 756 F.3d 307, 311 n.1 (4th Cir. 2014) (quoting *Retail Servs., Inc. v. Freebies Publ'g*, 364 F.3d 535, 543 (4th Cir. 2004)); *see also Berlin*, 381 F. Supp. 2d at 802 ("expired utility patent provides evidence of invalidity that causes the presumption of validity to drop out of the case" (citing *TrafFix*, 532 U.S. at 30)). Elimination of the presumption here is appropriate because ***both*** the "pan structure" and "grill structure"—which combine to create the asserted "generally octagonal shape" when "viewed from the side"—are functional. (SUF at ¶¶5, 6, 13, 14, 23.) Indeed, CTB's own '274 Patent (and others) make clear the functional nature of the Asserted Trade Dress. (*See infra* at Secs. I.B & I.C.) Therefore, the Product Configuration Trade Dress as a whole is functional, and any presumption of non-functionality has been more than adequately rebutted. *McAirlaids*, 756 F.3d at 311 n.1; *see also Apple Inc. v. Samsung Elecs. Co.*, 786 F.3d 983, 995–96 (Fed. Cir. 2015), *rev'd on other grounds*, 137 S. Ct. 429 (2016) (finding claimed trade dress functional where it comprised "nothing other than an assemblage of functional parts"); *see also Leatherman Tool Grp. v. Cooper Indus.*, 199 F.3d 1009, 1013 (9th Cir. 1999) (The whole is nothing other than the assemblage of functional parts, . . . it is semantic trickery to say that there is still some sort of separate 'overall appearance' which is non-functional.").

Further, any presumption relied upon by CTB should be rejected in view of CTB's withholding compelling evidence that was specifically requested by the PTO. (SUF at ¶¶38-53.) In the first Office Action rejecting the '988 Registration, CTB was required to provide the PTO with "a written explanation and any documentation *concerning similar designs* used by competitors." (*Id.* at ¶40.) ████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████ (*Id.* at ¶¶44, 47.)

Instead, CTB responded to the PTO's request for "similar designs used by competitors" with a separate compilation of irrelevant black and white feeder images that conveniently omit the Asserted Trade Dress elements.[1] (SUF at ¶47.) Indeed, so significant is the withholding of these numerous images of similar designs that CTB even withheld them from discovery in this case and was sanctioned. (*Id.* at ¶45.) Accordingly, even without the significant other rebuttal evidence identified herein, the withholding of the advertisements—because they were adverse to CTB's trade dress applications and could not be properly considered by the PTO (D.E. 74 at 24)—undermines any statutory presumption that could be afforded CTB. *See OBX-Stock, Inc. v. Bicast, Inc.*, 558 F.3d 334, 342 (4th Cir. 2009).

---

[1] In response to the identical Office Action in the companion case that matured into the Color Trade Dress registration, CTB withdrew its product configuration claim and asserted that the Request for Information was therefore moot and did not provide a response (e.g., a response including color images showing the prevalent use of red and/or gray at the time). (SUF at ¶50.)

**B.     CTB's Product Configuration Trade Dress is Functional**

A product feature is functional "if it is essential to the use or purpose of the article <u>or</u> if it affects the cost or quality of the article." *TrafFix*, 532 U.S. at 32. Put another way, "a feature is functional if it is the reason the device works," or "its exclusive use would put competitors at a significant non-reputation-related disadvantage." *McAirlaids*, 756 F.3d at 310-11 (quoting *TrafFix*, 532 U.S. at 34, 32 (citations omitted)). The ultimate inquiry is whether the product "works better" because of the asserted trade dress. *Baughman*, 211 F. Supp. 2d at 722 n.1.

To determine whether trade dress is functional, courts generally consider the *Morton-Norwich* factors: (1) the existence of utility patents disclosing the design's utilitarian advantages; (2) advertising materials touting the design's utilitarian advantages; (3) the availability of functionally equivalent designs, and (4) whether the design enables a comparatively simple or cheap method of manufacturing. *McAirlaids*, 756 F.3d at 313. However, a Court need not consider all of these factors when (1) one or more utility patents demonstrate the functionality of the design, *TrafFix*, 532 U.S. at 30-32, and/or (2) a party's admissions through its advertising or otherwise eliminate any genuine issue of fact regarding functionality. *See Baughman*, 211 F. Supp. 2d at 724. Here, the undisputed facts establish that both the Product Configuration and Color Trade Dress are functional and thus invalid.

The Product Configuration Trade Dress consists of the "pan structure" and "grill structure." (SUF at ¶¶5, 6, 13, 14, 23.) Significantly, ███████████████████ ██████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████ ████████████████████████████████████████████████ (SUF at ¶¶23-24.) In addition, CTB's own advertising and product literature touts the utilitarian aspects of this v-shaped pan. (*Id.* at ¶23.) Accordingly, there can be no dispute that the "v-shaped" outline of the

"pan structure" is functional because that is how and why it works and CTB advertised it as such. *TrafFix*, 532 U.S. at 34 (holding a feature functional where it was the "reason the device works" or "exclusive use would put competitors at significant non-reputation-related disadvantage"); *Valu Eng'g, Inc.*, 278 F.3d at 1274 (advertising materials touting utilitarian advantages evidence functionality).

Further, the record is replete with evidence that the claimed "grill structure" is likewise functional. (SUF at ¶¶14-22.) Of primary significance is the fact that the profile of the "grill structure" is the "central advance" of CTB's own '274 Patent. *TrafFix*, 532 U.S. at 29-30 ("utility patent is ***strong evidence***"); *McAirlaids*, 756 F.3d at 312 (discounting patent evidence where, unlike here, the trade dress was not the patent's "central advance"). Here, the '274 Patent specifically claims a "barrier" or "grill means" made up of "spoke members having an ***inverted L-shaped*** [or "approximately 90°"] ***profile***." (SUF at ¶¶16-20.) This novel spoke profile, that the '274 Patent teaches, results in "an annular area [] within the feeder [] ***of significantly greater dimension in both height and depth than existed in comparable prior art feeders***." (*Id.* at ¶16.) "When ***combined*** with the spoke members' "t-shaped cross sectional area," the grill means provides "sufficient room [for birds] ***to maneuver*** past and get out of the grill means [] easier than it was for them to get in, without suffering injury and/or damaging the feeder." (*Id.* at ¶17.) CTB's claims in this patent application are telling because it makes clear that the "inverted L-shaped profile" now being asserted as trade dress was at the heart of the novel utility patented more than 20 years ago. *TrafFix*, 532 U.S. at 31 (finding features claimed in a patent functional where patent touted the feature's "unique and useful manner"); *Berlin*, 381 F. Supp. 2d at 802 ("[I]t is important to note that the cap protected by the expired patent and . . . the trade dress ***are identical***" (emphasis)).

Furthermore, CTB admitted that the spoke profile claimed in the '274 Patent—*i.e.* the "inverted L shaped profile" that defines an internal area within the feeder of "significantly greater dimension in both height and depth than existed in comparable prior art feeders"— provides a "better product than other designs in the market place," including CTB's own Model 2000 and Model G. (SUF at ¶¶20-22.) This "significantly greater" area within the feeder allows birds that make their way inside to adequately maneuver and "migrate around the feeder and not be trapped." (*Id.* at ¶19.) Further still, CTB admitted that both the "***profile*** and spoke design" claimed in the patent is what "facilitates the exit of the birds." (*Id.* at ¶20.). ███████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████(SUF at ¶20.) Therefore, CTB's patent is conclusive evidence that the claimed "inverted L-shaped profile" being asserted now as trade dress is functional, and CTB's claims fail as a matter of law. *TrafFix*, 532 U.S. at 32 (finding asserted trade dress functional based on disclosures in related patents alone).

Although the '274 Patent is sufficient alone to establish functionality, CTB's own documents are also conclusive evidence that the trade dress is functional. For example, CTB's advertising promotes the design's utilitarian advantages. A 2003 advertisement touts the "patented feeder grill design [that allows] young birds to exit pans easily." (Cole Depo. Ex. 4; *see also* Exs. 2-4, 20-22, 24 (each touting similar functionality).) As noted above, CTB admitted that it is ***both*** the "***profile*** and spoke design" that "facilitates the exit of the birds." (SUF at ¶20.). This further evidences functionality. *Baughman*, 211 F. Supp. 2d at 724.

Accordingly, because the totality of the trade dress—a "generally octagonal shaped" profile—consists of the admittedly functional "pan structure" and the admittedly functional "grill structure," the asserted trade dress as a whole is functional. *Apple*, 786 F.3d at 995–96; *TrafFix*, 532 U.S. at 32. In addition, with this functionality established, the Court need not consider the availability of alternative designs. *TrafFix*, 532 U.S. at 33-34; *Baughman*, 211 F. Supp. 2d at 725 (quoting *Valu Eng'g*, 278 F.3d at 1276 ("once a product feature is found functional based on other considerations there is no need to consider the availability of alternative designs"); *see also McAirlaids*, 756 F.3d at 312 (considering alternative designs only because the patents in that case did not provide the "strong evidence" of functionality, unlike the patents here and in *TrafFix*). CTB's Product Configuration Trade Dress is functional and invalid.[2]

### C. CTB's Color Trade Dress Is Functional.

CTB's Color Trade Dress was denied registration multiple times on the Principal Register, and CTB was forced to settle for the Supplemental Register. (*See* '371 Reg. File Hist. at 19-20.) Accordingly, the Color Trade Dress is *presumed* functional, and CTB bears the burden of proving that the claimed color combination—the red pan and gray grill—is not functional. 15 U.S.C. § 1125(a)(3); *TrafFix*, 532 U.S. at 29; *see also OBX*, 558 F.3d at 342 (holding that multiple rejections at the PTO on invalidity grounds supports a finding of invalidity at trial). CTB cannot meet its burden, because once again it is simply attempting to claim a non-arbitrary combination of functional elements, the assemblage of which is also impermissibly functional. *Apple*, 786 F.3d at 995–96.

---

[2] CTB admitted that alternative designs yielding equivalent functionality are not readily available. (SUF at ¶21 (feeder height should be minimized to avoid "problems").) Accordingly, for this market segment, alternative designs with more vertically extending grill portions are not as effective. *See Valu Eng'g*, 278 F.3d at 1276 (holding that alternative designs, to be considered, must "work equally well")

First, CTB's patents and numerous others establish that the color red is attractive to chickens and functional in chicken feeders. Of particular interest is <u>CTB's own</u> '732 Patent, which highlights that it is "relatively well known within the agricultural industry that adult turkeys and chickens *are attracted to the color red* and, therefore, many adult turkey and chicken feeding trays *are now colored red*." (SUF at ¶30 (chickens see in red portion of color spectrum).) Not only does CTB's own patent highlight the utilitarian nature of the color red in chicken feeders, and the prevalence of this knowledge throughout the industry, but it specifically claims the color red as well. (*Id.*) Further still, numerous other patents identify and claim the use of red in chicken feeders to attract chickens. (*Id.* at ¶¶31-32.) These patents alone demonstrate that the color red in chicken feeders is functional. *TrafFix*, 532 U.S. at 32; *Baughman*, 211 F. Supp. 2d at 724.

A number of third party poultry equipment providers similarly promote the functional benefits of using the color red to attract poultry. (SUF at ¶33 ("The red coloring attracts birds so they will feed more.").) Such third party admissions can also be relied upon to find functionality. *See* Trademark Manual of Examination Procedure § 1202.02(A)(v)(B) (citing *In re Gibson Guitar Corp.*, 61 USPQ2d 1948, 1951 (TTAB 2001)).

Further and most significantly, CTB itself has admitted that red is functional. Mr. Cole, CTB's engineer and 30(b)(6) witness on "functional and utilitarian features" of CTB's products,

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

█████████████████████████████████████" (*Id.* at ¶ 27.) Accordingly, utilization of a red pan "is not an arbitrary flourish . . . of [CTB's] product; it is the reason the device works" and is

therefore functional. *TrafFix*, 532 U.S. at 34; *Baughman*, 211 F. Supp. 2d at 724 (finding yellow tubing functional based on party admissions).

████████████████████████████████████████████████████

████████████████████████████████████████████ (SUF at ¶¶25, 36.) This, too, is functional. In fact, the central advance of CTB's '732 Patent is to provide a feeder with reflective particles that attracts chickens to their feed trays. (SUF at ¶34.) The patent even goes so far as to identify aluminum flakes as the preferable reflective particles, just like the aluminum flakes used in CTB's grill. (*Id.* at ¶¶34-37.) Because the gray claimed by CTB as trade dress is the "central advance" of one of CTB's own issued patents, the claimed "gray" (metallic gray) grill structure is also functional. *TrafFix*, 532 U.S. at 30-32. Thus, the asserted combination comprises nothing more than a non-arbitrary combination of functional elements, and as a whole, is functional and invalid. *Apple*, 786 F.3d at 995–96.

## II. CTB's Asserted Trade Dress Lacks Secondary Meaning and Is Invalid

CTB's Asserted Trade Dress is also invalid because it lacks the requisite secondary meaning to serve any source identifying function. The Supreme Court has made clear that neither color trade dress, nor product configuration trade dress, can ever be "inherently distinctive." *Qualitex*, 514 U.S. at 162-63; *Wal-Mart*, 529 U.S. at 213 ("In the case of product design, as in the case of color, we think consumer predisposition to equate the feature with the source ***does not exist***." (emphasis)). Thus, for the Asserted Trade Dress to be valid, a showing of secondary meaning is absolutely required. *Id.*; *see also* 2 McCarthy at § 15:1 ("If a designation [is not] 'inherently distinctive,' then [it] must be proven to have acquired distinctiveness as a mark in buyers' minds. That acquired distinctiveness is called a 'secondary meaning.'"). CTB cannot meet its burden to demonstrate that the Asserted Trade Dress has, or ever had, secondary meaning. *Perini Corp. v. Perini Const., Inc.*, 915 F.2d 121, 125-26 (4th Cir. 1990).

As an initial matter, there can be no claim that CTB's Product Configuration Trade Dress registration on the Principal Register affords CTB any presumption of secondary meaning in the trade dress. The presumption of validity, and therefore secondary meaning, afforded by the Principle Register is only available as of the registration date—here March 27, 2012. 2 McCarthy at § 11:43 ("The presumption to which a § 2(f) registration is entitled is not that the designation is inherently distinctive, but that it had acquired secondary meaning *as of the date of registration*."); *see also Bay State Sav. Bank v. Baystate Fin. Servs., LLC*, 484 F. Supp. 2d 205, 214 (D. Mass. 2007) (rejecting presumption and placing burden of establishing secondary meaning on Plaintiff where accused infringement pre-dated registration (citing *Aromatique, Inc. v. Gold Seal, Inc.*, 28 F.3d 863, 870 (8th Cir. 1994))). Hog Slat entered the market more than a year before March 2012. (SUF at ¶63.) Accordingly, CTB cannot rely on any presumption of secondary meaning.[3] S*ee Perini*, 915 F.2d at 125-26 ("[P]laintiff has the burden to show secondary meaning . . . prior to the time when the defendant entered the market.").

Further, "[p]roof of secondary meaning entails a rigorous evidentiary standard." *George & Co., LLC v. Imagination Entm't Ltd.*, 575 F.3d 383, 395 (4th Cir. 2009). The Fourth Circuit considers six factors to determine secondary meaning: (1) plaintiff's advertising expenditures; (2) consumer studies linking the mark to a source; (3) plaintiff's record of sales success; (4) unsolicited media coverage; (5) attempts to plagiarize the mark; and (6) length and exclusivity of the plaintiff's use of the mark. *Id.* (citing *Perini*, 915 F.2d at 125)). Even when viewed in a light favorable to CTB, there is insufficient evidence of secondary meaning in the Asserted Trade Dress at any time, but especially *prior to* Hog Slat's entry into the market in early 2011 (SUF at

---

[3] Further, even if the presumption were available, it would be entitled to little weight in view of the adverse inferences surrounding CTB's withholding of materials specifically requested by the PTO that demonstrate extensive use by third parties. (*See supra* at Sec. I.A.)

¶63.); in fact, application of these factors here demonstrates an absence of any secondary meaning whatsoever.

## A. CTB Has No Direct Evidence of Secondary Meaning.

Generally, the "most direct and persuasive way" of establishing secondary meaning is through survey evidence. *George & Co.*, 575 F.3d at 395-96. Consumer surveys ordinarily determine the percentage of the consumer public that is able to identify the source of a specific product or service. Here, there is no admissible survey evidence for the Court to consider. (*See* D.E. 74 at 22-24; SUF at ¶50.) In the Fourth Circuit, "the absence of [survey evidence] is telling, as such evidence is generally thought to be the most direct and persuasive way of establishing secondary meaning." *Id.* (quoting *U.S. Search*, 300 F.3d at 526).

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████ Accordingly, the 2013 survey cannot support a finding of secondary meaning, and if anything, the adverse inference awarded to Hog Slat by this Court supports a finding of no secondary meaning in the Asserted Trade Dress. *See U.S. Search, LLC v. U.S. Search.com Inc.*, 300 F.3d 527, 526 (4th Cir. 2002) (relying on survey data showing lack of secondary meaning in finding no secondary meaning at summary judgment).

In addition, ██████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████" (SUF

at ¶50.)[4]  Accordingly, the only inference to be drawn from CTB's purported survey evidence is that CTB intentionally deleted data evidencing an ***absence*** of secondary meaning.  (D.E. 74 at 24.)  Therefore no secondary meaning in the Asserted Trade Dress exists.  *U.S. Search*, 300 F.3d at 536.

>    **B.**    **CTB's Use of the Asserted Trade Dress Has Not Been Exclusive**

Notwithstanding the "telling" absence of direct evidence of secondary meaning, the remaining factors further evidence a lack of secondary meaning.  *George & Co.*, 575 F.3d at 395-96.  For example, while evidence of ***substantially exclusive*** use of trade dress may indirectly support secondary meaning, *see U.S. Search*, 300 F.3d at 525 (rejecting evidence of continuous use that was not exclusive), "concurrent use of [trade dress] by competitors is relevant as tending to ***negate*** the existence of secondary meaning."  Restatement (Third) of Unfair Competition, § 13 cmt. e; *accord Campbell Sales Group, Inc. v. Gamercy Park Design, LLC*, No. 1:10-CV-55, 2010 WL 3945350, at *7 (M.D.N.C. Oct. 6, 2010) ("It is extremely difficult for a seller to successfully prove that a product or package design has achieved secondary meaning when the design is a common one put on the market by other sellers.") (citing 1 McCarthy at § 8:11.50)); *Mana Prods., Inc. v. Columbia Cosmetics Mfg., Inc.*, 65 F.3d 1063, 1069-70 (2d Cir. 1995) ("where it is the custom in a particular industry to package products in a similar manner, a trade dress done in that style is likely to be generic"); *see also CareFirst of Md., Inc. v. First Care, P.C.*, 434 F.3d 263, 270 (4th Cir. 2006) ("a weak trademark is one that is often used by other parties").  Here, the undisputed record makes clear that similar colors and designs have been and continue to be ubiquitous in the poultry feeding industry, thereby establishing an absence of

---

[4] CTB cannot rely on either or both of Ms. Harper's surveys; they are inadmissible and must be excluded.

secondary meaning. *See Campbell*, 2010 WL 3945350 at *7 ("the sheer number of similar designs on the market **weighs heavily against** a finding of secondary meaning" (emphasis)).

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████ (*See id.* at 2016 Hight 30(b)(6) Depo. at Exs. 13 & 16.) Further still, CTB has conceded that several other highly similar, and in at least one case identical (the Cumberland "E-Feeder"), poultry feeders proliferate or have proliferated the market. (*Id.* at ¶51 and numerous exhibits thereto.) The similar profiles and/or use of color among these many feeders in the market make clear that it is customary to construct poultry feeders in this generally octagonal shape. *See Mana*, 65 F.3d at 1069-70. In view of this proliferation of similar designs in the marketplace, this factor weighs against a finding of secondary meaning. *U.S. Search*, 300 F.3d at 525-26.

### C. CTB Has Not Meaningfully Advertised the Feeders in More than Ten Years.

Courts may also consider a plaintiff's advertising expenditures as indirect evidence of secondary meaning. *Id.* (finding summary judgment of no secondary meaning despite evidence of limited advertising expenditures). To be effective, the advertising must have "had the desired effect of creating a secondary meaning" in the trade dress. *Worsham Sprinkler Co., Inc. v. Wes Worsham Fire Prodction, LLC*, 419 F. Supp. 2d 861, 870 (E.D. Va. 2006); *accord* 2 McCarthy at § 15:48 ("Evidence of advertising and sales is entirely circumstantial and that evidence does not necessarily indicate that consumers associate a mark with a particular source, particularly when the advertisements and promotions do not specifically emphasize the mark." (quoting *Platinum Home Mortgage Corp. v. Platinum Financial Group, Inc.*, 149 F.3d 722, 729 (7th Cir. 1998))).

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████. (*Id.*) CTB cannot establish the requisite consumer association in view of the numerous competing products bearing the same or similar trade dress. *See Campbell*, 2010 WL 3945350 at *7-8; *see also U.S. Search*, 300 F.3d at 525-26; *Sunbeam Corp. v. Equity Indus. Corp.*, 635 F. Supp. 625, 629-30 (E.D. Va 1986) ("While sales success and advertising outlays are factors to be considered on the secondary meaning issue, they only peripherally relate to public perception of the product's appearance.").

CTB's Asserted Trade Dress is nothing more than a common product configuration ubiquitous in the poultry feeder industry. (*See supra* at Sec. II.B.) That inherent weakness,

███████████████████████████████████████████████████

███████████████████████████████████████ (Sec. II.C), a complete absence of unsolicited media coverage directed to the trade dress (SUF at ¶53), and no attempts to impermissibly exploit any good will in the trade dress (*see infra* at III.C),[5] establish that CTB cannot meet its "rigorous" burden to show secondary meaning in the Asserted Trade Dress. *U.S. Search*, 300 F.3d at 525 (affirming summary judgement of no secondary meaning despite evidence of advertising and sales where survey evidence showed an absence of recognition and there was no evidence of unsolicited media coverage, exclusive use, or improper plagiarizing); *see also B & J Enterprises, Ltd. v. Giordano*, 329 F. App'x 411, 420–21 (4th Cir. 2009)

---

[5] In the absence of evidence that defendant acted in bad faith indicating an intent to deceive or confuse, no presumption of secondary meaning should be inferred. *Gildan USA Inc. v. Dillard's, Inc.*, No. 3:14-CV-590, 2015 WL 1345260, at *5 (W.D.N.C. March 23, 2015) (citing *Shakespeare*, 110 F.3d at 241).

(affirming summary judgment for defendants where plaintiff, despite showing longstanding use of the mark and significant advertising expenditures, otherwise failed to demonstrate secondary meaning). Hog Slat is entitled to judgment as a matter of law.

### III.    CTB Has Failed to Show Any Likelihood of Confusion

CTB's claims also fail because CTB cannot show Hog Slat's sales of its product creates a likelihood of consumer confusion. Hog Slat is entitled to summary judgment on this ground as well. *Louis Vuitton*, 507 F.3d at 263.

The Fourth Circuit considers nine factors when evaluating whether a likelihood of confusion exists: "(1) the strength or distinctiveness of the plaintiff's mark as actually used in the marketplace; (2) the similarity of the two marks to consumers; (3) the similarity of the goods or services that the marks identify; (4) the similarity of the facilities used by the markholders; (5) the similarity of advertising used by the markholders; (6) the defendant's intent; (7) actual confusion; (8) the quality of the defendant's product; and (9) the sophistication of the consuming public." *George & Co.* 575 F.3d at 393 (citing *Pizzeria Uno Corp. v. Temple,* 747 F.2d 1522, 1527 (4th Cir. 1984)). "Not all of these factors are of equal importance, nor are they always relevant in any given case."[6] *CareFirst*, 434 F.3d at 268. Further, the mere possibility of consumer confusion is not enough; a *likelihood* of confusion is required. *U.S. Conference of Catholic Bishops v. Media Research Ctr.*, 432 F. Supp. 2d 616, 623 (E.D. Va. 2006) (citing *AMP, Inc. v. Foy*, 540 F.2d 1181, 1186 (4th Cir. 1976)).

---

[6] Here, for example, CTB has conceded that Hog Slat's product is a "quality feeder" (SUF at ¶68), making this factor irrelevant. *See Swatch, S.A. v. Beehive Wholesale, LLC*, 888 F. Supp. 2d 738, 755-56 (E.D. Va. 2012) (finding the quality factor "not applicable" where evidence showed that defendant's products, though less expensive, were **not** of inferior quality (citing *Sara Lee*, 81 F.3d at 467)), *aff'd*, 739 F.3d 150, 159 n.10 (2014).

**A. There Is No Actual Confusion Despite More Than Six Years' Concurrent Use.**

Evidence of actual confusion, or a lack thereof, is "often paramount' in the likelihood of confusion analysis," and can "weigh[] decidedly against" a plaintiff where, like here, there is ***no evidence of actual confusion*** (SUF at ¶11). *George & Co.*, 575 F.3d at 393, 400; *accord Lone Star Steakhouse & Saloon, Inc. v. Alpha of Va., Inc.*, 43 F.3d 922, 937 (4th Cir.1995) (noting that the actual confusion factor is "entitled to substantial weight as it provides the most compelling evidence of likelihood of confusion"). An absence of actual confusion is especially compelling where there is a substantial period of concurrent use, like the approximately six years here (SUF at ¶63). *See CareFirst*, 434 F.3d at 268-69 (finding nine years concurrent use without actual confusion "strong inference that there is no likelihood of confusion"). CTB has admitted that it cannot identify even one instance in which a consumer was confused by Hog Slat's sale of its feeder products. (SUF at ¶11.) This absence of actual confusion over the last six years therefore weighs heavily against any likelihood of confusion. *CareFirst*, 434 F.3d at 268-69; *Ale House Mgmt., Inc. v. Raleigh Ale House, Inc.*, No. 5:02-CV-709, 2006 WL 6663793, at *5 (E.D.N.C. Mar. 21, 2006) (finding six years concurrent use without actual confusion probative of an absence of confusion).

**B. CTB's Asserted Trade Dress Is Weak and Entitled to Little, If Any, Protection.**

The "strength of a mark" factor considers the degree to which a relevant consumer would associate the mark with a unique source. *CareFirst*, 434 F.3d at 269; *see also Pizzeria Uno Corp. v. Temple*, 747 F.2d 1522, 1527 (4th Cir. 1984) (strength of the mark is a "paramount factor"). "Generally, the stronger the mark, the greater the likelihood that consumers will be confused by competing uses of the mark." *George & Co.*, 575 F.3d at 393; *see also* 4 McCarthy at § 23:40.50 (noting converse that weak marks are typically given weak protection). In

determining a mark's strength, courts look to "both conceptual strength and commercial strength." *George & Co.*, 575 F.3d at 393.

"Conceptual strength" relates to a mark's inherent distinctiveness (or lack thereof). *Id.* at 393-94. As noted above, neither color nor product configuration can ever be inherently distinctive, and proof of secondary meaning is always required. *Wal-Mart*, 529 U.S. 205, 213 (2000) (product configuration); *Qualitex*, 514 U.S. at 162-63 (color). The trade dress is therefore not "distinctive or unusual," and therefore "not conceptually strong." *CareFirst*, 434 F.3d at 270. The "commercial strength," which is directly related to the concept of secondary meaning evaluated above (*see supra* at Sec. II), is also weak. *George & Co.*, 575 F.3d at 395. This factor therefore weighs in favor of no likelihood of confusion.[7] *See George and Co.*, 575 F.3d at 396 ("the record is devoid of meaningful evidence demonstrating that consumers associate the [mark] with [plaintiff]"); *see also Campbell*, 2010 WL 3945350 at *9 ("Defendants' evidence of the existence of a significant number of similar or nearly identical products is also compelling" in finding the mark weak and confusion unlikely).

## C. Defendant's Intent

Courts also consider a defendant's "intent to confuse the buying public" when determining likelihood of confusion. *George & Co.*, 575 F.3d at 397. Defendant's intent in copying trade dress is only relevant, however, "when the copier intends to exploit the ***good will*** created by an already registered trademark." *Shakespeare Co. v. Silstar Corp. of Am., Inc.* 110 F.3d 234, 239 (4th Cir. 1997) (emphasis); *see also CareFirst*, 434 F.3d at 273 ("The intent of a

---

[7] Also noted above at Sec. II.C is the fact that CTB dramatically reduced its advertising of the Products starting in 2003, with only minimal expenditures since about 2006. This tilts the similarity of advertising factor in Hog Slat's favor as well. *See Renaissance Greeting Cards, Inc. v. Dollar Tree Stores, Inc.*, 405 F. Supp. 2d 680, 696-697 (E.D. Va. 2005) ("minimal advertising . . . militates against a likelihood of confusion), *aff'd*, 227 Fed. Appx. 239, 245 (4th Cir. 2007); *Shakespeare*, 110 F.3d at 242 (sophistication of buyers and lack of advertising emphasis on claimed trade dress negated any confusion).

junior user is relevant only if the junior user intended to capitalize on the good will associated with the senior user's mark.").  The Fourth Circuit has made clear that an intent to copy mere "***functional attributes***" of a product, on the other hand, does ***not*** weigh in favor of a likelihood of confusion.  *Shakespeare*, 110 F.3d at 237 (affirming district court's conclusion that the only intent was "to reproduce and utilize a functional attribute, which is unquestionably a legitimate activity"); *id.* at 239 (holding that defendant is "legally entitled" to copy functional aspects of products (citing *Bonito Boats, Inc. v. Thunder Craft Boats, Inc.*, 489 U.S. 141, 164 (1989)); *see also Versa Prods. Co., Inc. v. Bifold Co. (Mfg.) Ltd.*, 50 F.3d 189, 208 (3d Cir. 1995) ("[I]n the product configuration context, a defendant's intent is [relevant] only if intent to confuse or deceive is demonstrated by clear and convincing evidence, and only where the product's labeling and marketing are also affirmatively misleading.").

Here, there is no question that Hog Slat had no desire to intrude on CTB's goodwill or confuse the purchasing public.  (SUF at ¶¶55-62, 66-67.) ████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████Copying of such functional attributes is entirely permissible.  *Shakespeare*, 110 F.3d

at 237, 239; *see also TrafFix*, 532 U.S. at 29 ("copying is not always discouraged or disfavored by the laws which preserve our competitive economy").

Hog Slat's good faith is further confirmed by its research into the expiration of CTB's '274 Patent, and its purposeful marketing that it was ***not*** a CTB product, but an ***improvement*** on CTB's product. (SUF at ¶¶59, 66-67.) This evidences Hog Slat's intent to differentiate itself from CTB and to avoid exploiting any of CTB's protectable intellectual property or good will, and incorporate only that which is allowable. *Shakespeare*, 110 F.3d at 239 (quoting Restatement (Third) of Unfair Comp., § 22 cmt. c ("If the actor reasonably believes that the other's designation is functional . . . , proof that the actor intentionally copied . . . does not justify an inference of confusion"); *CareFirst*, 434 F.3d at 273. Indeed, Hog Slat intentionally stamped its name "prominently on the grill" so consumers would know it was Hog Slat's product (SUF at ¶66). *Swatch, S.A. v. Beehive Wholesale, LLC*, 739 F.3d 150, 160-61 (4th Cir. 2014) (finding confusion unlikely when products sold through their own stores with their own marks). Not only that, ██████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████ ████████████████████████████████████████████████████ (SUF at ¶¶3, 12, 62.) This factor therefore weighs against a finding of likelihood of confusion. *See George & Co.*, 575 F.3d at 398 ("knowledge of another's goods is not the same as an intent to mislead [or] cause consumer confusion").

### D. The Relevant Consumers Are Sophisticated, Careful Purchasers Who Are Not Confused.

The poultry feeder market is not "the public at-large," and therefore the sophistication of the relevant purchaser is highly relevant. *Sara Lee Corp. v. Kayser-Roth Corp.*, 81 F.3d 455,

467 (4th Cir. 1996) ("If the typical consumer in the relevant market . . . possesses an expertise regarding a particular product, such sophistication or expertise may be pertinent in determining the likelihood of confusion." (citing *Perini*, 915 F.2d at 127-28 (reversing summary judgement for plaintiff and holding that "in a market with extremely sophisticated buyers [there, purchasers of expensive construction services], the likelihood of consumer confusion cannot be presumed on the basis of the similarity in trade name alone."))); *see also Re/Max LLC v. M.L. Jones & Assoc., Ltd.*, No. 5:12-CV-768, 2014 WL 7405461, at *7 (E.D.N.C. Dec. 30, 2014) (finding that the sophistication factor illustrates a lack of confusion among "software services to real estate professionals").   Such expertise and familiarity with the market means that purchasers will "know from whom they are buying" and therefore "there is no possibility of confusion."  *Perini*, 915 F.2d at 127-28; *see also Dorr-Oliver, Inc. v. Fluid-Quip, Inc.*, 94 F.3d 376, 383 (7th Cir. 1996) (finding a further lack of likelihood of confusion in product configuration context involving "high-priced, single-purchase products").

In the poultry market, ██████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

████████████████████████████████. (SUF at ¶56.)  Accordingly, the small set of purchasers here know exactly what they are buying and from whom.  *Perini*, 915 F.2d at 127-28.   Because purchasers are ***not*** relying on CTB's trade dress, but instead relying on the

infl███████████████████████████████████████████████████
████████████████.[8]  *Id.*; *Sara Lee*, 81 F.3d at 467.

## E.    Products Are Sold Through Different Facilities

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████"  (*Id.* at ¶64.)

Accordingly, the respective facilities are not similar and confusion is therefore unlikely, especially in view of the careful purchase consideration taken by the applicable consumers.  *See Swatch*, 739 F.3d at 160-61  (negating facilities factor where "products had never been sold in same store" and that other sales were limited to its own brand websites).

## F.    The Marks Are Not Similar

Where the trade dress is dissimilar, confusion is less likely.  *See George & Co.*, 575 F.3d at 396. Here, while both products incorporate similar utilitarian design elements, they are each prominently stamped with their respective CHORE-TIME® or GROWER SELECT® registered trademark. (SUF at ¶¶65-66.)  In product design trade dress cases, such prominent labeling weighs against a finding of likelihood of confusion.  *See Versa Prods.*, 50 F.3d at 203 (appearance of product configuration not similar for likelihood of confusion purposes where manufacturer's name or brand present on product); *see also Shakespeare*, 110 F.3d at 242 (similarity of marks negated by buyer sophistication and differences in the marks/products,

---

[8] This buyer sophistication, and the fact that the product at issue are each stamped with their respective brand (i.e. CHORE-TIME® vs. GROWER SELECT® (SUF at ¶¶65-66)) also negates any confusion that could be attributable to the similarity of the goods factor. *See Shakespeare*, 110 F.3d at 242 (similarity of marks and similarity of goods negated by buyer sophistication and differences in the marks/products, despite sales in close proximity to one another); *see also Versa Prods.*, 50 F.3d at 203 (labeling of products with respective house brands diminishes likelihood of confusion, despite being similar goods).

despite sales in close proximity to one another); *Swatch*, 739 F.3d at 160-61 (confusion unlikely when products carry their own brands).

Balancing these factors, even in the light most favorable to CTB, there is an absence of any likelihood of confusion and Hog Slat's motion must be granted.

## IV. CTB Has Failed to Show That Hog Slat's Use of the Alleged Trade Dress is the Proximate Cause of Any Harm to CTB

Finally, CTB's claims also fail as there is no evidence that Hog Slat's product and alleged trade dress infringement was the cause of any harm to CTB. In addition to proving the elements of Federal unfair competition outlined above, CTB had to show: "(1) an unfair or deceptive act or practice, (2) in or affecting commerce, and (3) which proximately caused injury to plaintiffs." *Walker v. Fleetwood Homes of N.C., Inc.*, 362 N.C. 63, 71–72, 653 S.E.2d 393, 399 (2007); N.C. Gen. Stat. § 75-1.1. Thus for all of its claims based on unfair competition, CTB was required to establish that its injuries were proximately caused by Hog Slat's use of the Asserted Trade Dress. *Muehler Co. Inc. v. Ply Gem Holdings, Inc.*, 637 F. App'x 746, 747 (4th Cir. 2016) (unpublished) (citing *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 134 S. Ct. 1377, 1389-90 (2014));[9] *see also State v. Lane,* 115 N.C. App. 25, 28, 444 S.E.2d 233, 235 (1994) (holding claimant "must prove that defendant's action was both the cause-in-fact (actual cause) and the proximate cause (legal cause)" of the harm).

To fall within the Lanham Act's zone of interests, the plaintiff must prove "an injury to a commercial interest in reputation or sales" from the alleged violations. *Lexmark Int'l*, 134 S. Ct.

---

[9] Other courts have similarly applied (or considered the application of) *Lexmark* to Lanham Act unfair competition claims. *See Int'l Found. of Emp. Ben. Plans, Inc. v. Cottrell*, No. 14-1269, 2015 WL 127839, at *3 (D. Md. 2015); *UHS of Delaware, Inc. v. United Health Services, Inc.*, No. 1:12-cv-485, 2016 WL 7474801, at *15–16 (M.D. Pa. 2016) (granting summary judgment based on a lack of evidence establishing causation); *Martin v. Wendy's Int'l, Inc.*, No. 15-6998, 2016 WL 1730648, at *4-5 (N.D. Ill. 2016); *Lundgren v. Ameristar Credit Sols., Inc.*, 40 F. Supp. 3d 543, 551 n.4 (W.D. Pa. 2014); *Ahmed v. Hosting.com*, 28 F. Supp. 3d 82, 90-91 (D. Mass. 2014).

at 1390. To demonstrate proximate cause, the plaintiff must establish "economic or reputational injury flowing ***directly*** from the deception wrought" by the defendant. *Id*. at 1391 (emphasis added). The Supreme Court summarized its test as follows: to maintain a cause of action under § 1125(a), "a plaintiff must plead (and ultimately prove) an injury to a commercial interest in sales or business reputation proximately caused by the defendant's [actions]." *Id*. at 1395. Similarly under North Carolina state law: "If a plaintiff is unable to show a cause-in-fact nexus between the defendant's conduct and any harm, our courts need not consider the separate proximate cause issue of foreseeability." *Holt v. N. Carolina Dep't of Transp.*, __ N.C. App. __, __, 781 S.E.2d 697, 710 (N.C. Ct. App. Feb. 2, 2016), *aff'd,* 791 S.E.2d 458 (N.C. 2016). In North Carolina, the standard for factual causation "is familiarly referred to as the 'but-for' test, as well as a *sine qua non* test [where]…an act is a factual cause of an outcome if, in the absence of the act, the outcome would not have occurred." *Id.* (quoting Restatement (Third) of Torts: Phys. & Emot. Harm § 26 (2010)). Needless to say, fair efforts to compete in a market do not establish such claims.

Here, CTB has garnered no evidence to show Hog Slat, and specifically the alleged acts of misuse of trade dress, were the cause of any harm to CTB. Indeed, CTB's only ***theory*** of harm other than disgorgement of profits (which flows from infringement) is based on a

████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

█████████████████████████████████████ (SUF at ¶65.)

Accordingly, CTB has no non-speculative **evidence** of any such erosion or other harm, or any evidence that Hog Slat was the cause of it. For these reasons, Hog Slat is also entitled to summary judgment as a matter of law on these claims. *Muehler Co.*, 637 F. App'x at 748; *see also Baughman*, 211 F. Supp. at 275; *Bob Timberlake Collection, Inc. v. Edwards*, 176 N.C. App. 33, 42, 626 S.E.2d 315, 323 (2006).

## <u>CONCLUSION</u>

CTB's Asserted Trade Dress is invalid for being impermissibly functional and lacking any secondary meaning. And even if it were valid, there are no genuine issues of fact to show that Hog Slat's sale of its products has caused, or is likely to cause, any confusion or any harm to CTB. For each of these reasons all of CTB's Federal and State claims fail, and Hog Slat is entitled to summary judgment as a matter of law.

Dated: January 20, 2017

Respectfully Submitted,

WILLIAMS MULLEN

By: */s/ Robert C. Van Arnam*
    Robert C. Van Arnam
    N.C. Bar # 28838
    Andrew R. Shores
    N.C. Bar # 46600
    P.O. Drawer 1000
    Raleigh, NC 27602-1000
    Telephone: (919) 981-4000
    Fax: (919) 981-4300
    rvanarnam@williamsmullen.com
    ashores@williamsmullen.com
    *Attorneys for Defendants*

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on January 20, 2016, I electronically filed the foregoing with the

Clerk of Court using the CM/ECF system which will send notification of electronic filing to the

following counsel of record for Plaintiff:

> David J. Marr (Ill. Bar No. 6194750)
> Eric Dorkin (Ill. Bar No. 6256390)
> 150 North Michigan Avenue
> Suite 2700
> Chicago, Illinois 60601
> dmarr@clarkhill.com
> edorkin@clarkhill.com
>
> Christopher B. Clare (N.C. Bar No. 39582)
> 601 Pennsylvania Avenue NW
> North Building, Suite 1000
> Washington, D.C. 20004
> Email: cclare@clarkhill.com
> Local Civil Rule 83.1 Counsel
>
> *Attorneys for Plaintiff, CTB, Inc.*

> WILLIAMS MULLEN
>
> */s/ Robert C. Van Arnam*
> Robert C. Van Arnam
> N.C. Bar # 28838
> Andrew R. Shores
> N.C. Bar # 46600
> P.O. Drawer 1000
> Raleigh, NC 27602-1000
> Telephone: (919) 981-4000
> Fax: (919) 981-4300
> rvanarnam@williamsmullen.com
> ashores@williamsmullen.com
>
> *Attorneys for Defendants*