# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF NORTH CAROLINA
## SOUTHERN DIVISION
### Case No. 7:14-CV-00157-D

| | | |
|---|---|---|
| CTB, INC., | ) | |
| | ) | |
| **Plaintiff,** | ) | **MEMORANDUM IN OPPOSITION TO** |
| | ) | **DEFENDANT'S MOTION *IN LIMINE*** |
| **v.** | ) | **TO EXCLUDE PLAINTIFF'S EXPERT** |
| | ) | **RHONDA HARPER** |
| HOG SLAT, INC., | ) | |
| | ) | |
| **Defendant.** | ) | |

Plaintiff CTB, Inc. ("CTB"), for its Memorandum In Opposition to Defendant's Motion *in Limine* to Exclude Plaintiff's Expert Rhonda Harper, states as follows:

## Introduction

Hog Slat's Motion *in Limine*, and supporting Memorandum, merely presents this Court with a routine dispute between CTB's expert, Rhonda Harper, and Hog Slat's expert, Thomas Maronick, as to conclusions that can properly be drawn from two surveys and reports prepared by Ms. Harper, which concluded that CTB's color trade dress of red and gray had achieved secondary meaning and that there was likelihood of confusion between CTB's poultry feeder and Hog Slat's clone poultry feeder. It is the norm that experts disagree on methods and conclusions; but, to bar testimony, the Court must receive evidence that the proffered expert testimony violates some established canon of practice. Neither Hog Slat nor its expert references any independent secondary source to justify the ***specific*** claims made in the Motion that Ms. Harper's two surveys should be stricken. In truth, Hog Slat offers only a credibility contest between the two experts, one which is properly decided at a trial on the merits, and not on a motion *in limine*.

Hog Slat does not raise any issues as to Ms. Harper's impeccable resume, nor as to her qualifications as an expert witness for CTB in this case. Hog Slat does not even challenge the

relevance of her opinion.  Instead, Hog Slat contests the reliability of her principals and methods, but in so doing, Hog Slat leaves out critical facts and fails to provide evidentiary support for its assertions.  The actual facts show that both surveys conducted by Ms. Harper in this case meet FRE 702, 703, and the *Daubert* standard of reliability.  Accordingly, Hog Slat's Motion *in Limine* should be denied.

## **Background**

There is no dispute that Ms. Harper employed a modified survey methodology for her two surveys in this case.[1]  Crucially, however, Hog Slat ignores Ms. Harper's deposition testimony in which she expressed her well-founded justification for modifying the surveys: without the modifications, a survey in this case would have been impossible.  First, there was no way to use a traditional online survey targeting consumers at their homes; and second, using a traditional on-site survey could have alerted Hog Slat to the survey and allowed for the possibility that any survey could be compromised.  As a result, Ms. Harper devised the instant surveys (i) for use at the largest industry convention where there were enough potential respondents and (ii) with questions that would not alert any convention attendee, *i.e.*, Hog Slat, that the surveys were designed to survey secondary meaning and likelihood of confusion for litigation purposes.  In its Motion, Hog Slat fails to explain how a traditional survey could reach the relevant potential purchasers, while avoiding the gaming that rightly concerned Ms. Harper and necessitated the modified survey design.

In its Motion, Hog Slat ignores and distorts the actual disclosures made by CTB's expert, Rhonda Harper, in her written materials and her deposition testimony, to claim that Ms. Harper

---

[1] Rhonda Harper's 2013 Survey and Report ("2013 Survey & Report," attached hereto as **Exhibit A**) and her 2015 Survey and Report ("2015 Survey & Report," attached hereto as **Exhibit B**).  For its Motion, Hog Slat does not separately attach Ms. Harper's two surveys.  Instead, Hog Slat cites to Docket Entries 132-5 and 132-6, which CTB had filed, but which do not contain the Appendices to Ms. Harper's reports.  Exhibit A and Exhibit B to this Response attached the complete documents authored by Ms. Harper, as introduced and used by Hog Slat at Ms. Harper's deposition.

violated the strictures of Rule 26(a)(2)(B). Hog Slat inexplicably claims that Ms. Harper failed to provide a list of cases in which she participated as an expert, yet, not only is such a list of some 43 cases included as part of Ms. Harper's 2015 Survey & Report, but Ms. Harper's litigation experience was discussed with Hog Slat's counsel at her deposition. (Deposition of Rhonda Harper, at 15-17, a copy of which is attached hereto as **Exhibit C**.) Further, Hog Slat claims that Ms. Harper did not disclose her compensation, yet that information was provided to Hog Slat in paragraph 34, on page 8 of the 2015 Survey & Report.

In addition, Hog Slat claims that Ms. Harper failed to disclose all of the bases for her opinion. Yet, the only thing missing from Ms. Harper's disclosure is certain "back-up" data for the 2013 Survey that was not maintained by the survey webhost, SurveyMonkey. (Harper Dep., at 151-52.) Importantly, nowhere does Hog Slat explain how the missing "back-up" data from the 2013 survey impacted the ability of its own expert, Thomas Maronick, to address Ms. Harper's findings. Moreover, there is no missing data from the separate 2015 Survey, the ultimate conclusion of which Ms. Harper concisely explained at her deposition (*id.* at 213):

> Q. So you believe these numbers show confusion and secondary meaning at the same time?
>
> A. I think that you can tilt them both directions because it's not a classic survey. As we discussed earlier, it was disguised. In this case, the numbers speak for themselves. 48 out of 53 people thought that what they were looking at was a Chore-Time [CTB], poultry pan feeder when it was actually Hog Slat, and 51 of 55 between the two accurately said Chore-Time as Chore-Time.
>
> So to me, that says Chore-Time has secondary meaning, people understand what they're looking at, and they're confused when they're seeing a product that looks just like them. They're going to attribute that to Chore-Time.

* * * * *

205657635.3 35002/170899

A.  I said 48 out of 53 people who looked at Hog Slat thought they were looking at Chore-Time which clearly says to me confusion, and 51 out of 55 who are looking at Chore-Time accurately described it as Chore-Time.  So they knew what they were looking at.

### Ms. Harper's *bona fides* as a testifying expert.

During her deposition, Ms. Harper went through her CV with opposing counsel (the CV is attached to the 2015 Survey & Report).  Ms. Harper is the owner of the research, consulting, and testimony firm Rhonda Harper LLC, located in Dallas, TX, where she has been engaged in legal case research, consulting, and testimony for the past seven years.  Ms. Harper is the former owner and CEO of RTM&J, a management and marketing consulting firm that engaged in research, consulting, and testimony from 2005 - 2010.  Ms. Harper held the top marketing officer position, VP of Marketing, at Walmart Sam's Club where she had full corporate responsibility for the $40 billion division's 100 professionals and a $300 million budget.  Ms. Harper is also the former top marketing officer, VP of Marketing, at VF Corporation VFI where she held the same responsibilities for a $1.5 billion division.  (2015 Survey & Report, at 1.)

During the course of her career, Ms. Harper has led, designed, and conducted hundreds of studies, including primary quantitative research for Sam's Club, VFI, UPS, Target Stores, Google, Russell Corporation, Home Shopping Network, Arby's and many others.  Ms. Harper is also a former adjunct M.B.A. marketing professor for Fairleigh Dickinson University, Madison, NJ and American University, Washington DC.  (2015 Survey & Report, at 1.)

At her deposition, Ms. Harper testified that she has prepared hundreds of research studies, many of which have included surveys, including likelihood of confusion studies.  (Harper Dep., at 8.)  As of 2013, Ms. Harper had conducted approximately 21 surveys as an expert, and approximately one third of those surveys had been trade dress or trademark.  (*Id.* at 15.)  In addition, maybe half of the studies included secondary meaning.  (*Id.* at 15-16.)  Ms. Harper

4

explained that she has testified approximately six times at trial. (*Id.* at 16.) Further, on her CV, Harper identified three cases where the results of the secondary meaning survey also allowed conclusions regarding likelihood of confusion. (*Id.*).

**CTB's Trade Dress.**

CTB is a leading global designer, manufacturer and marketer of agricultural systems and solutions serving the poultry, hog, egg production and grain industries. In particular, CTB, through its Chore-Time Group business unit, designs, manufactures, and markets equipment for poultry grow-out facilities, mainly for breeder and broiler chickens and turkeys. Chore-Time has been in the poultry business since 1952. Broiler chickens are chickens bred and raised specifically for meat production. Breeder chickens are used to produce eggs that hatch into broiler chickens.

This lawsuit relates to pan poultry feeders - round feeders into which chicken feed is brought through a tube passing into the top of the feeder. Chickens meant for consumption are fed from pan feeders from shortly after birth and throughout their lives. A pan feeder as commonly used in the industry has a lower portion or pan and an upper portion or grill. The feed is conveyed through a central cone portion.

CTB bases its allegations in this case in part on United States Trademark Registration No. 4,116,988, issued on March 27, 2012, and on United States Trademark Registration No. 4,290,371, issued on February 12, 2013. The fact that the Trademark Office issued these two registrations to CTB is not in dispute, having been admitted by Hog Slat. CTB sought and obtained the two trademark registrations at issue in this litigation:

- The '988 Registration relates to the ***shape*** of CTB's pan feeders (the product configuration). The product configuration trademark is basically a flattened octagonal profile:



- The '371 Registration relates to the *color* combination.  CTB's pan feeders have a red pan and a gray grill.

Soon after the issuance of the two trade dress registrations, CTB considered a consumer survey as a predicate for determining the viability of litigation against Hog Slat.  To that end, Ms. Harper was retained and she performed the 2013 survey for the 2013 Survey & Report at the International Production & Processing Expo ("IPPE") held in Atlanta, Georgia.  CTB sued Hog Slat on July 30, 2014 for trademark infringement and unfair competition for Hog Slat's manufacture and sale of poultry feeders indistinguishable from CTB's poultry feeders.  During the pendency of the instant litigation, Ms. Harper returned to the IPPE in 2015 to perform the 2015 survey for the 2015 Survey & Report.

**Ms. Harper's survey design.**

The surveys in this case were crafted and designed using Ms. Harper's extensive experience and judgment.  (Harper Dep., at 54.)  As explained by Ms. Harper, "virtually every marketing research study is customized, there is no one-size-fits-all methodology." (*Id*.)  The two surveys here incorporate industry best practices to make sure the correct universe of respondents was selected by screening out potentially biased individuals.  (*Id.* at 67.)

The surveys in this case present a "unique" situation.  (Harper Dep., at 22.)  Ordinarily, trade dress surveys can be done online to a broader audience; however, when the purchasing group is so small and so rare, as is the case here, the survey must go to a specific location.  (*Id*.)  In addition, "you want to disguise the purpose of the company behind the survey" so there will be decoy questions.  (*Id*.)  As for why, Ms. Harper explained that the survey methodology had to

6

be modified to allow for the fact that Hog Slat and CTB personnel were in attendance at the survey location. (*Id.* at 23.) According to Ms. Harper, "what I would characterize as a normal secondary meaning survey would have caused alarm or intrigue among all of the industry participants that potentially showing the hand of my client which could have biased the survey or created undue responses to the survey itself." (*Id.* at 23-24.) More specifically, both litigants were at the convention, and "the potential litigant on the other side could have sent a lot of people over to answer the questions a certain way which would have biased the survey." (*Id.* at 24.) As a result, the survey included more than one product to disguise its true purpose. (*Id.*)

In constructing the surveys, the "actual images were selected because they were approximately the same size, the same angle, show the products as similarly visually as possible." (Harper Dep., at 40.) The survey provided "consistent imagery across all of the feeders." (*Id.* at 99.) Importantly, to avoid the various respondents from sharing their experiences with the survey, the respondents did not see the feeders in the same order, as the survey randomized the ordering of the feeders for each respondent. (*Id.*)

The 2013 survey is composed of three general parts. The first part showed a series of gray-scale images of individual feeders; the second part used words, but not images, to describe the color combinations. The third part showed color images of the individual feeders. For each selection across all three parts of the survey, the respondents were presented with the following choices (1) Big Dutchman, (2) CTB, (3) Cumberland, (4) Roxell, (5) Val-Co, (6) Lomax (dummy brand), and (7) Other/Don't Know. Based upon her analysis of the 2013 survey data, Ms. Harper concluded that CTB "has acquired secondary meaning of the brand through the color red and the combination red/gray." (2013 Survey & Report, at 8.)

205657635.3 35002/170899

The 2015 survey showed each respondent a series of different feeders, with an additional choice for the manufacturer: Hog Slat / Georgia Poultry. The survey rotated the CTB and the identical looking Hog Slat feeders, while the additional feeders were added to disguise the purpose of the survey. Based upon her analysis of the 2015 survey data, Ms. Harper concluded that "the results of the survey demonstrates [sic] that there is a strong affiliation of secondary meaning attached to the [CTB] trademarks, design and color," and that the Hog Slat feeder "pose[s] a clear likelihood of confusion among the relevant universe." (2015 Survey & Report, at ¶15.)

## Argument

Hog Slat offers three (3) methodological challenges to Ms. Harper's surveys. First, Hog Slat asserts that Ms. Harper did not sample the proper universe because she focused on growers and not integrators. Hog Slat ignores the ***factual*** dispute between the parties as to who makes the relevant purchasing decision for poultry feeder equipment. Second, Hog Slat claims that the surveys improperly use leading questions because those questions suggest "to the participant there is only one manufacturer for each color." (Memorandum, at 15.) Other than Hog Slat's clone of CTB's poultry feeder, each of the manufactures included in Ms. Harper's surveys (and in the marketplace) uses an exclusive color combination, such that there is nothing leading about the questions in either of Ms. Harper's two surveys. Third, Hog Slat claims that Ms. Harper's surveys failed to eliminate guessing. To make this argument, Hog Slat ignored Ms. Harper's deposition testimony where she explained that the option to answer with "other/don't know" properly controls for respondent guessing. Hog Slat also suggests that Ms. Harper's surveys did not account for location bias and ignored the existence of manufacturer paraphernalia at the survey sites. Again, Hog Slat ignores Ms. Harper's deposition testimony where she explained precisely why these two issues did not impact the surveys.

8

A.    **General *Daubert* Case Law**

The parties agree that the admissibility of expert testimony is governed by *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589 (1993). The parties do not dispute that this Court must examine whether proposed expert testimony is supported by adequate validation to render it trustworthy, and to ensure that the opinion is relevant to the facts at issue. *Id*. (It appears, however, that Hog Slat addresses only the first prong, trustworthiness.) That Hog Slat and/or its own expert witness disagree with Ms. Harper's methodology does not render that evidence inadmissible; it merely means there is a fact issue for a jury to decide. The opinion of the Trademark Trial and Appeal Board in a case of conflicting expert witness reports is instructive:

> That [one expert's] testimony conflicts with that given by [opposing experts] demonstrates more that the application of market research principles to likelihood of confusion issues is a matter on which opinions are bound to differ than that the expert(s) on one side or the other of these issues is (are) lacking in expertise. Indeed, while the results of properly conducted surveys are generally accepted by the courts and this Board, *see*, generally, 2 T. J. McCarthy, TRADEMARKS AND UNFAIR COMPETITION §§ 32:46 and 32:52 (2d ed. 1984) . . . .

*Miles Laboratories, Inc. v. Naturally Vitamin Supplements, Inc*., 1986 TTAB LEXIS 173 at *24, n.32 (TTAB 1986). As noted by the court in *Miles Laboratory* (*id*.),

> there continue to be differences of opinion concerning particular aspects of survey design, methodology and administration, and the interpretation of survey results.

Disagreements do not require the exclusion of evidence. The surveys conducted by Ms. Harper in this case meet the *Daubert* standard of trustworthiness. Accordingly, Hog Slat's Motion should be denied.

Ms. Harper cited the Federal Judicial Center, MANUAL FOR COMPLEX LITIGATION (4th ed.) ¶11.493 at 102-04 (2004) to demonstrate that her surveys meet the criteria for trustworthiness. (2015 Survey & Report, at 4 n.5.) Hog Slat fails to mention this fact and does

not even address this Manual in its Motion.  The Manual is accepted in the Fourth Circuit as a tool for use by district courts.  *See SD3, LLC v. Black & Decker (U.S.) Inc.*, 2015 U.S. App. LEXIS 18834, *45 (4th Cir. 2015).  Accordingly, Ms. Harper's representation that her surveys met the standards of this Manual is unrebutted.

Hog Slat's own brief states that "survey evidence may be admissible if a qualified expert testifies that the survey was conducted according to generally accepted principles of survey research."  (Memorandum, at 9, *citing*, *e.g.*, *Dick's Sporting Goods, Inc. v. Dick's Clothing and Sporting Goods, Inc.*, 188 F.3d 501, 1999 WL 639165, *5 (4th Cir. 1999)).  Hog Slat does not object to Ms. Harper's qualifications; accordingly her representations that the surveys were conducted according to generally accepted principles of survey research supports admissibility.

Hog Slat instead cites to the Federal Judicial Center's REFERENCE MANUAL ON SCIENTIFIC EVIDENCE'S (2nd ed. 2000) chapter titled "Reference Guide on Survey Research," hereinafter referred to as "Reference Manual," attached hereto as **Exhibit D**.)  Hog Slat only identifies one instance in which Ms. Harper's reports supposedly do not meet the standards of the Reference Manual.  Hog Slat asserts that the use of closed-ended questions may sometimes be appropriate, but must be included with appropriate qualifying questions not present, according to Hog Slat, in the Harper surveys.  (Memorandum, at 15 n.5.)  The Reference Manual, however, states that "closed-ended questions are more suitable for assessing choices between *well-identified* options or obtaining ratings on a clear set of alternatives."  REFERENCE MANUAL ON SCIENTIFIC EVIDENCE'S, at §IV(C), at 253 (emphasis added).  Ms. Harper was investigating choices between well-identified options, as discussed below, so her surveys meet the standard of the Reference Manual as well.

205657635.3 35002/170899

Furthermore, Hog Slat criticizes Ms. Harper's selection of the "universe" of participants. (Memorandum, at 10.) Here, The Reference Manual unambiguously supports Ms. Harper:

> Frequently, however, the target population includes members who are inaccessible or who cannot be identified in advance. As a result, compromises are sometimes required in developing the sampling frame. The survey report should contain a description of the target population, a description of the survey population actually sampled, a discussion of the difference between the two populations, and an evaluation of the likely consequences of that difference.

REFERENCE MANUAL ON SCIENTIFIC EVIDENCE, at 242. Ms. Harper testified why the target population could not be identified in advance and testified to why compromises are sometimes required. Mss. Harper's two surveys meet the requirements of the Reference Manual.

Hog Slat asserts that Ms. Harper's surveys failed to eliminate guessing. The Reference Manual specifically addresses this issue, and resolves it in favor of CTB. According to the Reference Manual:

> [T]he survey can use a quasi-filter question to reduce guessing by providing "don't know" or "no opinion" options as part of the question (e.g., "Did you understand the guarantee offered by Clover to be for more than a year, a year, or less than a year, or don't you have an opinion?"). By signaling to the respondent that it is appropriate not to have an opinion, the question reduces the demand for an answer and, as a result, the inclination to hazard a guess just to comply.

REFERENCE MANUAL ON SCIENTIFIC EVIDENCE § IV(B), at 250 (footnote omitted). Ms. Harper provided a "don't know" option and, accordingly, based on the Reference Manual cited by Hog Slat, Ms. Harper complied with good survey practice.

**B.    Ms. Harper properly identified growers as "relevant" to feeder purchases.**

The parties are in general agreement as to the law applicable to determining the proper universe of survey respondents. The survey taker must include only those persons whose opinions are "relevant to the issues in this case." *See PBM Prod., LLC v. Mead Johnson & Co.*,

11

639 F.3d 111, 123 (4th Cir. 2011) (quoting J. Thomas McCarthy, McCarthy On Trademarks And Unfair Competition §32:159 (4th Ed. 2003).)  It is also accurate to say that the relevant universe includes "potential purchasers" of the goods at issue.  *See* McCarthy, at §32:159. Here, the parties disagree, as a factual matter, as to whether growers are "relevant" to the poultry feeder purchasing process.  Moreover, a proper survey may include both purchasers and users in the relevant universe.  *Essie Cosmetics, Ltd. v. Dae Do International, Ltd*., 808 F. Supp. 952, 958 (E.D.N.Y. 1992).  Thus, even with the dispute as to who qualifies as a "relevant" purchaser, there is no dispute that the growers are users of poultry feeders.

As CTB contends, and as described by Ms. Harper, the relevant survey universe is "potential poultry pan feeder purchasers or influencers . . . Generally the growers." (Harper Dep., at 31.)  As explained by Ms. Harper, the integrators "generally provide a set list of approved manufacturers to the growers," and the "grower then determines and purchases from the company they want to, and then the integrator may go back and make a visual check to see that those poultry pan feeders were installed." (*Id.* at 32.)  In executing her surveys, Ms. Harper explained "growers are the proper universe because "the growers are the ones who make the ***final*** purchase decision, and those growers are familiar with poultry pan feeders." (*Id.* at 88 (emphasis added).)

Ms. Harper's factual understanding of the poultry feeder purchasing decision is in line with the position CTB has taken in the instant litigation.  Clearly, Hog Slat disagrees.  Hog Slat believes that because the integrators provide a list, then the integrators, and only the integrators, make up the proper universe of the survey respondents.  This is a factual issue that is wholly independent of the parties' survey experts.  At issue is the factual matter as to whether the growers' discretion in the feeder purchasing decision makes them relevant to the purchasing

decision. CTB contends that this is a simple issue, and that the Court will ultimately agree with CTB that the growers are properly the purchasers of the feeding equipment, but that decision is factual and must await trial.

Hog Slat also challenges Ms. Harper's screening process in deciding who was a potential purchaser. Hog Slat claims that it was improper to ask the survey respondents simply (a) if they were familiar with poultry feeders (2013 survey), or (b) if they were familiar with poultry feeder companies (2015 survey). (Memorandum, at 11.) The Motion is devoid of any reference in the case law, the secondary literature, or anything from Hog Slat's proffered expert as to why, in this niche industry, Ms. Harper's screening questions would not catch persons relevant to the purchase decision. Ms. Harper addressed the screening issue at her deposition. First, as explained by Ms. Harper at her deposition, it was *not* a proper screening question to ask if the respondent had purchased a pan feeder. (Harper Dep., at 88.) Thus, the screening question was "are you familiar with poultry pan feeders." (*Id*.) The appropriate standard is "against potential purchasers, not current customers for current purchases." (*Id*.) The logic follows that if the respondent is familiar with poultry pan feeders than the respondent is familiar with the industry itself and "could become influences or purchasers of poultry pan feeders in the future." (*Id.* at 89.) The fact that CTB and Hog Slat both advertise poultry feeders to the growers and the integrators demonstrates the error in Hog Slat's position here – this point will be more aptly shown at trial.

Hog Slat claims Ms. Harper's 2015 survey is further flawed because of the use of the term "hog" when describing "Hog Slat / Georgia Poultry." Hog Slat offers no evidence, other than a bald assertion from its expert that the term "hog" might dissuade a respondent because the respondent might not realize that Hog Slat makes poultry feeders. (Memorandum, at 16.) Hog

Slat's claim ignores the fact that Georgia Poultry includes the word "poultry," and that the survey had already screened for familiarity with poultry feeding companies. It should be noted that in its Memorandum offered in support of this Motion, Hog Slat refers to its own feeder as "Hog Slat's GEORGIA POUTRY feeder," which is nearly identical to how Ms. Harper described the feeder in her survey. (Memorandum, at 5.) Hog Slat's claim reeks of desperation.

## C. Ms. Harper did not use impermissible leading questions.

Although Hog Slat correctly identifies the general propositions of law related to leading questions for surveys, Hog Slat ignores the peculiar facts of the poultry feeder market that explains exactly why Ms. Harper's surveys were properly constructed. Hog Slat complains that Ms. Harper's surveys used leading questions because those questions "improperly suggest[] to the participant there is only one manufacturer for each color." (Memorandum, at 15 (citing *Proctor & Gamble Pharm., Inc. v. Hoffman-LaRoche, Inc.*, 2006 WL 2588002, *23 (S.D.N.Y. Sept. 6, 2006)). In the instant case, however, it is not improper to suggest that each color combination is associated with only one manufacturer, because that is actually the case.

Other than Hog Slat's clone of CTB's poultry feeder, each of the manufacturers included in the surveys uses an exclusive and distinctive color combination, such that there is nothing leading about the questions in either of Ms. Harper's two surveys. In addition, the five manufacturers are the five largest market participants in the U.S. market, comprising approximately 90+% of the poultry feeder market. As noted above, and excluding the dummy manufacturer (Lomax) and Hog Slat's clone, here are the five (5) manufacturers from Ms. Harper's two surveys and the color combination of each of their respective feeders:

| Manufacturer | Color Combination |
|---|---|
| Big Dutchman | Orange and white |
| CTB | Red and gray |

| Manufacturer | Color Combination |
|---|---|
| Cumberland | Red, or red and white |
| Roxell | Yellow and gray |
| Val-Co | Green and yellow |

Thus, it is clear that there was only one possible correct answer for each of the images shown to the respondents. In addition, at her deposition, Ms. Harper explained that in the unlikely event that a respondent thought that there could have been more than one manufacturer, then "Don't Know / Other" was available as an option. (Harper Dep., at 57, 98.) As noted in The Reference Manual, "closed-ended questions are more suitable for assessing choices between **well-identified** options or obtaining ratings on a clear set of alternatives." REFERENCE MANUAL ON SCIENTIFIC EVIDENCE'S, at §IV(C), at 253 (emphasis added). Thus, in this particular niche market where each manufacturer has its own distinctive brand colors, the questions in the two surveys were not impermissibly leading or otherwise infirm.

**D.      Ms. Harper's surveys control for guessing.**

Hog Slat also complains that Ms. Harper did not craft questions that accounted for guessing by the survey respondents. (Memorandum, at 17.) Again, the parties are in agreement on the general contours of the law: survey questions should allow respondents to opt out when they do not know the correct answer. (*Id.* (citing *SMD Software, Inc. v. EMove, Inc.* 945 F.Supp.2d 628, 637 (E.D.N.C. 2013).) Once again, Hog Slat ignores the actual material presented to the survey respondents and Ms. Harper's deposition, where she explained how the survey questions account for guessing. As is clear from the surveys themselves, and from Harper's deposition testimony, respondents were given a choice of manufacturers, and the choice to select "Don't Know / Other" with every question (Harper Dep., at 121-22):

Q.  Okay.  How do you know that they didn't just guess?

A.  Because there was an option there for don't know/other.

The "Don't Know / Other" language is precisely the opt-out language required, as it did not force the respondents to choose a manufacturer.  Hog Slat's Motion does not address this point at all; instead, it simply, and repeatedly, ignores Ms. Harper's deposition testimony.

**E.**     **Ms. Harper explains why no bias from location or paraphernalia.**

Hog Slat complains that Ms. Harper did not in account for location bias (Memorandum, at 12), however, to make such a claim, Hog Slat again ignores Ms. Harper's deposition testimony on the matter.  As Ms. Harper told Hog Slat's counsel, the survey booth was off "the beaten path and surrounded by other non-influential products and services to the actual survey that we were conducting." (Harper Dep., at 30.)  The survey booth was not in the poultry feeding hall to avoid allowing the respondents to simply look up and see the answers to the questions by looking at the exhibit booths.  (*Id.* at 48.)   In addition, in constructing the survey, and to make sure that the respondents were not limited to those people walking by the survey booth, Ms. Harper distributed more than 500 flyers all around the exhibit hall to draw respondents over to the survey booth.  (*Id.* at 47.)  CTB's booths were ***not*** located near the survey booth.  (*Id.* at 74.)  Moreover, there is nothing in Hog Slat's Motion citing its own survey expert in support of its assertion that Ms. Harper's efforts to protect the survey from "location bias" were insufficient.

As another complaint, Hog Slat notes that there was paraphernalia bearing the images for manufacturers all around the exhibition hall, including paraphernalia that bore CTB images. (Memorandum, at 12.)  Ms. Harper addressed this issue at her deposition, none of which is included as part of Hog Slat's Motion.  As Ms. Harper explained, "the tradeshow was full of materials and logos and products in advertising, and everything that could've been imprinted upon with a brand-name work product was imprinted upon. So I think at the end of the day, it's a

205657635.3 35002/170899

wash." (Harper Dep., at 76.)  According to Ms. Harper, given the prevalence and variety of manufacturer advertising, there is nothing to suggest that any incidental advertising impacted either survey.  (*Id.* at 78-79.)  Here, too, Hog Slat offers nothing from its own survey expert to rebut Ms. Harper's testimony that the ubiquity of manufacturer paraphernalia eliminated any potential contamination to the surveys.

**F.     Ms. Harper's analysis and opinions are reliable and admissible.**

Hog Slat's challenges to Ms. Harper's analysis and opinions are cribbed from the report of its expert, Thomas Maronick, though there are no actual citations to Mr. Maronick's report. ("Maronick Report," attached hereto as **Exhibit E**.)  Two things stand out when examining Mr. Maronick's report:  first, although Mr. Maronick disagrees with Ms. Harper, his criticisms are devoid of references to secondary literature to support his *specific* objections to Ms. Harper's opinions; and second, there are instances where he is either wrong or disputes the facts, and not survey methodology.   Mr. Maronick cites to secondary sources, but only for generic propositions, not in support of his precise criticisms.

By way of examples, Mr. Maronick thinks the questions in the 2013 survey are leading because the "design suggests to the participant that there is only one manufacturer for each color."  (2013 Survey & Report, at 17.)  Yet, as shown above, as a factual matter, there is only one manufacturer for each color!  As another example, it is from Mr. Maronick's report that Hog Slat makes the complaint that the use of the word "hog" in the 2015 survey did, in fact, impact the survey.   Yet, again, there is nothing in Mr. Maronick's report to show any quantifiable justification for his objection, nor is there any reference to secondary literature explaining that the word usage is counter to best practices.  In short, Mr. Maronick simply disagrees with Ms. Harper: nowhere in his report does Mr. Maronick cite to secondary literature to justify a specific

205657635.3 35002/170899

problem he has with Ms. Harper's surveys.

As for the specific challenges raised by Hog Slat in its Motion, one of them contradicts a point made in Hog Slat's expert's report. In his report, Mr. Maronick wrote (Maronick Report, at 18):

> One generally accepted methodology in a research design involving a control group or control question/option is to deflate all responses by the number of responses to the control option, thereby accounting for guessing.

In other words, the survey taker subtracts the "don't knows" before calculating the numbers to determine secondary meaning or likelihood of confusion. Remarkably, in its Motion, Hog Slat considers just such a reduction of "all responses" as a "fatal flaw in Ms. Harper's Reports." (Memorandum, at 20-21.) Contrary to its own expert, Hog Slat wrote (with emphasis) that "Ms. Harper *ignored the 1/3 of them who said they did not know*." (*Id*. at 21.) This point alone suggests that this Court should deny the entirety of the Motion as baseless.

In addition, Mr. Maronick makes a point in his report that is beyond specious, and one that undermines his *bona fides* as an expert, as well as Hog Slat's Motion (Maronick Report, at 17 (emphasis added)):

> a third part of the 2013 survey *inexplicably* combines the CTB configuration and color Trade Dress, thereby causing confusion in the survey results as to whether any alleged recognition of the feeder was based on the configuration or the color.

First, it is *impossible* (not simply difficult, but impossible) to show the CTB feeders in color without showing the configuration. In fact, it is *impossible* to show any poultry feeder in color without showing its configuration. Second, at her deposition, Ms. Harper explained the so-called "inexplicable" when she described the three-part process she employed to try and localize color over configuration. In short, Ms. Harper's 2013 survey showed respondents (1) gray-scale

205657635.3 35002/170899

images, (2) then words of color combinations, and (3) then color images.  The goal was to see if there was a progressive improvement in recognition from the gray-scale image (which included the configuration) to the color image (also with the configuration). The recognition of the gray-scale feeders formed the baseline for those that recognized the feeders for configuration.  (Harper Dep., at 113.)  As for the words identifying color combinations, there was less recognition than for the gray scale.  (*Id.* at 116.)  Finally, the respondents who recognized the CTB feeder because of the colors, "far outweigh" the recognition of the gray scale.  (*Id.* at 117.)  As explained by Ms. Harper, the 2013 survey was designed thusly:  "So you have to look at all three parts of the survey and bring them together in an analysis.  (*Id.* at 137)

Hog Slat also complains that Ms. Harper did not ask follow-up questions asking "why?" respondents made the selections they did.  (Memorandum, at 19.)  Once again, Hog Slat ignores Ms. Harper's deposition, where she addressed this issue head-on following questioning from Hog Slat's counsel (Harper Dep., at 129):

> Q.  Okay.  When you conduct a survey to identify whether there is secondary meaning in trade dress, don't you need to determine the question why they selected the correct product or –
>
> A.  No. You don't have to ask why.

Nowhere in its Motion does Hog Slat offer the Court a citation to its expert or to a specific secondary source relied upon by Hog Slat's expert to support striking Ms. Harper's reports.  That is not at all surprising because there is no such secondary source cited in Hog Slat's expert report.  In sum, Hog Slat and its expert disagree with many of the things Ms. Harper did in her two surveys; what is lacking, however, is any definitive citation to a meaningful secondary source to support Hog Slat over Ms. Harper on the very precise points raised in the instant Motion.  As such, there is no basis to strike Ms. Harper's two reports.

**G.     There is nothing prejudicial about allowing Ms. Harper's surveys at trial.**

In case the Court was not aware, Hog Slat wants to remind the Court (again) that certain of Ms. Harper's data from the 2013 survey no longer exists and that Ms. Harper used the word "manipulation" during her deposition.  (Memorandum, at 23.)  This matter has been explained to the Court before.   For the two surveys, Ms. Harper used SurveyMonkey as the cloud data collection platform. When participants took the survey, they made selections on the computer screen and the SurveyMonkey server collected and stored the data in an account held by the survey taker, in this case, Ms. Harper.  Ms. Harper testified that she still had access to all of the 2015 data, but she no longer had access to *all* of the 2013 data. On this point, here is the testimony from Ms. Harper as to what data she still possessed (Harper Dep., at 59):

> I have the data for 2015. I believe I gave you what I have for 2013
> I'm not sure if it was my error or SurveyMonkey, but everything
> before 2014 has been eliminated from my account, and I don't
> know if that's their cleansing process or my membership package
> or what that is, but they have no records of anything before '14.

Ms. Harper further testified that she provided some of the underlying data from the 2013 survey, but in the material she provided to opposing counsel there were some additional columns of information generated by her so-called "manipulation" of the underlying data.  (*Id*. at 152-53.) In other words, Ms. Harper used the raw data to create a "working document" that provided additional information other than the raw percentages emblematic of the underlying data, and included as a part of her report. Ms. Harper never testified that she modified or changed any consumer responses in either of the two surveys she performed in this case.  Ms. Harper testified that the report was accurate.  (Harper Dep., at 96.)

Critically, Hog Slat cites no actual prejudice, nor does Hog Slat even suggest what that prejudice might theoretically entail.  The place one would look to determine whether Ms. Harper

205657635.3 35002/170899

failed to provide sufficient underlying data would be the rebuttal expert report by Mr. Maronick offered by Hog Slat. Yet, despite the critiques offered by Hog Slat's expert, nowhere in his written report does he complain that he lacked access to the underlying data from the 2013 survey, or that the so-called missing data inhibited his analysis or was a strike against Ms. Harper's analysis. Instead, Hog Slat simply takes the time to remind the Court that an adverse inference **may** be allowed at trial. Importantly, there was nothing in the Magistrate's sanctions opinion that obliged this Court to provide any adverse inference instruction.

**WHEREFORE**, Plaintiff, CTB, Inc., respectfully requests that this Court enter an Order denying Defendant's Motion *in Limine*, and granting any further relief the Court deems appropriate.

Dated: April 11, 2017

Respectfully submitted,

CLARK HILL PLC

/s/ *Christopher B. Clare*
David J. Marr (Ill. Bar No. 6194750)
Eric Dorkin (Ill. Bar No. 6256930)
130 East Randolph St., Suite 3900
Chicago, Illinois 60601
tel (312) 985-5900
fax (312) 985-5999
dmarr@clarkhill.com
edorkin@clarkhill.com

Christopher B. Clare (N.C. Bar No. 39582)
601 Pennsylvania Avenue NW
North Building, Suite 1000
Washington, D.C. 20004
tel (202) 572-8671
fax (202) 772-0919
cclare@clarkhill.com
Attorney for Plaintiff, CTB, Inc.
Local Civil Rule 83.1 Counsel

*Attorneys for Plaintiff, CTB, Inc.*

205657635.3 35002/170899

## CERTIFICATE OF SERVICE

I certify that, on April 11, 2017, I electronically filed the foregoing **Memorandum In Opposition to Defendant's Motion *in Limine* to Exclude Plaintiff's Expert Rhonda Harper** with the Clerk of the Court using the CM/ECF system.

The aforementioned documents will be served on the following counsel of record for Hog Slat, Incorporated in accordance with the Federal Rules of Civil Procedure and the Local Rules of this Court:

> Robert C. Van Arnam
> Richard Matthews
> Andrew Shores
> WILLIAMS MULLEN
> 301 Fayetteville Street, Suite 1700
> P.O. Box 1000 (27602)
> Raleigh, NC 27601
> rvanarnam@williamsmullen.com
> rmatthews@williamsmullen.com
> ashores@williamsmullen.com

Dated: April 11, 2017.

> CLARK HILL PLC
>
> s/ *Christopher B. Clare*
> Christopher B. Clare