IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
SOUTHERN DIVISION

NO. 7:14-CV-157-FL

| | | |
|---|---|---|
| CTB, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | SEALED |
| v. | ) | ORDER[1] |
| | ) | |
| HOG SLAT, INC., | ) | |
| | ) | |
| Defendant. | ) | |

This matter, pending for four years, was reassigned to the undersigned May 7, 2018, with numerous motions pending. It is now before the court on plaintiff's motion for partial summary judgment, (DE 115), filed January 20, 2017; defendant's motion for summary judgment, (DE 118), also filed January 20, 2017; defendant's motion in limine to exclude plaintiff's expert Rhonda Harper, (DE 142), filed March 17, 2017; and defendant's unopposed motion requesting hearing on defendant's motion in limine, (DE 148), filed June 6, 2017. The issues raised are ripe for ruling. For the following reasons, defendant's motion for summary judgment is granted, defendant's motions in limine and for hearing are denied as moot, and plaintiff's motion for partial summary judgment is denied as moot.

---

[1] Where discovery was conducted pursuant to a consent protective order, certain filings on which the parties rely in furtherance of their motions were sealed. Within 14 days, the parties jointly shall return to the court by U.S. Mail, addressed to the case manager, a copy of this order marked to reflect any perceived necessary redactions. Upon the court's inspection and approval, redacted copy of this sealed order will be made a part of the public record. If the parties jointly perceive no redactions are necessary, within 14 days joint notice to this effect shall be filed on the docket and, thereafter, this order will be unsealed.

**STATEMENT OF THE CASE**

Plaintiff initiated the instant action by complaint filed July 30, 2014, alleging defendant "commissioned an exact replica" of plaintiff's "MODEL C2® PLUS feeder," ("plaintiff's feeder"), and then sold the replica as defendant's Grower Select® feeder, ("defendant's feeder"), thereby committing the following:

1.      Trademark infringement under the Lanham Act, 15 U.S.C. § 1114(1), of United States Trademark Registration No. 4,116,988 ("'988 Registration"), issued on March 27, 2012, for product configuration trade dress ("product configuration trade dress");

2.      Trademark infringement under the Lanham Act, 15 U.S.C. § 1114(1), of United States Trademark Registration No. 4,290,371 ("'371 Registration"), issued on February 12, 2013 on the supplemental register for color trade dress ("color trade dress");

3.      Unfair competition under the Lanham Act, 15 U.S.C. § 1125(a);

4.      Violation of the North Carolina Unfair and Deceptive Trade Practices Act ("UDTPA"), N.C. Gen. Stat. § 75-1.1 et seq.;

5.      North Carolina common-law trademark infringement; and

6.      North Carolina common-law unfair competition.

(See Compl. (DE 3) ¶¶ 20, 22, 37, 39, 43-50).

On September 23, 2014, defendant filed answer and counterclaims, asserting claims for cancellation of the '988 Registration and '371 Registration, alleging in part that plaintiff engaged in inequitable conduct and fraud on the Patent and Trademark Office ("PTO") to obtain them, and asserting the following affirmative defenses as relevant to the instant motions: laches, waiver, acquiescence, estoppel (second affirmative defense), inequitable conduct and fraud on the PTO regarding '988 Registration (fifth affirmative defense), inequitable conduct and fraud

2

on the PTO regarding '371 Registration (sixth affirmative defense), and abandonment (seventh affirmative defense).[2]

On November 19, 2014, the court[3] entered scheduling order, providing for an original deadline for discovery to close on September 25, 2015, and on December 23, 2014, the court allowed the parties' joint motion for protective order.

Discovery has been extensive and contentious. (See, e.g., DE 34 (defendant's motion to compel production); DE 41 (plaintiff's motion to quash or for protective order); DE 74 (March 23, 2016 magistrate judge's order, inter alia, granting in part defendant's motion to compel production and denying plaintiff's motion for protective order); DE 88 (plaintiff's appeal from court's March 23, 2016 order); DE 103 (defendant's motion for show cause order for plaintiff's failure to comply with court's March 23, 2016 order); DE 114 (October 24, 2016 order, inter alia, overruling plaintiff's appeal from March 23, 2016 magistrate judge's order and denying defendant's motion to show cause).

Of present relevance, defendant filed motion for sanctions on November 10, 2015, which was referred to Magistrate Judge James E. Gates and, following hearing, was granted in part on March 23, 2016, holding that plaintiff should be sanctioned "for its failure to preserve and its destruction of relevant evidence after it has a clear duty to preserve it." (DE 74 at 15). The relevant evidence consists of 1) competitive advertising materials compiled for submission to the PTO during the application process for plaintiff's '988 Registration and 2) 2013 survey data

---

[2] Defendant additionally asserts the following affirmative defenses: failure to state a claim (first), failure to mitigate (third), functionality (fourth), lack of secondary meaning (eighth), no likelihood of confusion (ninth), generic trade dress (tenth), unclean hands (eleventh), no use as a trademark (twelfth), no damages (thirteenth). These affirmative defenses have not been challenged in plaintiff's instant motion for partial summary judgment.

[3] The case was initially assigned to United States Chief Judge James C. Dever III. On May 7, 2018, the case was reassigned to United States District Judge Louise W. Flanagan.

relating to the alleged distinctiveness and secondary meaning of plaintiff's trade dress. (Id. at 18).[4]

Following multiple extensions to the discovery deadline, discovery closed on December 2, 2016. Plaintiff filed the instant motion for partial summary judgment on defendant's second, fifth, sixth, and seventh affirmative defenses and for partial summary judgment on defendant's counterclaims on January 20, 2017.[5] In support, plaintiff relies on statement of materials facts as well as declaration of Susan Hight ("Hight"), plaintiff's manager of corporate communications; deposition testimony from John Cole ("Cole"), plaintiff's employee and one of the inventors of plaintiff's United States Patent Number 5,092,274 for a "Poultry Feeder" ("the '274 Patent")[6]; deposition testimony from David J. Marr ("Marr"), plaintiff's attorney, relating to his involvement in the prosecution of plaintiff's trademark applications to the PTO; and the '988 and '371 Registrations issued by the PTO.

Also on January 20, 2017, defendant filed the instant motion for summary judgment. In support, defendant relies on statement of material facts, file histories of the '988 and '371 Registrations, and declaration of Andrew Shores, defendant's attorney, with supporting exhibits

---

[4] Magistrate Judge Gates additionally recommends the presiding district judge over trial issue the following adverse inference jury instructions:

CTB withheld from the United States Patent and Trademark Office and subsequently destroyed competitor advertising materials it had compiled in connection with its application for the '988 registration for product configuration that were adverse to that application.

CTB deleted response data obtained in its 2013 survey on the acquired distinctiveness and secondary meaning of the trade dress of its feeder that was adverse to the conclusion of the 2013 survey that as of January 2013 the trade dress did have acquired distinctiveness and secondary meaning.

(DE 74 at 24).

[5] Defendant does not challenge plaintiff's motion for partial summary judgment as to defendant's affirmative defenses of acquiescence (second affirmative defense) and abandonment (seventh affirmative defense). DE 130 at 4 n.1.

[6] Plaintiff's '274 Patent can be found at DE 127-1 at 89-101.

4

including plaintiff's and other companies' patents and feeder advertisements. Additionally, defendant relies upon deposition testimony from Cole; Marr; Dave Laurenz ("Laurenz"), plaintiff's sales manager who was deposed both in 2015 and 2016; Hight, who was also deposed both in 2015 and 2016; W. Thomas Herring ("Herring"), defendant's president; Trevor Houston ("Houston"), defendant's national sales manager; C. Douglas Westfall ("Westfall"), defendant's chief financial officer; Frank Harris ("Harris"), product engineer with defendant; Victor Mancinelli ("Mancinelli"), plaintiff's president and CEO, and David Haas ("Haas"), who provided expert report in support of defendant, opining as to available remedies for trade dress infringement damages.[4] Defendant also relies upon expert reports of Thomas Maronick ("Maronick"), who provides an "analysis of marketing practices of poultry feeders and rebuttal of Rhonda Harper surveys," (DE 127-13) and Carmen Parkhurst ("Parkhurst"), who opines the trade dress asserted by plaintiff is functional and therefore is not eligible for registration under the Lanham Act, (DE 127-5).

In response to defendant's motion for summary judgment, plaintiff filed opposing statement of material facts and in support relies upon deposition errata of Marr; declaration from Marr; deposition testimony from Parkhurst; and email from Herring. Additionally, plaintiff relies upon rebuttal expert reports from Kenneth B. Germain ("Germain"), asserting the trade dress asserted by plaintiff is not functional, (DE 132-2), and Jeanna Wilson ("Wilson"), asserting that commercial poultry is not particularly attracted to red and gray materials in their environment, (DE 132-3); as well as expert reports provided by Rhonda J. Harper ("Harper") in which she opines as to secondary meaning acquired by plaintiff's feeder and likelihood of

---

[4] Cole, Laurenz, Hight, and Mancinell were designated and thereafter deposed as plaintiff's representative corporate witnesses.

confusion as to plaintiff's and defendant's feeders, based on surveys conducted by Harper in both 2013 and 2015, (DE 132-5, DE 132-6).

In response to plaintiff's motion for summary judgment, defendant filed an opposing statement of material facts and in support relies upon additional exhibits from both Laurenz and Marr's depositions, deposition testimony from Germain and Hight, supplemental declaration of Shores, and expert report provided by Robert F. Cissel ("Cissel"), asserting that the trade dress asserted by plaintiff is functional, (DE 133-3).

On March 17, 2017, defendant filed the instant motion in limine to "exclude plaintiff's expert Rhonda Harper," (DE 142), to which defendant filed opposition. Additionally, on June 6, 2017, plaintiff filed the instant unopposed motion for hearing regarding defendant's motion in limine.

Following the filing of the above motions, the parties filed a joint motion "for a stay of the case pending engineering tests and settlement," informing the court that the parties were in discussion concerning "a potential design change to the products at issue that could resolve the present dispute," but that feasibility tests would need to be conducted. (DE 153 at 1-2). On July 31, 2017, the court granted the parties' motion to stay. (DE 154). On March 13, 2018, the parties filed a joint motion to lift stay, informing the court that the parties remain at an impasse as to settlement following feasibility tests, which the court granted on April 6, 2018, reactivating the instant motions. (DE 162). Since that time, both parties have filed notice of subsequently decided controlling authority. (DE 164, DE 166).

## STATEMENT OF THE FACTS

Except as otherwise stated, the undisputed facts relevant to the resolution of the instant motions may be summarized as follows.

6

Plaintiff is a corporation headquartered in Milford, Indiana, and is a designer, manufacturer, and marketer of agricultural systems and solutions for servicing the poultry, hog, egg production, and grain industries. (DE 117 ¶¶ 1-2; DE 131 ¶¶ 1-2). Plaintiff, through its Chore-Time Group division, designs, manufactures, and markets equipment for poultry grow-out facilities, mainly for breeder and broiler chickens and turkeys, including pan feeders. (DE 117 ¶¶ 2, 4; DE 131 ¶¶ 2, 4).[5]

Pan feeders, which have become the industry standard, usually consist of a pan (bottom portion in which feed collects), grill (top portion, which is usually made up of spokes of varying number, size, and shape), and center cone (or central feed distribution mechanism). (DE 117 ¶¶ 5-6; DE 131 ¶¶ 5-6). Plaintiff has sold the MODEL C2® feeder since 1991 and the MODEL C2® PLUS feeder since 1998 or 1999. (DE 117 ¶¶ 7-10; DE 131 ¶¶ 7-10; DE 138 ¶ 70).

Feeders are sold to roughly forty "integrators," such as Sanderson Farms, who dictate which feeders individual growers may use. (DE 120 ¶ 55 ; DE 132 ¶ 55). Integrators own the chickens in the grower houses and therefore have considerable influence over what equipment growers purchase. (DE 120 ¶ 56; DE 132 ¶ 56).

1.      Plaintiff's '274 Patent, '988 Registration,'371 Registration, and '732 Patent

In 1992, plaintiff was issued the '274 Patent for a "Poultry Feeder," which expired on October 30, 2010. (DE 117 ¶¶ 11-12; DE 131 ¶¶ 11-12). An explicit object of the '274 Patent was to "provide a poultry feeder having a barrier for preventing birds and animals from bodily climbing into the feeder yet simultaneously allowing those that do force their way inside to easily exit without sustaining injury or damaging the feeder apparatus." (DE 120 ¶ 15 (citing

---

[5] Broiler chickens are chickens bred and raised specifically for meat production; breeder chickens are used to produce eggs that hatch into broiler chickens. (DE 117 ¶ 3; DE 131 ¶ 3).

'274 Patent, col. 1, ll. 63-68); DE 132 ¶ 15).  The '274 Patent discloses a locking brood gate and

a mechanism for rotationally unlocking and locking the pan structure and grill structure together.

(DE 117 ¶ 13; DE 131 ¶ 13).[6]


An embodiment of the poultry feeder as found in '274 Patent is found below:



('274 Patent, Fig. 2).

The advances in the '274 Patent were incorporated into plaintiff's MODEL C2® PLUS

feeder; additionally, the profile of the MODEL C2® and MODEL C2® PLUS feeders, profile in

the '274 Patent, and profile in plaintiff's asserted trade dress are all the same.  (DE 120 ¶ 2; DE

132 ¶ 2).  From when they were first sold, both the MODEL C2® and MODEL C2® PLUS

---

[6] The parties dispute the additional disclosures of the '274 Patent.  Plaintiff argues the '274 Patent's additional
teachings are limited to "spoke members" having a "T-shaped cross-section," which allowed "chicks to get back out of
the feeder more easily." (DE 117 ¶¶ 13-14; DE 131 ¶¶ 13-14).   Defendant argues the '274 Patent additionally discloses
a "barrier" or "grill means" having a utilitarian "profile" distinguishable from other "prior art feeders."  (DE 120 ¶ 2;
DE 132 ¶ 2).

feeders have a configuration characterized by a pan structure and a grill structure wherein, when viewed from any side, the pan feeder has a "generally flattened octagonal profile." (DE 117 ¶¶ 15-17; DE 131 ¶¶ 15-17).

On November 18, 2010, roughly three weeks after the expiration of the '274 Patent, plaintiff filed United States Trademark Application No. 85/180,347 on November 18, 2010, to register the configuration of its pan feeders ("the '347 product configuration application"), which the PTO rejected as being functional. (DE 117 ¶¶ 18-19; DE 131 ¶¶ 18-19).

Concurrent with rejection, the PTO also asked for information, including "[a]dvertising, promotional and/or explanatory materials concerning the applied-for configuration mark, particularly related to the design features embodied in the applied-for mark," and a request for "a written explanation and any documentation concerning similar designs used by competitors." (DE 117 ¶ 20; DE 131 ¶ 20; DE 126-1 at 73-74). The PTO also asked for "[a] written explanation as to whether there are alternative designs available for the feature(s) embodied in the applied-for mark, and whether such alternative designs are equally efficient and/or competitive." (DE 117 ¶ 21; DE 131 ¶ 21; DE 126-1 at 74).

Following plaintiff's response to the PTO,[7] the PTO issued the '988 Registration on March 27, 2012, to plaintiff, who is the owner of all right, title, and interest in the registration, and the image depicted[8] in that registration is as follows:

_____

[7] The parties dispute whether plaintiff's response to the PTO was complete or accurate. (See DE 117 ¶¶ 22-23, 25-26; DE 131 ¶¶ 22-23, 25-26).

[8] The image depicted in both the '988 Registration and '371 Registration is the "shallow pan" version of plaintiff's feeder, not the "standard pan" version, although plaintiff argues that the "overall Product Configuration Trade Dress . . . is not materially altered" by this distinction. (DE 131 ¶ 85; DE 138 ¶ 85).

9



(DE 117 ¶¶ 27-29, 31; DE 131 ¶¶ 27-29, 31; DE 125-4).[9]

The mark described in the '988 Registration is as follows:

The mark consists of a three-dimensional configuration of a unique mechanized poultry feeder which includes a pan structure and a grill structure. When viewed from any side, the perimeter of the feeder has a generally octagonal shape as it has two generally vertical sides, one defined at the bottom of the pan structure and the other defined at the top of the grill structure, and four generally diagonal sides which inter connect the vertical sides to the horizontal sides. Internal angles between the diagonal sides and the vertical sides are generally smaller than the internal angles between the diagonal sides and the horizontal sides. The matter shown in broken lines is not part of the mark and serves only to show the position or placement of the mark.

(DE 117 ¶ 30; DE 131 ¶ 30; DE 125-4).

Plaintiff also filed United States Trademark Application No. 85/180,324 on November 18, 2010, to register the configuration of its pan feeders, including both the product configuration described above and a color combination of red pan and gray grill ("the '324 color combination application"), which the PTO rejected on the basis that the product configuration

---

[9] Broken and dotted lines are used to indicate the portions that are not claimed as part of the mark. U.S. Dept. of Commerce, Patent and Trademark Office, Trademark Manual of Examining Procedure §807.08.

was functional.  (DE 117 ¶¶ 40-41; DE 131 ¶¶ 40-41).[10]  Thereafter, plaintiff amended its application, seeking registration only for color combination, arguing that a combination of red and gray was not functional, which the PTO rejected multiple times on the basis that the color combination was not inherently distinctive.  (DE 117 ¶¶ 41-42; DE 131 ¶¶ 41-42).

Plaintiff amended the application to seek registration on the supplemental register, and the PTO issued the '371 Registration on February 12, 2013, to plaintiff, who is the owner of all right, title, and interest in the registration.[11]  (DE 117 ¶¶ 43-44, 48; DE 131 ¶¶ 43-44, 48).

The image depicted on the '371 Registration is as follows, which illustrates a red pan and gray grill:



(DE 117 ¶ 46; DE 131 ¶ 46; DE 125-5 ).

The mark described in the '371 Registration is as follows:

_____

[10] On February 3, 2011, plaintiff filed a petition to make special both the '347 product configuration application and the '324 color combination application, discussed more below, stating that defendant's sale of its feeder created a "likelihood of confusion as to the source" between plaintiff and defendant.  (DE 131 ¶ 76; DE 138 ¶ 76).  A petition to make special is a request for prioritized examination.  See 37 C.F.R. §1.102.

[11]  A registered trademark is entitled to a statutory presumption of validity.  See 15 U.S.C. § 1057(b) (registration is "prima facie evidence of the validity of the registered mark and of the registration of the mark, of the owner's ownership of the mark, and of the owner's exclusive right to use the registered mark in commerce on or in connection with the goods or services specified . . . .").  However, registration on the supplemental register is not entitled to such presumption.  15 U.S.C. § 1057(b).

The mark consists of the colors red and gray as it appears on the surface of the poultry feeder. The color red is provided on the surfaces of the pan and the color gray is provided on the surfaces of the grill of the poultry feeder. The overall shape of the poultry feed is no [sic] claimed as a feature of the mark.

(DE 117 ¶ 47; DE 131 ¶ 47; DE 125-5).

United States Patent No. 6,571,732 (hereinafter "the '732 Patent"), is an additional patent owned by plaintiff, which teaches in pertinent part: "[I]t is relatively well known within the agricultural industry that adult turkeys and chickens are attracted to the color red and, therefore, many adult turkey and chicken feeding trays are now colored red in order to entice the adult turkeys and chickens to move towards the red feeding tray so that it is easier for the adult turkey and chickens to find their food." (DE 117 ¶ 56; DE 131 ¶ 56).

The '732 Patent also teaches: "For example, chickens and adult turkeys are known to be attracted to the color red and, thus, the feeder 10 is preferably formed with a reddish color when chickens or adult turkeys will be feeding from the feeder." (DE 117 ¶ 57; DE 131 ¶ 57).

Finally, the '732 Patent also teaches:

The feeder 10 is also preferably integrally formed with a plurality of reflective particles 36. The particles 36 are visible from any viewpoint and are preferably disposed at random throughout the feeder 10, although, it is envisioned that patterns of particles could be formed if desired. The particles 36 allow reflection from lighting within the poultry house 14, or natural light, which is noticed by the agricultural animals. The animals will then be drawn or attracted to the reflecting particles 36 and, thus, the feeder 10. Because the animals are then attracted to the feeder 10, the animals will be able to find and eat their food. The reflective particles 36 are preferably metallic flecks or flakes, such as titanium or aluminum, or any other metallic or non-metallic material that will bond with the nonreflective material of the feeder 10.

(DE 117 ¶ 58; DE 131 ¶ 58).

2.      Defendant's Competing Product

By at least October 2009, plaintiff was aware of rumors that defendant was developing its own feeder based on plaintiff's MODEL C2® and MODEL C2® PLUS feeders.  (DE 131 ¶ 73 (citing DE 133-1 at 4 (Laurenz, Sales and Marketing Manager, stating "We have picked up a rumor that they are now trying to copy our feeder in China"); DE 138 ¶ 73).  Plaintiff obtained, at least as early as January 2011, two samples of defendant's feeder products and conducted a complete analysis.[12]  (DE 131 ¶ 75; DE 138 ¶ 75).

Throughout this time period up to and including filing of suit, plaintiff did not provide direct notice to defendant of plaintiff's trade dress rights.  (DE 131 ¶ 77; DE 138 ¶ 77).[13]

As provided by plaintiff, images of plaintiff's feeder and defendant's competing feeder are pictured below:



---

[12]  Plaintiff disputes that prior to January 2011 "it had any idea at this time that [defendant] intended to identically clone or had actually cloned [plaintiff's] feeders for sale in the marketplace."  (DE 138 ¶¶ 71-74; see also id. ¶ 77 (plaintiff "denies that it had any indication that [defendant] was developing a 'copy' of [plaintiff's] Model C2 feeder in 2009")).

[13]  Plaintiff argues notwithstanding that defendant had constructive notice in that "the applications that are the subject of this lawsuit were public records."  (DE 138 ¶ 77).

(DE 132 ¶ 63; DE 132-8 at 2).  Each feeder has the parties' respective registered brand names molded onto the upper grill portion and bottom pan portion of the feeders.  (DE 127-11 at 113:8-23; DE 132 ¶ 66).

## COURT'S DISCUSSION

A.    Standard of Review

1.    Summary Judgment

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The party seeking summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact."  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).

Once the moving party has met its burden, the non-moving party must then "come forward with specific facts showing that there is a genuine issue for trial."  Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586–87 (1986) (internal quotation omitted).  Only disputes between the parties over facts that might affect the outcome of the case properly preclude the entry of summary judgment.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986) (holding that a factual dispute is "material" only if it might affect the outcome of the suit and "genuine" only if there is sufficient evidence for a reasonable jury to return a verdict for the non-moving party).

"[A]t the summary judgment stage the [court's] function is not [itself] to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."  Id. at 249.  In determining whether there is a genuine issue for trial, "evidence of the

14

non-movant is to be believed, and all justifiable inferences are to be drawn in [non-movant's] favor." Id. at 255; see United States v. Diebold, Inc., 369 U.S. 654, 655 (1962) ("On summary judgment the inferences to be drawn from the underlying facts contained in [affidavits, attached exhibits, and depositions] must be viewed in the light most favorable to the party opposing the motion.").

Nevertheless, "permissible inferences must still be within the range of reasonable probability, . . . .and it is the duty of the court to withdraw the case from the [factfinder] when the necessary inference is so tenuous that it rests merely upon speculation and conjecture." Lovelace v. SherwinWilliams Co., 681 F.2d 230, 241 (4th Cir. 1982) (quotations omitted). Thus, judgment as a matter of law is warranted where "the verdict in favor of the non-moving party would necessarily be based on speculation and conjecture." Myrick v. Prime Ins. Syndicate, Inc., 395 F.3d 485, 489 (4th Cir. 2005). By contrast, when "the evidence as a whole is susceptible of more than one reasonable inference, a [triable] issue is created," and judgment as a matter of law should be denied. Id. at 489-90.

B.    Analysis

1.    Defendant's Motion for Summary Judgment

Plaintiff brings two sets of claims against defendant: 1) trademark infringement claims, pursuant to the Lanham Act and common law, regarding both defendant's product configuration trade dress and color trade dress, and 2) unfair competition claims, pursuant to the Lanham Act, the North Carolina UDTPA, and common law. The court will address each set of claims in turn below.

a.   Trademark Infringement Claims

"The trade dress of a product consists of its 'total image and overall appearance,' including 'its size, shape, color or color combinations, texture, graphics, or even particular sales techniques.'" <u>Ashley Furniture Indus., Inc. v. SanGiacomo N.A. Ltd.</u>, 187 F.3d 363, 368 (4th Cir.1999) (citing <u>Two Pesos, Inc. v. Taco Cabana, Inc.</u>, 505 U.S. 763, 764 n. 1 (1992)). "A claim of trade dress infringement requires proof of three elements: (1) the trade dress is primarily non-functional; (2) the trade dress is inherently distinctive or has acquired a secondary meaning; and (3) the alleged infringement creates a likelihood of confusion." <u>Tools USA and Equip. Co. v. Champ Frame Straightening Equip. Inc.</u>, 87 F.3d 654, 657 (4th Cir.1996).

Regarding the first element, the Supreme Court has stated that "'a product feature is functional,' and cannot serve as a trademark, 'if it is essential to the use or purpose of the article or if it affects the cost or quality of the article.'"[14] <u>TrafFix Devices, Inc. v. Marketing Displays, Inc.</u>, 532 U.S. 23, 32–33 (2001) (citing <u>Inwood Laboratories, Inc. v. Ives Laboratories, Inc.</u>, 456 U.S. 844, 850 n.10 (1982)). "In other words, a feature is functional if 'it is the reason the device works,' or its exclusive use 'would put competitors at a significant non-reputation-related disadvantage.'" <u>McAirlaids, Inc. v. Kimberly-Clark Corp.</u>, 756 F.3d 307, 310–11 (4th Cir. 2014) (citing <u>TrafFix</u>, 532 U.S. at 32, 34).

---

[14] The PTO no longer uses the terms "de facto" and "de jure" to designate the categories in refusing registration. <u>See</u> U.S. Dept. of Commerce, Patent and Trademark Office, Trademark Manual of Examining Procedure § 1202.02(a)(iii)(B) (explaining that because the Supreme Court and the Lanham Act do not use these terms, examining attorneys will not use them in office actions). However, these terms are used in case law and by the parties. Currently at issue is de facto functional features, which may be entitled to trademark protection, versus de jure functional features, which may not. <u>See</u> <u>Valu Engineering, Inc. v. Rexnord Corp.</u>, 278 F.3d 1268, 1274 (Fed. Cir.2002) ("de facto functional means that the design of a product has a function, <u>i.e.</u> a bottle of any design holds liquid . . . . De jure functionality means that the product has a particular shape because it works better in this shape.") (citation omitted). The present issue is whether plaintiff's feeder "works better" because of its configuration. If so, the configuration is functional and not protectable.

"When assessing a design element's functionality, courts often look" to the <u>Morton-Norwich</u> factors: "(1) the existence of utility patents, (2) advertising focusing on the utilitarian advantages of a design, (3) the availability of 'functionally equivalent designs,' and (4) the effect of the design on manufacturing." <u>McAirlaids</u>, 756 F.3d at 313 (citing <u>Valu</u>, 278 F.3d at 1276; <u>In re Morton–Norwich Prods., Inc.</u>, 671 F.2d 1332, 1340–41 (C.C.P.A.1982)).

However, the Supreme Court has made clear that if functionality is properly established under <u>Inwood</u>, that is, if a product feature is "essential to the use or purpose of the article or if it affects the cost or quality of the article," further inquiry is not necessary. <u>TrafFix</u>, 532 U.S. at 33 ("Where the design is functional under the <u>Inwood</u> formulation there is no need to proceed further to consider if there is a competitive necessity for the feature."); <u>see also</u> <u>In re Becton, Dickinson and Co.</u>, 675 F.3d 1368, 1378 (Fed. Cir. 2012) ("[S]ince the patent and advertising evidence established functionality, the Board did not need to analyze whether alternative designs exist.").[15]

Finally, the Supreme Court has instructed that "[t]rade dress protection must subsist with the recognition that in many instances there is no prohibition against copying goods and products." <u>TrafFix</u>, 532 U.S. at 29.

### i. Product Configuration Trade Dress Infringement Claim

Consistent with the first <u>Morton-Norwich</u> inquiry and as similarly addressed by the Supreme Court in <u>TrafFix</u>, "[t]he principal question in this case is the effects of an expired patent

---

[15] The Supreme Court's decision in <u>TrafFix</u> did not alter the Federal Circuit's prior approach to the analysis of functionality, a position adopted by the Fourth Circuit in <u>McAirlaids</u>. <u>See</u> <u>Valu</u>, 278 F.3d at 1276 ("We do not understand the Supreme Court's decision in <u>TrafFix</u> to have altered the <u>Morton-Norwich</u> analysis. We do not read the Court's observations in <u>TrafFix</u> as rendering the availability of alternative designs irrelevant. Rather we conclude that the Court merely noted that once a product feature is found functional based on other considerations there is no need to consider the availability of alternative designs, because the feature cannot be given trade dress protection merely because there are alternative designs available."); <u>McAirlaids</u>, 756 F.3d at 312.

on a claim of trade dress infringement," the expired patent which the Supreme Court determined "has vital significance in resolving the trade dress claim." Id. Additionally, the Supreme Court stressed that a "utility patent is strong evidence that the features therein claimed are functional." Id. at 29; see also In re Becto, 675 F.3d at 1375 ("TrafFix does not require that a patent claim the exact configuration for which trademark protection is sought in order to undermine an applicant's assertion that an applied-for mark is not de jure functional. Indeed, TrafFix teaches that statements in a patent's specification illuminating the purpose served by a design may constitute equally strong evidence of functionality.").

Here, plaintiff's expired utility patent, the '274 Patent, claims multiple advances, including "a poultry feeder having a barrier for preventing birds and animals from bodily climbing into the feeder yet simultaneously allowing those that do force their way inside to easily exit without sustaining injury or damaging the feeder apparatus," in contrast to prior art whose "shape and configuration of the barriers" allowed "birds which force their way in the feeder apparatus [to] become trapped inside." ('274 Patent, col. 1, ll. 35-38, 63-68). This functional advance is echoed multiple times in the claims of the patent and is specifically connected to the configuration of the feeder; the patent claims:

> 1. A feeder assembly for birds or animals . . . comprising: . . .
> d. grill means for preventing consuming birds and animals from bodily climbing into said assembly; . . . .
> 3. The feeder assembly recited in claim 1, wherein said grill means comprises a plurality of spaced, spoke members having an inverted L-shaped profile and T-shaped cross-section thereby defining a rectangular area within the assembly and making it easier for birds and animals to climb out of the feeder than to climb in. . . .
> 10. A poultry feeder comprising a pan member operatively associated with feeder tube means and a feed conveyor system; barrier means for discouraging feeding poultry from climbing into the pan member . . . .
> 14. . . . . wherein said barrier means comprises a series of spaced spoke members extending from a lower perimeter of said barrier means to a

central hub member thereof loosely surrounding said cone means, and wherein said spoke members have an angle of profile of approximately 90° and T-shaped cross-sections thereby permitting consuming poultry to exit the pan member more easily than gaining access thereto. . . .

18.     Feeder apparatus comprising: a feeder tube operatively associated with a feed conveyor; a feed pan for providing access to the feed having a substantially circular perimeter of predetermined diameter; and a cage-like barrier having a central hub portion and a series of spoke members having an inverted L-shaped profile and T-shaped cross-section extending between said central hub and a substantially circular lower perimeter portion having a diameter similar to the diameter of said circular perimeter of said feed pan to define a rectangular area within the assembly which makes it easier for birds or animals to climb out of the feeder apparatus than to climb in.

(Id. at col. 8, ll. 14, 19, 26-27, 45-50; col. 9, ll. 13-16, 37-45; col. 10, ll. 3-15).

Plaintiff's utility patent, which expressly claims a feeding system with a feed pan and a grill means made up of a plurality of spaced, spoke members having an inverted L-shaped profile and where those spoke members have an angle of profile of approximately 90°, all for the stated purpose of creating a "rectangular area within the assembly which makes it easier for birds or animals to climb out of the feeder apparatus than to climb in," provides "strong evidence" of the functionality of  the configuration of plaintiff's feeder.[16]  See McAirlaids, 756 F.3d at 312 (reversing grant of summary judgment on functionality where plaintiff's "utility patents cover a process and a material" but made no mention of "a particular embossing pattern as a protected element," the pattern which was claimed in plaintiff's registered trademark).  Here, plaintiff's patent makes repeated mention of the functionality of the configuration of its feeder, the same configuration claimed in plaintiff's registered trademark.

---

[16] Plaintiff's argument, that the only "functional part of the grill structure as used in [plaintiff's] product is the T-shaped cross section of the grill members," (DE 134 at 11), is belied by the claims of the '274 Patent, which repeatedly addresses the functionality of other parts of the product's configuration.  Similarly, plaintiff's argument that "[n]one of the features claimed in the '274 Patent necessitate the use of any particular basic overall shape," (id. at 12), is likewise belied by the claims of the patent.  Although it may be true that the benefits claimed by the patent at issue may be "shared by a wide variety of poultry feeds that possess drastically different shapes," (id.), plaintiff did not claim a wide variety of drastically different shapes in its patent.

This strong evidence is further buttressed by the specification of the '274 Patent, wherein every angle of the configuration as claimed in the '988 Registration is found and is stated to be functional and no other embodiments of the patent with other configurations are acknowledged. See McAirlaids, 756 F.3d at 312 (reversing summary judgment where "patents also directly acknowledge that embossing studs of different shapes can be used"). A side-by-side comparison is useful:



'274 Patent    Configuration Trade Dress

First, regarding the grill structure found on top of the pan, the '274 specification states:

> [I]t can be seen that the central hub 44 loosely surrounds the cone member 34 and that the individual spokes 46 radially project outward therefrom at spaced intervals in a substantially horizontal direction, until turning downward to extend in a substantially vertical direction before joining with the perimeter rim 48. Accordingly, . . . the profile of each spoke members 46, in combination with the central hub 44, define an annular area 50 within the feeder 10 of significantly greater dimension in both height and depth than existed in comparable prior art feeders. . . . With the benefits of the combined effects of the above-described features, however, birds and animals [that] do find their way inside have sufficient room to maneuver past and get out of the grill means 36 easier than it was for them to get in, without suffering injury and /or damaging the feeder.

('274 Patent, col. 5, ll. 7-31) (emphasis added). Thus, the specification details the area created by the grill means and individual spokes, which provides the product's configuration in part, stating this area 1) is created by "the profile of each spoke member" combined with "the central

hub," 2) is an improvement over prior art feeders, and 3) allows for the functionality of birds entering and exiting the feeder without injury.

Plaintiff's advertisements are also persuasive evidence as to the functionality of the grill structure, which tout the following: "patented feeder grill design [that allows] young birds to exit pans easily," (DE 127-1 at 85, 87); "chick-friendly, 14-spoke grill design," (id. at 82); "Bird-friendly, 14-spoke grill design and patented feed windows," (id. at 160); "Chick-friendly 14-spoke grill design and patented feed windows," (id. at 173), "The C2 grill has been designed to allow the young birds to enter and exit the pan," (id. at 168).

Second, regarding the pan member found underneath the grill structure, identified in figure 2 above as 38 and again as 38 in figure 16 below, the specification states "the pan member 38 comprises a conical central bottom portion 86, contoured intermediate area 88 and cylindrical side wall 90. The sectional side view of the pan member 38 illustrated in FIG. 16, further illustrates that the side wall 90 terminates at a top rim 92 which includes intermittent barbs 94." (Id. col. 7, ll. 28-34).



The parties agree, and therefore it is undisputed, that the V-shaped pan structure is functional. (See DE 122 at 9; DE 134 at 9; DE 132 ¶¶ 23-24; DE 127-1 at 175: 6-20 (Cole testifying the V-shaped pan design gives plaintiff an advantage over the competition and "helps make the device work as intended")); see also, e.g., id. at 160 ("Feed-saving features include

Chore-Time's proven 'V'-shaped pan bottom design which places feed where birds can easily reach it."). Plaintiff argues, however, that the V-shaped pan structure is not part of the asserted product configuration trade dress because the pan structure is "not visible" or only "encompassed within the pan itself." (DE 134 at 14; <u>see also</u> DE 134 at 13 ("Regardless of the functionality or not of the V-shaped pan structure, it is irrelevant to the overall product shape.")).

The V-shaped pan structure dictates the profile of the pan claimed as part of the trade dress, as seen in the following demonstrative offered by plaintiff with circles added for emphasis:



(DE 132 ¶ 23; DE 144 at 5).

Finally, plaintiff argues that the section connecting the upper grill structure to the lower pan member is not functional, stating the "two vertical walls, partly formed from the pan structure," claimed in the '988 Registration is "an additional, non-functional element." (<u>Id.</u>). However, as testified by Cole, the "double-pan lip," as touted in advertisements by plaintiff, functioned to save feed. (<u>See</u> DE 127-1 at 173:9-175:5; <u>see also, e.g.</u>, <u>id.</u> at 173 ("Feed saving features include . . . double pan lip.")).

Plaintiff is not "a manufacturer seek[ing] to protect arbitrary, incidental, or ornamental aspects of features of a product found in the patent claims, such as arbitrary curves in the legs or

an ornamental pattern painted on the springs." TrafFix, 532 U.S. at 34. Here, there is no evidence to support the assertion that the configuration of plaintiff's feeder is arbitrary, incidental, or ornamental, and plaintiff's '274 Patent shows that the configuration was plaintiff's answer to the problem of how to prevent birds from becoming trapped in feeders. See Rosetta Stone Ltd. v. Google, Inc., 676 F.3d 144, 161 (4th Cir. 2012) ("Under Inwood's traditional rule, a product feature is functional if it is the reason the device works") (citations omitted).

Plaintiff's argument, that in order to show functionality, defendant must "demonstrate that the entire design is functional," and not just dissected individual features, (see DE 134 at 10), is unavailing. Plaintiff is correct that the appropriate focus is the overall trade dress rather than each dissected component. See Tools USA, 87 F.3d at 658 ("[T]he critical functionality inquiry is not whether each individual component of the trade dress is functional, but rather whether the trade dress as a whole is functional."). However, here, the trade dress as a whole is functional in that the silhouette claimed in plaintiff's '988 Registration is an arrangement of functional parts, the arrangement of which was dictated solely by functional concerns. See Groeneveld Transp. Efficiency, Inc. v. Lubecore Int'l, Inc., 730 F.3d 494, 506 (6th Cir. 2013) (finding functionality and stating "the question is whether the overall shape of Groeneveld's grease pump was substantially influenced by functional imperatives or preferences"); Leatherman Tool Grp., Inc. v. Cooper Indus., Inc., 199 F.3d 1009, 1013 (9th Cir. 1999) ("Leatherman is correct that trade dress must be viewed as a whole, but where the whole is nothing other than the assemblage of functional parts, and where even the arrangement and combination of the parts is designed to result in superior performance, it is semantic trickery to say that there is still some sort of separate 'overall appearance' which is non-functional."); Secalt S.A. v. Wuxi Shenxi Const. Machinery Co., Ltd., 668 F.3d 677, 687 (9th Cir. 2012), abrogated

23

on other grounds by SunEarth Inc. v. Sun Earth Solar Power Co., Ltd., 839 F.3d 1179 (9th Cir. 2016) ("[Plaintiff's] hoist is, at bottom, a utilitarian machine with no indication that the visual appearance of its rectangular exterior design is anything more than the result of a simple amalgamation of functional component parts. Absent are any indicia of arbitrary or fanciful design.); see also In re Heatcon, Inc., 116 U.S.P.Q.2d 1366, 1378, 2015 WL 6166638, *11 (T.T.A.B. 2015) ("While we do not foreclose the possibility, it is difficult to imagine a situation where the sum of a configuration's entirely functional parts adds up to a design capable of indicating the source of the product.").[17]

Likewise, plaintiff's arguments that "the grill can be done numerous other ways" does not alter the court's analysis. (See DE 134 at 11-12). The facts of this case are similar to those presented to the Supreme Court in TrafFix, and therefore the Court's holding that there is no need to consider whether a different design could also have accomplished this purpose is controlling. See TrafFix, 532 U.S. at 34; McAirlaids, 756 F.3d at 312 (considering alternative designs because the patents at issue did not provide the "strong evidence" of functionality, unlike in TrafFix).[18]

"Functionality . . . is a question of fact that, like other factual questions, is generally put to a jury." McAirlaids, 756 F.3d at 310. Additionally, a registered trade dress is presumed to be non-functional unless the alleged infringer demonstrates that it is functional. See 15 U.S.C. §

_____

[17] Cases cited by plaintiff do not suggest otherwise. See Blumenthal Dist., Inc. v. Herman Miller, Inc., No. 14-01926, 2016 WL 6948339, at *10 (C.D. Cal. Mar. 31, 2016) ("This dispute is whether its asserted trade dress seeks to protect arbitrary or ornamental elements of the overall design [of the chairs] rather than the specific utilitarian features of the chairs that are included in the utility patent"); Cybergun, S.A. v. Jag Precision, No. 2:12-CV-74, 2012 WL 4868104, at *5 (D. Nev. Oct. 11, 2012) ("no evidence submitted that the firearms . . . work better in their shape and configuration").

[18] The parties have not submitted evidence or argument as to the fourth Morton-Norwich factor, the effect of the design on manufacturing.

1115; but see McAirlaids, 756 F.3d at 312 n.1 (citation omitted) ("If sufficient evidence . . . is produced to rebut the presumption, the presumption is neutralized and essentially drops from the case."). Here, defendant has overcome any presumption of non-functionality, plaintiff offers no evidence its feeder's configuration was dictated by any concerns other than functionality, and the undisputed evidence establishes that the configuration of plaintiff's feeder is "essential to the use or purpose" of the feeder.[19]

Accordingly, defendant's motion for summary judgment as to plaintiff's trademark infringement claims regarding plaintiff's asserted product configuration trade dress is granted.[20]

ii.      Color Trade Dress Infringement Claim

Plaintiff also argues defendant has infringed plaintiff's trade dress by copying the color combination of plaintiff's feeder.

(a)      Trade Dress Claimed

As a threshold matter, the parties dispute what plaintiff's color trade dress entails. Plaintiff's color trade dress as registered on the supplemental register is as follows: "The mark consists of the colors red and gray as it appears on the surface of the poultry feeder. The color red is provided on the surfaces on the pan and the color gray is provided on the surfaces of the grill of the poultry feeder." DE 125-5.

It is undisputed that both plaintiff's feeder and defendant's feeder consist of a red pan and a grill that is silver with metal flakes or shiny gray. (DE 127-1 at 119:14-17 (Plaintiff's

---

[19]  Given the court's holding, it is not necessary to address defendant's argument that any presumption relied upon by plaintiff's "should be rejected in view of [plaintiff's] withholding compelling evidence that was specifically requested by the PTO." (DE 122 at 8).

[20]  Where a court finds an asserted trade dress claim to be functional, the court need not reach issues of secondary meaning and likelihood of confusion as to that claim. See TrafFix, 532 U.S. at 26 ("secondary meaning is irrelevant because there can be no trade dress protection in any event"); Tools USA, 87 F.3d at 657.

feeder "is silver with metal flake in it. The pan is red. Most of the grills are just silver or gray. We do have metal flake in ours to give us a bit of shine."); DE 127-9 at 20: 10-13 ("What color is the Classic Flood Grower select feeder? The pan and internal components are red and the grill is shiny gray")). It is additionally undisputed that plaintiff claims its feeders embody plaintiff's asserted trade dress "[s]ince at least 1991," including previous versions of plaintiff's feeders that consisted of a red pan and metal, not plastic, grills. (See DE 117 ¶ 39; DE 117-1 at 11-12). Finally, it is undisputed that chickens are attracted to shiny objects. (See, e.g., DE 132-3 at 4-5 (Plaintiff's expert Wilson stating: "I would agree that poultry are attracted to shiny metallic items in their environment"); DE 127-5 (defendant's expert Parkhurst stating: "birds including chickens have been attracted to shiny metal objects")).

Without elaboration, plaintiff asserts that the issue of metal flakes is "not material to any issue in this lawsuit," and the asserted trade dress is simply "the color gray" as found in plaintiff's color trade dress registration. (DE 132 ¶¶ 34-37). The court rejects this argument. First, the issue of metal flakes is material in that the parties agree chickens are attracted to shiny metallic or metal objects and thus could render the use of metal flakes in plaintiff's color scheme a functional choice. Second, plaintiff cannot assert a claim for trade dress infringement of the colors red and gray where neither plaintiff's or defendant's feeders utilize the gray asserted by plaintiff but instead utilize a shiny gray. To find otherwise would mean both plaintiff's and defendant's feeders do not embody plaintiff's asserted color trade dress. See Flying Pigs, LLC v. RRAJ Franchising, LLC, 757 F.3d 177, 182 (4th Cir. 2014) (citing 2 McCarthy on Trademarks and Unfair Competition § 16:18 (4th ed.) (collecting cases)) ("Our conclusion is supported by the settled proposition that '[t]rademark ownership is not acquired by federal or state registration. Ownership rights flow only from prior use[.]'").

Accordingly, the court finds plaintiff's asserted color trade dress that defendant is alleged to have infringed to be red and shiny gray.

(b)     Functionality

As stated above, just as plaintiff cannot exclude others from using its product configuration if that configuration is functional, plaintiff also cannot exclude others from employing plaintiff's functional color scheme. Plaintiff's color scheme is not registered on the principle register, thus plaintiff's color trade dress is presumed functional, and plaintiff bears the burden of proving that the claimed color combination is not functional. 15 U.S.C. § 1125(a)(3) ("In a civil action for trade dress infringement under this chapter for trade dress not registered on the principal register, the person who asserts trade dress protection has the burden of proving that the matter sought to be protected is not functional."); TrafFix, 532 U.S. at 29 (on summary judgment, "burden was on MDI to prove that its trade dress was nonfunctional, and not on TrafFix to show that it was functional" where MDI's trade dress was not registered on the principle register).

The Supreme Court has held that "color alone, at least sometimes, can meet the basic legal requirements for use as a trademark." Qualitex Co. v. Jacobson Products Co., 514 U.S. 159, 166 (1995). In Qualitex, petitioner sought trademark protection of a "special shade of green-gold color on the pads that it makes and sells to dry cleaning firms for use on dry cleaning presses." Id. at 161. The Court held that color "can act as a symbol that distinguishes a firm's goods and identifies their source, without serving any other significant purpose." Id. at 166 (emphasis added). The Court further stated "'[i]n general terms, a product feature is functional,' and cannot serve as a trademark, 'if it is essential to the use or purpose of the article or if it affects the cost or quality of the article,' that is, if exclusive use of the feature would put

27

competitors at a significant non-reputation-related disadvantage." Id. at 165 (citing Inwood, 456 U.S. at 850 n.10).

Record evidence in the form of plaintiff's own patents and witness testimony supports the conclusion the colors used by plaintiff in plaintiff's feeders are functional.

First, plaintiff's '732 Patent touts the functional advantages of using red and shiny gray in plaintiff's feeder. (See DE 117 ¶ 56; DE 131 ¶ 56 ("[I]t is relatively well known within the agricultural industry that adult turkeys and chickens are attracted to the color red and, therefore, many adult turkey and chicken feeding trays are now colored red in order to entice the adult turkeys and chickens to move towards the red feeding tray so that it is easier for the adult turkey and chickens to find their food."); (DE 117 ¶ 57; DE 131 ¶ 57) ("For example, chickens and adult turkeys are known to be attracted to the color red and, thus, the feeder 10 is preferably formed with a reddish color when chickens or adult turkeys will be feeding from the feeder."); (DE 117 ¶ 58; DE 131 ¶ 58) ("The feeder 10 is also preferably integrally formed with a plurality of reflective particles 36 . . . . Because the animals are then attracted to the feeder 10, the animals will be able to find and eat their food. The reflective particles 36 are preferably metallic flecks or flakes, such as titanium or aluminum, or any other metallic or non-metallic material that will bond with the nonreflective material of the feeder 10.")). Additionally, plaintiff's other patents also identify the utilitarian function of the color red. (See DE 132 ¶ 31; DE 127-4 at 28-40 (U.S. Pat. No. 4,527,513) col. 6, ll. 8-12 ("colored red so as to attract the poultry"); DE 127-4 at 42-47 (U.S. Pat. No. 5,456,210) col. 4, ll. 13-15 ("preferably . . .colored red or yellow for maximum attraction of the watering flock")).

Second, plaintiff's witness Cole testified he conducted testing to determine what colors birds are attracted to on various feed pans and found that the black grill and gold pan variation was best but that plaintiff's combination of red and shiny gray was "very close to the same response from the birds, and here we were using a yellowish-colored feed." (DE 127-1 at 204:19-205:14).[21] Cole also stated that although plaintiff "used the red because it was part of our color scheme," that "[r]ed is just our product color," and that "Chore-Time logos and everything else is red," Cole further testified that "I use red because it's a good color and it attracts birds, yes." (Id. at 138: 4-13,17-18).

Finally, other patents applicable to the industry also identify the advantages of including red in feeders. (See DE 127-4 at 49-52 (U.S. Pat. No. 3,664,304) at Abstract ("colored red to attract the chicks"), col. 1, ll. 58-59 (same), col 2, ll. 39-40 ("red tends to attract the chicks to the feeder, and the feeder herein is the first known feeder on the market to incorporate color attraction for the baby chicks"), col. 3, l. 6 (specifically claiming the color red); DE 127-4 at 54-59 (U.S. Pat. No. 4,981,109) at col. 3, ll. 26-27 ("The trays may be dyed with the color red to help attract the baby chicks"), col. 6, l.10 (specifically claiming the color red); DE 127-4 at 61-69 (U.S. Pat. Pub. No. 2008/0260892) at ¶ 0012 ("The color of the food-coloring agent is one that enhances consumption of animal feed by the animal. Preferably, the color is red or blue, more preferably red.")).

---

[21] Plaintiff additionally contends that if "red and gray attracted chickens, one would expect all of the feeder manufacturers in the industry to use red and gray." (DE 134 at 11). This is not the correct standard. A product's features can be functional even where those features are not widely incorporated by competitors for providing superior utility. See Disc Golf Ass'n, Inc. v. Champion Discs, Inc., 158 F.3d 1002, 1007 (9th Cir. 1998) ("A product feature need only have some utilitarian advantage to be considered functional . . . . This court has never held, as DGA suggests, that the product feature must provide superior utilitarian advantage."); Apple Inc. v. Samsung Elecs. Co., 786 F.3d 983, 991 (Fed. Cir. 2015), rev'd and remanded, 137 S. Ct. 429 (2016) ("A product feature need only have some utilitarian advantage to be considered functional").

Notwithstanding the above, plaintiff asserts there is a genuine issue of material fact whether red or gray is functional because there is no scientific evidence to support the conclusion that chickens are more attracted to these colors versus other colors. In support, plaintiff's expert Wilson reviewed technical publications from Cobb-Vantress, Inc. and Aviagen, Inc., the "two largest primary breeding companies in the world," and "5 editions of The Commercial Chicken Meat and Egg Production text starting in 1972 through 2001," considered "by many to be the most complete reference and production manual available," and found no evidence to support the conclusion that chickens are attracted to red and gray, concluding:

> commercial poultry . . . is not particularly attracted to red and gray materials in their environment. Nor do I think that these birds would be more inclined to eat from a red and gray feeder when compared to green, orange, yellow or white feeders. I would agree that poultry are attracted to shiny metallic items in their environment; however, I see no evidence that the gray colored plastic used in feeding equipment is attractive to poultry in a similar way as shiny metallic surfaces.

(DE 132-3 at 4-7). Additionally, Wilson states, with no support, that "[t]here is no scientific information on whether using gray plastic is viewed by the bird as similar to gray metallic parts. In my opinion, the gray plastic feeder parts are considerably different from the shiny metallic feeder parts used years ago. I do not believe that the gray plastic is attractive to the birds." (Id. at 8).

First, Wilson agrees that birds are attracted to shiny metallic surfaces and notably dismisses "gray plastic feeder parts" as attractive to birds in general but does not address plaintiff's gray plastic feeder parts containing metal flake, at issue here. Second, Wilson's survey of the literature consulted, and that literature's lack of reference to birds' attraction to red and shiny gray, does not overcome the presumption that plaintiff's color trade dress is functional

nor alter the undisputed evidence that plaintiff chose the colors red and shiny gray for utilitarian reasons.

Wilson offers no support for the proposition that the colors chosen by plaintiff are "ornamental, incidental, or arbitrary" or were chosen for any reason other than functionality. See TrafFix, 532 U.S. at 30 ("Where the expired patent claimed the features in question, one who seeks to establish trade dress protection must carry the heavy burden of showing that the feature is not functional, for instance by showing that it is merely an ornamental, incidental, or arbitrary aspect of the device"); Christian Louboutin S.A. v. Yves Saint Laurent Am. Holdings, Inc., 696 F.3d 206, 219 (2d Cir. 2012) (citations omitted) ("[a] feature is essential if it is dictated by the functions to be performed by the article").[22]

Additionally, plaintiff's attempt to create a triable issue of material fact by contradicting a previously asserted position found in plaintiff's '732 Patent, that chickens are attracted to red, and dismissing that position as "apocryphal lore," (DE 134 at 9), does not defeat summary judgment in this instance. See, e.g., Miller v. FDIC, 906 F.2d 972, 975-76 (4th Cir.1990) (plaintiff's contradictory testimony insufficient to create a genuine issue of fact); Townley v. Norfolk & W. Ry. Co., 887 F.2d 498, 501 (4th Cir.1989) (a party may not create an issue of fact by contradicting own testimony); Barwick v. Celotex Corp., 736 F.2d 946, 960 (4th Cir.1984) (a party examined at length on deposition cannot raise an issue of fact simply by submitting an affidavit contradicting the prior testimony); Disc Golf Ass'n, 158 F.3d at 1008 (citations omitted) ("A trademark proponent cannot create an issue of material fact regarding a shape's

---

[22] Likewise, plaintiff's expert Germain, who objects to defendant's expert Cissel's conclusions, relies on Wilson's statements, and cites plaintiff's lack of advertising as to the advantages of its color scheme, (see DE 132-2 at 14-17), also does not create a genuine issue of material fact defeating summary judgment.

functionality, and thus survive summary judgment, by contradicting an earlier assertion contained in an expired utility patent that the same feature is functional. A kind of estoppel arises. That is, one cannot argue that a shape is functionally advantageous in order to obtain a utility patent and later assert that the same shape is non-functional in order to obtain trademark protection."); Poly-Am., L.P., 124 U.S.P.Q.2d 1508 (T.T.A.B. Oct. 18, 2017) ("Simply put, its predecessors having availed themselves of the protection of the '434 patent until its expiration, Respondent's convenient change of heart falls far short of convincing us that the features described in the sixth claim were never functional and may now be the subject of trademark protection.").[23]

Plaintiff argues that the color trade dress at issue is a combination of colors, not merely red, and that "[r]egardless of whether the color red alone or the color gray alone are functional, there is no evidence that the color combination is functional." (DE 134 at 15 (citing Transportation, Inc. v. Mayflower Servs., Inc., 769 F.2d 952, 955 (4th Cir. 1985); DE 132 at 32 (plaintiff's expert Germain arguing "the red and gray color combination as displayed in the particular manner shown in [plaintiff's] mark [has no utility]")).

---

[23] Plaintiff states that while there is "apocryphal lore in the chicken industry relating to the color red," such evidence is not admissible under Daubert, because no evidence produced by defendant is "based on scientifically valid principles." (DE 134 at 13-14). Because plaintiff, not defendant, bears the burden of proving that the claimed color combination is not functional, 15 U.S.C. § 1125(a)(3); TrafFix, 532 U.S. at 29, the court need not address this argument. Additionally, functionality is a legal, not scientific, conclusion. See C5 Med. Werks, LLC v. CeramTec GmbH, 249 F. Supp. 3d 1210, 1219 n.5 (D. Colo. 2017) ("Concluding that the chromium in BIOLOX Delta is 'functional' because it increases hardness, I reiterate that this is a legal conclusion, not necessarily a scientific one, based on the evidence presented at trial."); Norwich Pharmacal Co. v. Sterling Drug, Inc., 271 F.2d 569, 572 (2d Cir. 1959) (finding pink color of Pepto-Bismol could have "functional value," notwithstanding the trial court's finding that "the pink color and ingredients producing same have no healing value in themselves."). Finally, plaintiff offers no evidence that plaintiff sought to disclaim claims made as to the functionality of the color red as found in plaintiff's patents based on plaintiff's realization that the color red conferred no functional benefit. See 35 U.S.C. § 253 ("A patentee, whether of the whole or any sectional interest therein, may . . . make disclaimer of any complete claim, stating therein the extent of his interest in such patent."); Poly-Am., L.P., 124 U.S.P.Q.2d 1508 (T.T.A.B. Oct. 18, 2017) ("there is no evidence the Respondent sought to disclaim [the color line on the product] based upon Mr. Austin's asserted realization that those features . . . conferred no functional benefit.").

As discussed at length above, a functional arrangement of functional parts remains functional. See Tools USA, 87 F.3d at 658; Groeneveld Transp. Efficiency, 730 F.3d at 506; Leatherman Tool Grp., 199 F.3d at 1013; Secalt S.A., 668 F.3d at 687. The undisputed evidence shows that, historically, plaintiff utilized a red pan and metal grill for functional reasons, and, more recently, plaintiff utilizes a red pan and gray plastic grill with metal flakes for functional reasons. See Antioch Co. v. W. Trimming Corp., 347 F.3d 150, 158 (6th Cir. 2003) ("where individual functional components are combined in a nonarbitrary manner to perform an overall function, the producer cannot claim that the overall trade dress is nonfunctional").[24]

Finally, plaintiff brings to the court's attention the recently decided Moldex-Metric, Inc. v. McKeon Prod., Inc., 891 F.3d 878, 886 (9th Cir. 2018). In Moldex-Metric, the Ninth Circuit recognized that in TrafFix, the Sixth Circuit had "erred by inquiring into the competitive necessity of the dual-spring design and speculation about other design possibilities where the device was otherwise functional under the Inwood formulation." Id. at 882. However, the Ninth Circuit determined "[u]nder Qualitex, TrafFix, and our court's own precedent, evidence of alternative colors should be considered in deciding functionality of the mark in this case," because the case concerned the "aesthetic functionality" of the green color found on plaintiff's earplugs. Id. at 886 (emphasis added). In so holding, the court contrasted utilitarian or "traditional functional analysis," wherein Inwood applies, and "aesthetic functionality" wherein

_____

[24] Plaintiff's citation to Transportation is inapposite. There, the Fourth Circuit did not disturb the district court's conclusion that the color combination red and black was protectable as found on a taxi cab, even though at that time, prior to the Supreme Court's decision in Qualitex, one color alone could not be protectable; the court additionally stressed "there was substantial, if not overwhelming, evidence of actual public confusion resulting from Mayflower's red/black color scheme," evidence not provided here. Transportation, 769 F.2d at 955; (see also DE 132 ¶ 11 (plaintiff admitting "that it is unaware of any instances of actual confusion")).

the "Inwood test does not always easily apply" and wherein "the availability of alternative designs becomes more important in assessing functionality." Id. at 883-886.[25]

This case does not concern aesthetic functionality, as defined by the Court in TrafFix or by other circuit courts, including the Ninth Circuit in Moldex-Metric, as stated above. In TrafFix, the Supreme Court held:

> It is proper to inquire into a "significant non-reputation-related disadvantage" in cases of esthetic functionality, the question involved in Qualitex. Where the design is functional under the Inwood formulation there is no need to proceed further to consider if there is a competitive necessity for the feature. In Qualitex, by contrast, esthetic functionality was the central question, there having been no indication that the green-gold color of the laundry press pad had any bearing on the use or purpose of the product or its cost or quality.

532 U.S. at 33.

Here, aesthetic functionality is not at issue, and plaintiff's utilitarian choice of red and shiny gray has significant bearing on the use or purpose of plaintiff's feeder, unlike as found in Qualitex. See Dippin' Dots, Inc. v. Frosty Bites Distribution, LLC, 369 F.3d 1197, 1203 (11th Cir. 2004) (holding color functional under traditional test and stating "[w]here the design is functional under the traditional test, there is no need to proceed further to consider if there is a competitive necessity for the feature"); Antioch Co. v. Trimming Corp., 347 F.3d 150, 156 (6th Cir. 2003) ("The traditional Inwood test for functionality is the main rule, and if a product is clearly functional under Inwood, a court need not apply the competitive-necessity test and its

---

[25] Aesthetic functionality, versus utilitarian functionality, "has for many years been the subject of much confusion" and refers to situations where "the feature may not provide a truly utilitarian advantage in terms of product performance, but provides other competitive advantages." U.S. Dept. of Commerce, Patent and Trademark Office, Trademark Manual of Examining Procedure §1202.02(a)(vi); see also Brunswick Corp. v. British Seagull Ltd., 35 F.3d 1527 (Fed. Cir. 1994) (holding color black for outboard motors was functional because, while it had no utilitarian effect on the mechanical working of the engines, it nevertheless provided other identifiable competitive advantages, for example ease of coordination with a variety of boat colors and reduction in the apparent size of the engines).

related inquiry concerning the availability of alternative designs"); see also Rosetta Stone, 676 F.3d at 162 n.6 (indicating where a design is functional under Inwood, inquiry ends).[26]

Plaintiff has failed to raise any evidence that would create a genuine issue of material fact as to whether the color choices were non-functional. Thus, TrafFix's holding, that further inquiry into competitive necessity is unnecessary, applies in this case with equal force to plaintiff's color trade dress infringement claims as it does to plaintiff's product configuration claims.

Accordingly, defendant's motion for summary judgment as to plaintiff's trademark infringement claims regarding plaintiff's asserted color trade dress is granted.[27]

In sum, plaintiff's patent covering plaintiff's feeder expired. Assuming without deciding that defendant thereafter copied plaintiff's feeder, it does not necessarily follow that plaintiff's trade dress is valid or that defendant infringed upon that trade dress. See TrafFix, 532 U.S. at 29 ("Allowing competitors to copy will have salutary effects in many instances"); Elmer v. ICC Fabricating, 67 F.3d 1571 (Fed. Cir. 1995) ("[P]atent law, not trade dress law, is the principal means for providing exclusive rights in useful product features . . . . [O]nce the '994 patent

---

[26] As stated by the Federal Circuit:

TrafFix suggests that there may be a requirement under Qualitex to inquire into a "significant non-reputation-related disadvantage" in aesthetic functionality cases, because aesthetic functionality was "the question involved in Qualitex." 121 S.Ct. at 1262. This statement has been criticized because "aesthetic functionality was not the central question in the Qualitex case." J. Thomas McCarthy, 1 McCarthy on Trademarks and Unfair Competition § 7:80, 7–198 (4th ed.2001). We need not decide what role, if any, the determination of a "significant non-reputation-related disadvantage" plays in aesthetic functionality cases, because aesthetic functionality is not at issue here.

Valu, 278 F.3d at 1276 n.4.

[27] The standard that applies to plaintiff's common law trade dress infringement claim is similar to that applied to Lanham Act claims. See Polo Fashions, Inc. v. Craftex, Inc., 816 F.2d 145, 148 (4th Cir.1987); Devan Designs, Inc. v. Palliser Furniture Corp., No. 2:91CV00512, 1992 WL 511694, at *14 (M.D.N.C. Sept. 15, 1992), aff'd, 998 F.2d 1008 (4th Cir. 1993). Here, plaintiff alleges no additional facts concerning the common-law claim. The court grants defendant's motion for summary judgment as to this claim for the same reasons stated above.

expires, the public will be entitled to practice the invention claimed in the patent."); <u>Dorr-Oliver, Inc. v. Fluid-Quip, Inc.</u>, 94 F.3d 376, 383-84 (7th Cir. 1996) (after the plaintiff "reaped the rewards of its patents" on an industrial machine for the patent term, "the product passed into the public domain"; thereafter, defendant's introduction of a look-alike machine is not unfair competition when clearly labeled as to source).  Here, defendant has overcome the presumption of validity of plaintiff's product configuration trade dress, plaintiff has failed to carry its burden regarding its color trade dress, and plaintiff has offered no evidence that plaintiff's asserted trade dress, product configuration or color, was dictated by anything other than wholly functional concerns.

Therefore, defendant's motion for summary judgment as to each of plaintiff's trademark infringement claims is granted.

### b.    Unfair Competition Claims

In addition to trademark infringement claims, plaintiff brings claims under the Lanham Act and common law for unfair competition as well as a claim under the North Carolina UDTPA.

The Lanham Act creates a private right of action for victims of "false or misleading" representations or descriptions in commercial promotion, labeling, or advertisement.  15 U.S.C. § 1125(a).[28]  Similarly, the UDTPA prohibits "[u]nfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce."  N.C. Gen. Stat.

---

[28]  Section 1117 governs the recovery awarded to a party whose rights were violated under the Lanham Act. 15 U.S.C. § 1117 ("When . . . . a violation under section 1125(a) . . . shall have been established in any civil action arising under this chapter, the plaintiff shall be entitled . . . . to recover (1) defendant's profits, (2) any damages sustained by the plaintiff, and (3) the costs of the action . . . .   In assessing profits the plaintiff shall be required to prove defendant's sales only . . . .").

§ 75-1.1.  To prove a claim under either statute, plaintiff must establish that his injuries were proximately caused by the defendant's unfair trade practice.  See Lexmark Int'l, Inc. v. Static Control Components, Inc., 134 S.Ct. 1377, 1395 (2014) ("To invoke the Lanham Act's cause of action for false advertising, a plaintiff must plead (and ultimately prove) an injury to a commercial interest in sales or business reputation proximately caused by the defendant's misrepresentations."); Walker v. Fleetwood Homes of N. Carolina, Inc., 362 N.C. 63, 71–72 (2007) ("[i]n order to establish a violation of N.C.G.S. § 75-1.1, a plaintiff must show: (1) an unfair or deceptive act or practice, (2) in or affecting commerce, and (3) which proximately caused injury to plaintiffs"); Belmora LLC v. Bayer Consumer Care AG, 819 F.3d 697, 707–08 (4th Cir. 2016) (citations omitted) (applying Lexmark in the context of a 15 U.S.C. § 1125(a) claim, stating a "Lexmark background principle is that a statutory cause of action is limited to plaintiffs whose injuries are proximately caused by violations of the statute"); see also Muhler Co. v. Ply Gem Holdings, Inc., 637 F. App'x 746, 747 (4th Cir. 2016) (affirming grant of summary judgment, holding "[t]o prove a claim under either [substantively similar South Carolina statute or the Lanham Act], the plaintiff must establish that his injuries are proximately caused by the defendant's unfair trade practice").[29]

---

[29] Under North Carolina common-law, a plaintiff must also establish injury proximately caused by defendant's unfair competition.  See Carolina Aniline & Extract Co. v. Ray, 221 N.C. 269, 20 S.E.2d 59, 61 (1942) ("Today the law of unfair competition is plastic. The test is simple, and lies in the answer to the question: Has the plaintiff's legitimate business been damaged through acts of the defendants which a court of equity would consider unfair?"); Am. Rockwool, Inc. v. Owens-Corning Fiberglas Corp., 640 F. Supp. 1411, 1444 (E.D.N.C. 1986) ("It is the court's view that the standard for establishing proximate cause as an element of plaintiff's claims under N.C.Gen.Stat. §§ 75–1.1, 75–5(b)(3) and 75–16, the federal Lanham Act and the common law torts of unfair competition and disparagement are essentially the same."); BellSouth Corp. v. White Directory Publrs., Inc., 42 F.Supp.2d 598, 615 (M.D.N.C.1999) (citing Carolina Aniline, 221 N.C. at 269) (stating the standard for violation of the UDTPA and common law unfair competition are not "appreciably different").

Although the issue of proximate cause is usually a question for the jury, see Lamm v. Bissette Realty, Inc., 327 N.C. 412, 418 (1990), here plaintiff has submitted no evidence to show the plaintiff was harmed by defendant's alleged misuse of plaintiff's trade dress.

Plaintiff's damages expert Haas briefly mentions, as a possible injury suffered by plaintiff, the price erosion of plaintiff's feeder, (DE 127-15 at 59:12-15 ("I have not quantified any damages in the form of lost sales or lost profits. I made a reference to price erosion damages [in the expert report at paragraph 31] but have not quantified that.")), which plaintiff does not pursue or indeed reference in its opposition to defendant's motion for summary judgment, (see DE 134 at 23 (stating only that defendant's sales during the alleged infringing period is plaintiff's "measure of damages")).[30]

Haas stated his support for a theory of price erosion stemmed 1) in part from a conversation he had with plaintiff's sales and marketing manager, Laurenz[31] and 2) "some analysis," although neither Haas nor plaintiff offers support for this analysis, and Haas concludes that other than what was said in paragraph 31 of his report, Haas did not "render[] any opinion with respect to price erosion harm." (DE 127-15 at 97:15-98:22). Plaintiff does not dispute there is no evidence in support of the theory of price erosion. (DE 120 ¶ 69 ("plaintiff has no

---

[30] Although plaintiff states that it "has submitted a report of David Haas," citing "Ex. R," (DE 134 at 23), plaintiff is mistaken. Plaintiff's exhibit Q, found at DE 127-15, contains the deposition of David Haas, whereas plaintiff's exhibit R, found at DE 133-1, contains additional exhibits from the 2015 deposition of David Laurenz. However, as deposition testimony from David Haas, as noted above, makes clear, the expert report references price erosion at one paragraph and does not provide evidentiary support for Haas' claim that "plaintiff likely suffered price erosion." (DE 127-15 at 97:15-22).

[31] Turning to the deposition of Laurenz, Laurenz stated only plaintiff's products were priced higher than its competitors and that his understanding of damages was based solely on Haas' expert report. (DE 127-10 at 43:25-45:22; 83:5-10; 267:23-268:13. Laurenz additionally testified that plaintiff was not "claiming its lost profits from lost sales of C2 Plus or other feeders as damages." (Id. at 268:14-17).

evidence to support its speculative allegations of 'price erosion' or similar economic harm"); DE 132 ¶ 69 (in response offering only evidence of defendant's revenue from sales).

Accordingly, the court finds there is no genuine dispute of material fact as to whether plaintiff has established injuries proximately caused by the defendant's unfair trade practice, and summary judgment is granted to defendant as to plaintiff's claims under the Lanham Act and under common law for unfair competition as well as plaintiff's claim under the North Carolina UDTPA.

## CONCLUSION

Based on the foregoing, defendant's motion for summary judgment (DE 118) is granted. Plaintiff's motion for partial summary judgment (DE 115) is DENIED AS MOOT. Additionally, defendant's motion in limine to exclude plaintiff's expert Rhonda Harper (DE 142) and defendant's unopposed motion requesting hearing on defendant's motion in limine (DE 148) are DENIED AS MOOT.  The clerk is DIRECTED to close the case.

SO ORDERED, this the 22nd day of August, 2018.

_____
LOUISE W. FLANAGAN
United States District Judge